## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

—————————————————————x
:
MARIA DESOUSA, On Behalf of Herself And : Civil Action No. 08-CV-6626
All Others Similarly Situated, :
:
      Plaintiff, :
:
      vs. :
:
LEHMAN BROTHERS HOLDINGS INC., :
RICHARD S. FULD, JR., ERIN M. CALLAN, :
WENDY M. UVINO, MICHAEL L. AINSLIE, :
JOHN F. AKERS, ROGER S. BERLIND, :
THOMAS H. CRUIKSHANK, MARSHA J. :
EVANS, SIR CHRISTOPHER :
GENT, JERRY A. GRUNDHOFER, :
ROLAND A. HERNANDEZ, HENRY :
KAUFMAN, JOHN D. MACOMBER, THE :
EMPLOYEE BENEFIT PLAN COMMITTEE, :
THE COMPENSATION AND BENEFITS :
COMMITTEE, JOHN DOES 1-20, :
:
      Defendants. :
:
—————————————————————x

[Additional Captions Follow]

### DECLARATION OF LORI G. FELDMAN IN SUPPORT OF THE
### MOTION OF PLAINTIFF MARIA DESOUSA FOR CONSOLIDATION,
### APPROVAL OF THE PROPOSED LEADERSHIP STRUCTURE,
### ENTRY OF [PROPOSED] PRETRIAL ORDER NO. 1 AND
### RESPONSE IN OPPOSITION TO THE RESPECTIVE COMPETING
### MOTIONS OF PLAINTIFFS RINEHART/FONG AND PLAINTIFF BUZZO

```
-------------------------------------------------x
                                                 :
ALEX E. RINEHART, On Behalf of Himself And       :   Civil Action No. 08-CV-5598 (LAK)
All Others Similarly Situated,                   :
                                                 :
                    Plaintiff,                   :
                                                 :
        vs.                                      :
                                                 :
LEHMAN BROTHERS HOLDINGS INC.,                    :
RICHARD S. FULD, JR., MICHAEL L.                 :
AINSLIE, JOHN F. AKERS, ROGER S.                 :
BERLIND, THOMAS H. CRUIKSHANK,                   :
MARSHA JOHNSON EVANS, SIR                        :
CHRISTOPHER GENT, ROLAND A.                      :
HERNANDEZ, HENRY KAUFMAN, JOHN D.                :
MACOMBER, ERIN M. CALLAN, WENDY M.               :
UVINO, THE EMPLOYEE BENEFIT PLANS                :
COMMITTEE, and JOHN DOES 1-10,                   :
                                                 :
                    Defendants.                  :
                                                 :
-------------------------------------------------x
                                                 :
JO ANNE BUZZO, Individually And On Behalf        :   Civil Action No. 08-CV-6245 (UA)
of All Others Similarly Situated,                :
                                                 :
                    Plaintiff,                   :
                                                 :
        vs.                                      :
                                                 :
LEHMAN BROTHERS HOLDINGS INC.,                   :
WENDY M. UVINO, LEHMAN BROTHERS                  :
HOLDINGS INC. EMPLOYEE BENEFIT                   :
PLANS COMMITTEE, JOHN DOES 1-10,                 :
HENRY KAUFMAN, JOHN F. AKERS, ROGER             :
S. BERLIND, MARSHA JOHNSON EVANS and            :
ROLAND A. HERNANDEZ,                            :
                                                 :
                    Defendants.                  :
                                                 :
                                                 :
-------------------------------------------------x
```

[Additional Caption Follows]

————————————————————————x
:
MONIQUE MILLER FONG, On Behalf Of :    Civil Action No. 08-CV-6282 (LAK)
Herself And All Others Similarly Situated, :
:
Plaintiff, :
:
vs. :
:
LEHMAN BROTHERS HOLDINGS INC., :
RICHARD S. FULD, JR., MICHAEL L. :
AINSLIE, JOHN F. AKERS, ROGER S. :
BERLIND, THOMAS H. CRUIKSHANK, :
MARSHA JOHNSON EVANS, SIR :
CHRISTOPHER GENT, JERRY A. :
GRUNDHOFER, ROLAND A. HERNANDEZ, :
HENRY KAUFMAN, JOHN D. MACOMBER, :
ERIN M. CALLAN, WENDY M. UVINO, THE :
EMPLOYEE BENEFIT PLANS COMMITTEE, :
and JOHN DOES 1-10, :
:
Defendants. :
:
————————————————————————x

I, LORI G. FELDMAN, hereby declare the following under penalty of perjury:

1.      I am an attorney duly licensed to practice before the courts of the State of New York and Washington State.  I am a member of the firm Milberg LLP and am an attorney for Plaintiff Maria DeSousa and the putative class in the above-referenced actions.  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      I submit this declaration in support of Plaintiff Maria DeSousa's Motion For Consolidation, Approval of the Proposed Leadership Structure, entry of [Proposed] Pretrial Order No. 1 and response in opposition to the respective competing motions of Plaintiffs Rinehart/Fong and Plaintiff Buzzo made in the above-captioned actions.

3.     Attached hereto as Exhibit A is a true and correct copy of the firm résumé of Milberg LLP.

4.     Attached hereto as Exhibit B is a true and correct copy of the firm résumé of Zimmerman Reed P.L.L.P.

5.     Attached hereto as Exhibit C is a true and correct copy of the firm résumé of Lockridge Grindal Nauen P.L.L.P.

6.     Attached hereto as Exhibit D is a true and correct copy of the firm résumé of Harwood Feffer LLP.

7.     Attached hereto as Exhibit E is a true and correct copy of a hearing transcript before the Honorable John W. Bissell, *In re Royal Dutch/Shell Transport ERISA Litig.*, No. 04-CV-1398 JWB-SDW (D.N.J. Aug. 22, 2005).

8.     Attached hereto as Exhibit F is a true and correct copy of Plaintiff DeSousa's letter requesting plan documents from Lehman Brothers Holdings Inc. pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4).

9.     Attached hereto as Exhibit G is a true and correct copy of the Class Action Complaint, filed by Plaintiff Maria DeSousa.

10.     Attached hereto as Exhibit H is a true and correct copy of plaintiff's letter to the Department of Labor enclosing a copy of the Class Action Complaint filed by Plaintiff Maria DeSousa pursuant to 29 U.S.C. § 1132(h).

11.     Attached hereto as Exhibit I is a true and correct copy of plaintiff's letter to the Department of Treasury enclosing a copy of the Class Action Complaint filed by Plaintiff Maria DeSousa pursuant to 29 U.S.C. § 1132(h).

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 28th day of July 2008, at New York, New York.

_____*/s/ Lori G. Feldman*___
Lori G. Feldman

# EXHIBIT A

# Milberg LLP

## THE FIRM'S PRACTICE AND ACHIEVEMENTS

Milberg LLP was founded in 1965 and was one of the first law firms to prosecute class actions in federal courts on behalf of investors and consumers. The Firm pioneered this type of litigation and is widely recognized as one of the nation's leading defenders of the rights of victims of corporate and other large-scale wrongdoing. The Firm has principal offices in New York City and Los Angeles. The Firm's practice focuses on the prosecution of class and complex actions in many fields of commercial litigation, emphasizing securities, corporate fiduciary, ERISA, consumer, insurance, antitrust, mass tort, human rights, and related areas of litigation.

In the Firm's early years, its founding partners built a new area of legal practice in representing shareholders' interests under the then recently amended Rule 23 of the Federal Rules of Civil Procedure, which allowed securities fraud cases, among others, to proceed as class actions. In the following decades, the Firm obtained decisions that established important legal precedents in many of its areas of practice and prosecuted cases that set benchmarks in terms of case theories, organization, discovery, trial results, methods of settlement, and amounts recovered and distributed to clients and class members.

Important milestones in the Firm's early years include the Firm's involvement in the U.S. Financial litigation in the early 1970s, one of the earliest large class actions, which resulted in the $50 million recovery for purchasers of the securities of a failed real estate development company; the Ninth Circuit decision in *Blackie v. Barrack* in 1975, which established the fraud-on-the-market doctrine for securities fraud actions; the Firm's co-lead counsel position in the *In re Washington Public Power Supply System (WPPSS) Securities Litigation*, a seminal securities fraud action in the 1980s in terms of complexity and amounts recovered; the representation of the Federal Deposit Insurance Corp. in a year-long trial to recover banking losses from a major accounting firm, leading to a precedent-setting global settlement; attacking the Drexel-Milken "daisy chain" of illicit junk-bond financing arrangements with numerous cases that resulted in substantial recoveries for investors; representing life insurance policyholders defrauded by "vanishing premium" and other improper sales tactics and obtaining large recoveries from industry participants; and ground-breaking roles in the multi-front attack on deception and other improper activities in the tobacco industry.

Milberg remains at the forefront in its areas of practice. Significant litigation results include: Tyco International Ltd. Securities Litigation. ($3.2 billion settlement); Nortel Networks Litigation (settlement for cash and stock valued at $1.142 billion); Lucent Technologies Securities Litigation ($600 million recovery); Raytheon Co. Securities Litigation ($460 million recovery); Managed Care Litigation (recoveries over $1 billion and major changes in HMO practices); the WPPSS litigation (settlements totaling $775 million), and NASDAQ Market Makers Antitrust Litigation ($1 billion recoveries). Milberg has been responsible for recoveries valued at approximately $45 billion during the life of the Firm.

The Firm is consistently active in *pro bono* litigation, highlighted by its leadership role in the Swiss Bank Litigation, which led to the recovery of $1.25 billion from Swiss banks to benefit victims of the Holocaust and its efforts representing claimants of the September 11 Victim Compensation Fund.

The Firm's lawyers come from many different professional backgrounds. They include former federal or state prosecutors, private defense attorneys, and government lawyers. The Firm's ability to pursue claims against defendants is augmented by its team of investigators, headed by a former agent for the Federal Bureau of Investigation, and a full-time staff of forensic accountants and financial analysts.

For more information, please visit www.milberg.com.

# JUDICIAL COMMENDATIONS

In *In re September 11 Victim Compensation Fund*, Preliminary Hearing, Claim No. 212-003658 (Dec. 9 2003), Special Master Kenneth R. Feinberg stated the following regarding the Firm's commitment to the public interest:

> Once again, as I have learned over the years here in New York, the Milberg Weiss firm steps up to the plate in the public interest time and time again. The social conscience of the Milberg Weiss firm, acting through its excellent associates and partners, help deal with crises that confront the American people and others, and I am personally in the debt of Milberg Weiss for the work that it is doing, even under the gun with the December 22 deadline looming. I am once again in Milberg Weiss' debt for their extraordinary willingness to help out in the public interest, and I hope you'll relay that message back to the firm. . . . [T]hey are second among none in terms of the public interest, and I'm very, very grateful, not only to you guys for doing this, but . . . for the firm's willingness to help out. I wanted to let everybody know that.

Milberg has been commended by countless judges all over the country for the quality of its representation in class action lawsuits. In approving a $3.2 billion securities fraud settlement, one of the largest in history, in *In re Tyco Int'l, Ltd. Sec. Litig.*, No. 02-1335 (D.N.H. Dec. 19, 2007), Judge Barbadoro lauded Milberg's efforts:

> This was an extraordinarily complex and hard-fought case. Co-Lead Counsel put massive resources and effort into the case for five long years, accumulating [millions of dollars in expenses] and expending [hundreds of thousands of hours] on a wholly contingent basis. But for Co-Lead Counsel's enormous expenditure of time, money, and effort, they would not have been able to negotiate an end result so favorable for the class. . . . Lead Counsel's continued, dogged effort over the past five years is a major reason for the magnitude of the recovery[.]

In *Simon v. KPMG LLP*, No. 05-3189, 2006 U.S. Dist. LEXIS 35943, at *18, 30-31 (D.N.J June 2, 2006), a case in which Milberg served as class counsel, Judge Cavanaugh, in approving the $153 million settlement, found that "Plaintiffs [] retained highly competent and qualified attorneys" and that "[t]he Initial Complaint . . . demonstrates that [Milberg] expended considerable time and effort with the underlying factual and legal issues in this case before even filing this lawsuit. . . . Settlement discussions were conducted over a period of some fourteen months with the supervision and guidance of Judges Politan and Weinstein, and are evidence of [Milberg's] appreciation of the merits and complexity of this litigation."

In *In re Lucent Technologies, Inc. Securities Litigation*, No. 00-621, slip op. at 14-15, 26 (D.N.J. Feb. 24, 2004), Judge Pisano issued an Opinion approving the settlement of the Lucent Technologies Securities Litigation, in which he complimented Milberg (Co-Lead Counsel for the Plaintiff Class) as follows:

> [T]he attorneys representing the Plaintiffs are highly experienced in securities class action litigation and have successfully prosecuted numerous class actions throughout the United States. They are more than competent to conduct this action. Co-Lead Counsel diligently and aggressively represented the Plaintiffs before this Court and in the negotiations that resulted in the Settlement . . . the efforts and ingenuity of Lead Plaintiffs and Lead Counsel resulted in an extremely valuable Settlement for the Benefit of the Class.

In *In re Rite Aid Corp. Securities Litigation*, 269 F. Supp. 2d 603, 611 (E.D. Pa. 2003), Judge Dalzell commented on the skill and efficiency of the Milberg attorneys litigating the complex case:

> At the risk of belaboring the obvious, we pause to say a specific word about . . . the skill and efficiency of the attorneys involved. [Milberg was] extraordinarily deft and efficient in handling this most complex matter. [T]hey were at least eighteen months ahead of the United States Department of Justice in ferreting out the conduct that ultimately resulted in the write-down of over $1.6 billion in previously reported Rite Aid earnings. . . . In short, it would be hard to equal the skill class counsel demonstrated here.

In *In re IKON Office Solutions, Inc. Securities Litigation*, 194 F.R.D. 166, 195 (E.D. Pa. 2000), where Milberg served as co-lead counsel, Judge Katz commented on the skill and professionalism of plaintiffs' co-lead counsel:

> First, class counsel is of high caliber and has extensive experience in similar class action litigation. . . . Each of the co-lead counsel firms has a national reputation for advocacy in securities class actions, and there is no doubt that this standing enhanced their ability both to prosecute the case effectively and to negotiate credibly. Similarly, defense counsel has a fine reputation and has displayed great skill in defending this complex class action. Their opposition to plaintiffs has been anything but token, and many of the battles on crucial issues were hard fought.

> Of particular note in assessing the quality of representation is the professionalism with which all parties comported themselves. The submissions were of consistently high quality, and class counsel has been notably diligent in preparing filings in a timely manner even when under tight deadlines. This professionalism was also displayed in class counsel's willingness to cooperate with other counsel when appropriate. . . . This cooperation enabled the parties to focus their disputes on the issues that mattered most and to avoid pointless bickering over more minor matters.

In *In re NASDAQ Market-Makers Antitrust Litigation*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998), in an opinion approving settlements totaling over $1.027 billion, Judge Sweet commented:

> Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

In approving a $100 million settlement in *In re Prudential Securities Inc. Partnership Litigation*, 912 F. Supp. 97, 101 (S.D.N.Y. 1996), in which Milberg was one of the lead counsel, Judge Pollack noted that he "had the opportunity at first hand to observe the quality of plaintiffs' class counsel's representation, both here and in prior complex litigation, and is impressed with the quality of plaintiffs' class counsel."

# PROMINENT CASES

- *In re Tyco International Ltd., Securities Litigation*, MDL Docket No. 02-1335-B (D.N.H.). Milberg served as co-lead counsel in this litigation, which involved claims under the Securities Act of 1933 and the Securities Exchange Act of 1934 against Tyco and its former CEO, CFO, general counsel and certain former directors that arise out of Tyco's $5.8 billion overstatement of income and $900 million in insider trading, plus hundreds of millions of dollars looted by insiders motivated to commit the fraud. Claims were also made under the 1933 and 1934 Acts against PricewaterhouseCoopers LLP, which is alleged to have published false audit opinions on Tyco's financial statements during the Class Period and to have failed to audit Tyco properly, despite knowledge of the fraud. On December 19, 2007, the court approved a $3.2 billion

settlement of the plaintiffs' claims and praised the work of co-lead counsel.

- *In re Sears, Roebuck and Co. Securities Litigation*, No. 02-7527 (N.D. Ill.). This case involved allegations that Sears concealed material adverse information concerning the financial condition, performance and prospects of Sears' credit card operations. The approved settlement provides $215 million to compensate investors who purchased Sears securities between October 24, 2001 and October 17, 2002 and suffered a loss thereon. As an additional benefit to the Class, Sears agreed to separately pay the costs of class notice and settlement administration.

- *In re American Express Financial Advisors Securities Litigation*, No. 04-1773 (S.D.N.Y.). This case involved allegations that American Express Financial Advisors violated securities laws by representing to class members that the

company would provide tailored financial advice, when the company actually provided "canned" financial plans and advice designed to steer clients into American Express and certain nonproprietary mutual funds. The case settled for $100 million, with the settlement agreement requiring that the company institute remedial measures.

- *In re Lucent Technologies, Inc. Securities Litigation*, No. 00-621 (AJL) (D.N.J.). This settlement provides compensation of $600 million to aggrieved shareholders who purchased Lucent stock between October 1999 and December 2000.

- *In re Raytheon Securities Litigation*, No. 99-12142 (D. Mass.). This case concerned claims that a major defense contractor failed to write down assets adequately on long term construction contracts. In May 2004, Raytheon and its auditor PricewaterhouseCoopers LLP settled for a total of $460 million.

- In *In re Rite Aid Securities Litigation*, Master File No. 99-1349 (E.D. Pa.), Judge Dalzell approved class action settlements totaling $334 million against Rite Aid ($207 million), KPMG ($125 million -- the second largest amount ever recovered from an accounting firm in a federal securities class action, and the largest ever against an auditor in a case where the securities claims were limited to claims under section 10(b), which requires proof of knowing or reckless misconduct), and certain former executives of Rite Aid ($1.6 million).

- In *In re CMS Energy Corp. Securities Litigation*, No. 02-72004 (E.D. Mich.), Judge Steeh approved a cash settlement in excess of $200 million in a federal securities fraud case arising out of alleged round-trip trading practices by CMS Energy Corporation. Milberg served as co-lead counsel in this litigation.

- *In re Deutsche Telekom AG Securities Litigation*, No. 00- 9475 (NRB) (S.D.N.Y.). Milberg served as co-lead counsel in this securities class action, alleging that Deutsche Telekom issued a false and misleading registration statement which improperly failed to disclose its plans to acquire VoiceStream Wireless Corporation and materially overstated the value of the Company's real estate assets. On July 29, 2005, Judge Buchwald approved a settlement of $120 million in cash.

- *In re CVS Corp. Securities Litigation*, No. 01-11464 (JLT) (D. Mass). Milberg served as co-

lead counsel in this class action alleging that defendants engaged in a series of accounting improprieties and issued false and misleading statements which artificially inflated the price of CVS stock. On September 7, 2005, Judge Tauro approved a settlement of $110 million dollars in cash for shareholders who acquired CVS stock between February 6, 2001 and October 30, 2001.

- *In re Scheiner v. i2 Technologies, Inc.*, No. 01-418 (N.D. Tex.). This case alleged securities fraud against defendants relating to the company's software product descriptions and alleged violations of Generally Accepted Accounting Principles. In May 2004, Milberg recovered a settlement of $84.85 million.

- Milberg served as co-lead counsel in *Irvine v. ImClone Systems*, Inc., No. 02-0109 (RO) (S.D.N.Y.), in which a settlement of $75 million in cash was approved by the Court in July 2005. Plaintiffs alleged that ImClone issued a number of misrepresentations and fraudulent statements to the market regarding the likelihood of approval of the drug Erbitux, thereby artificially inflating the price of ImClone stock.

- The Firm was lead counsel in *In re Prudential Insurance Co. Sales Practice Litigation*, No. 95-4704 (AMW) (D.N.J.), a landmark case which concerned securities claims as well as common law claims and which resulted in a recovery exceeding $4 billion for Prudential policyholders. The settlement was approved in a comprehensive decision handed down by the Third Circuit.

- In *In re NASDAQ Market-Makers Antitrust Litigation*, MDL 1023, No. 94-3996 (S.D.N.Y.), Milberg served as court-appointed co-lead counsel for a class of investors. The class alleged that the NASDAQ market-makers set and maintained wide spreads pursuant to an industry-wide conspiracy in one of the largest and most important antitrust cases in recent history. After more than three years of intense litigation, the case settled for a total of $1.027 billion, the largest antitrust settlement ever.

- *In re Washington Public Power Supply System Securities Litigation*, MDL 551 (D. Ariz.) was a massive securities fraud litigation in which Milberg served as co-lead counsel for a class that obtained settlements totaling $775 million after several months of trial.

- *In re Exxon Valdez*, No. 89-095 (D. Alaska) and *In re Exxon Valdez Oil Spill Litigation*, 3

AN-89-2533 (Alaska Super. Ct. 3d Jud. Dist.). Milberg is a member of the Plaintiffs' Coordinating Committee and co-chair of Plaintiffs' Law Committee in the massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. A jury verdict of $5 billion was obtained; certain issues are currently on appeal.

- In *In re Managed Care Litigation*, MDL 1334 (S.D. Fla.). Final approval of a settlement between a nationwide class of physicians and defendant CIGNA Healthcare valued in excess of $500 million dollars was granted on April 22, 2004. A similar settlement valued in excess of $400 million involving a nationwide class of physicians and Aetna was approved by the Court on November 6, 2003. The settlements stem from a series of lawsuits filed in both state and federal court by physicians and medical associations currently pending against many of the nation's largest for-profit health insurers arising from conduct involving issues dating back to 1990. These settlements bring sweeping changes to the health care industry and involve improvements to physician-related business practices and provide for the establishment of an independent foundation dedicated to improving the quality of health care in America.

- *In re Baldwin United Annuity Litigation*, No. M-21-35 (S.D.N.Y.). Milberg served as co-lead counsel in this consolidated proceeding on behalf of purchasers of annuities that settled for over $160 million.

- *In re MicroStrategy, Inc. Securities Litigation*, No. 00-473 (E.D. Va.). Milberg served as co-lead counsel in this action, which alleged securities fraud based on a massive restatement. Settlements with the defendants totaled in excess of $150 million.

- *In re Sunbeam Securities Litigation*, No. 98-8258 (S.D. Fla). Milberg acted as co-lead counsel for the class. Plaintiffs alleged that Sunbeam, its auditor, and its management engaged in a massive accounting fraud which led to a restatement of over three years of previously reported financial results. The Court approved a combined settlement of over $140 million. The settlement amount included a $110 million settlement with Arthur Andersen LLP, Sunbeam's auditor. The Andersen settlement is one of the largest amounts ever paid by a public accounting firm to settle claims brought under the federal securities laws. The settlement with the individuals was achieved on the eve of trial, and ended almost four years of litigation against Andersen and Sunbeam's insiders, including Albert Dunlap, Sunbeam's former Chairman and CEO. The settlement included a personal contribution from Dunlap of $15 million.

- In *In re Computer Associates Securities Litigation*, Nos. 98-4839, 02-1226 (TCP) (E.D.N.Y.), Milberg served as co-lead counsel and obtained a pretrial settlement valued at over $134 million in these securities fraud class actions.

- In *In re IKON Office Solutions, Inc. Securities Litigation*, MDL 1318, No. 98-4286 (E.D. Pa.), Milberg served as co-lead counsel and obtained a pretrial settlement of $111 million in this securities fraud class action.

- In *In re W.R. Grace & Co. (Official Committee of Asbestos Personal Injury Claimants v. Sealed Air. Corp. and Official Committee of Asbestos Personal Injury Claimants v. Fresenius Medical Care Holdings, Inc.)*, Nos. 02-2210 and 02-2211 (D. Del.), Milberg acted as lead counsel for the asbestos personal injury and property damage committees in two separate fraudulent conveyance actions within the W.R. Grace bankruptcy. The actions sought to return the assets of Sealed Air Corporation and Fresenius Medical Care Holdings (each of which had been Grace subsidiaries pre-bankruptcy) to the W.R. Grace bankruptcy estate. Complaints in both cases were filed in mid-March 2002, and agreements in principle in both cases were reached on November 27, 2002, the last business day before trial was set to begin in the Sealed Air matter. The total of the two settlements, which consisted of both cash and stock, was approximately $1 billion.

- *In re Nortel Networks Corp. Securities Litigation*, No. 01-1855 (S.D.N.Y.). This federal securities fraud class action was commenced in February 2001 against Nortel Networks Corp. and certain of its officers and directors. In February 2002, Milberg was appointed to serve as sole Lead Counsel for the Class and for the Court-appointed Lead Plaintiff, the Trustees of the Ontario Public Service Employees' Union Pension Plan Trust Fund. In January 2003, the Court sustained the Complaint in its entirety, denying defendants' motion to dismiss and, in September 2003, certified a Class for all purposes. In certifying the Class, the Court specifically rejected defendants' argument that those who traded in Nortel securities on the Toronto Stock

Exchange (and not the New York Stock Exchange) should be excluded from the Class. The Second Circuit denied defendants' attempted appeal. On January 29, 2007, the court approved a settlement valued at $1.142 billion.

- Milberg is prosecuting numerous class actions involving a significant area of abuse directed at investors: deceptive sales of deferred annuity tax shelters to investors for placement in retirement plans that are already tax-qualified. In *Nelson v. Pacific Life Ins. Co.*, No. 03-131 (S.D. Ga.) the district court approved a $60 million settlement of claims arising from such deception. In *American United Life Insurance Co. v. Douglas*, No. 29A02-0304-CV-350 (Ind. Ct. App.), denial of defendant's summary judgment motion was sustained on interlocutory appeal. The SEC and NASD have begun regulatory programs to address these problems.

- Milberg is co-lead counsel in *In re Vivendi Universal, S.A. Securities Litigation*, No. 02-5571 (RJH) (S.D.N.Y.), a securities fraud class action on behalf of U.S. and certain foreign investors. Plaintiffs allege that Vivendi and two of its senior officers concealed huge liquidity problems and hid accounting violations during the class period. The district court has denied defendants' motions to dismiss the complaint and has certified a class of purchasers from the United States, France, England, and the Netherlands. Trial is scheduled for October 2008.

- *Rabi Abdullahi v. Pfizer, Inc.*, No. 01-8118 (WHP) (S.D.N.Y.). This is a case in which the Firm has brought claims under the Alien Tort Claims act on behalf of Nigerian children and their families who were enrolled in a clinical trial of a drug by Pfizer without their knowledge. Plaintiff alleges that Pfizer's conduct violated the international prohibition on medical experimentation without informed consent when children suffering from meningitis, whose families had brought them to a local hospital for treatment, were secretly enrolled in a clinical trial of the Pfizer drug, Trovan. Plaintiffs' claims were dismissed by the trial court. The case is currently on appeal before the Second Circuit.

- *In re General Instrument Corp. Securities Litigation*, No. 01-3051 (LR) (E.D. Pa.). Milberg served as co-lead counsel and obtained a pretrial settlement of $48 million in this securities fraud class action.

- *In re Royal Dutch/Shell Transport ERISA Litig.*, No. 04-1398 (JWB) (D.N.J.). This was an ERISA breach of fiduciary duty class action against the Royal Dutch/Shell Oil Group of Companies on behalf of certain of the company's U.S. employees invested in the company's stock fund. Notably, the $90 million settlement included important provisions regarding the monitoring and training of individuals appointed to be ERISA fiduciaries.

- *In re Triton Energy Limited Securities Litigation*, No. 98-256 (E.D. Tex. Texarkana Division), settled for $42 million. Plaintiffs alleged that defendants misrepresented, among other things, the nature, quality, classification, and quantity of Triton's Southeast Asia oil and gas reserves during the period March 30, 1998 through July 17, 1998.

- Milberg served as co-lead counsel in *In re Thomas & Betts Securities Litigation*, No. 00-2127 (W.D. Tenn), in which plaintiffs recovered $46.5 million dollars in cash from the Company and $4.65 in cash from its outside auditor, KPMG. Plaintiffs alleged that Thomas & Betts engaged in a series of accounting improprieties while publicly representing that its financial statements were in compliance with GAAP, and failed to disclose known trends and uncertainties regarding its internal control system and computer and information systems.

- *In re MTC Electronic Technologies Shareholder Litigation*, Master File No. 93-0876 (JG) (E.D.N.Y.). Plaintiffs alleged that defendants issued false and misleading statements concerning, among other things, purported joint venture agreements to establish telecommunications systems and manufacture telecommunications equipment in China. The Court approved a settlement of $70 million, including $65 million in cash and $5 million worth of MTC Class A shares with "put" rights.

- In *In re PaineWebber Limited Partnerships Litigation*, Master File No. 94-8547 (SHS) (S.D.N.Y.), Milberg represented investors alleging that PaineWebber developed, marketed, and operated numerous investment partnerships as part of an ongoing conspiracy to defraud investors and enrich itself through excessive fees and commissions over a twelve-year period. On March 20, 1997, Judge Sidney Stein approved a settlement of $200 million, which consisted of $125 million in cash and $75 million worth of guarantees and fee waivers.

- In *In re Ames Department Stores, Inc.*, MDL 924 (MP) (S.D.N.Y.), Milberg represented purchasers of Ames securities alleging that defendants issued false and misleading statements regarding the success of Ames' integration of a major acquisition and the Company's future financial prospects. The Court approved a settlement of $41 million in cash.

- In *Andrews v. AT&T*, No. 91-175 (S.D. Ga.) the Firm represented a class of persons who paid for premium-billed "900-number" calls that involved allegedly deceptive games of chance, starting in 1993. Defendants included major long-distance companies, which approved the call programs and billed for the calls. Defendant MCI settled for $60 million in benefits.    The class against AT&T was decertified on appeal and the Firm prosecuted the individual plaintiffs' claims, obtaining a jury verdict in 2003 for compensatory and punitive damages.

# PRECEDENT-SETTING DECISIONS

Milberg has consistently been a leader in developing the law for investors and consumers under the federal securities, antitrust, and consumer protection laws.    The Firm has represented individual and institutional plaintiffs in hundreds of class action litigations in federal and state courts throughout the country.    In most of those cases, Milberg has served as lead or co-lead counsel for the class.    The Firm has also been responsible for establishing many important precedents, including:

- *Asher v. Baxter International, Inc.*, 377 F.3d 727 (7th Cir. 2004).    In reversing and remanding the District Court's dismissal, the Seventh Circuit resolved an important issue involving the PSLRA's "safe harbor" for forward-looking statements in plaintiffs' favor. The Court held that whether a cautionary statement is meaningful is an issue of fact, because whether a statement is meaningful or not depends in part on what the defendant knew as well as other issues of fact.    Thus, this issue is not appropriately resolved on a motion to dismiss.

- In *In re Vivendi Universal, S.A. Securities Litigation*, No. 05-5571, 2003 U.S. Dist. LEXIS 19431 (S.D.N.Y. Nov. 3, 2003), Judge Harold Baer upheld plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934, which alleged that Vivendi and two of its former executives (CEO Jean-Marie Messier and CFO Guillaume Hannezo) did not disclose to investors that: (1) Vivendi's corporate acquisition programs had brought Vivendi to the brink of a potentially catastrophic liquidity crisis; (2) although it consolidated the financial results of several majority owned subsidiaries, Vivendi did not have access to the cash flows of these entities; (3) Vivendi failed to write down billions of dollars of impaired goodwill from prior acquisitions; and (4) one of Vivendi's U.S. subsidiaries improperly recognized revenue "up front" on the full value of long term contracts. The case is particularly notable because the court held that because of defendants' activities in New York promoting Vivendi stock, defendants' conduct was more than "merely prepatory" to the alleged fraudulent scheme, and thus the court had jurisdiction not only over purchasers of Vivendi ADRs on the NYSE, but also over the claims of foreign purchasers who purchased Vivendi ordinary shares on foreign exchanges.

- *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824 (8th Cir. 2003). This important decision strongly reaffirmed the principle that whether an undisclosed fact would have been material to investors cannot ordinarily be decided on a motion to dismiss. The Eighth Circuit, stressing that "[t]he question of materiality hinges on the particular circumstances of the company in question," observed that even relatively small errors in financial statements might be material if they concern areas of particular importance to investors and raise questions about management integrity.

- *In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003). The Court sustained, in large part, the plaintiffs' initial amended complaints against more than 50 underwriters of high-tech stocks in one of the most comprehensive decisions issued under the securities laws. Milberg is a principal member of the Plaintiffs' Executive Committee in this landmark litigation.    A second round of motions to dismiss was filed by defendants in response to a limited set of

recently amended complaints, and the court sustained in significant part the plaintiffs' claims.

- *In re Cabletron Systems, Inc.*, 311 F.3d 11 (1st Cir. 2002). In this opinion, the First Circuit joined the Second Circuit in allowing a complaint to be based on confidential sources. The Court also accepted the argument made by Milberg that courts should consider the amount of discovery that has taken place in deciding a motion to dismiss and that the lack of discovery will result in a correspondingly less stringent standard for pleading securities fraud claims with particularity.

- In *Puckett v. Sony Music Entertainment*, No. 108802/98 (New York Cty. 2002), Milberg achieved a precedent-setting decision in which a class action was certified against Sony Music Entertainment on behalf of a class of recording artists who were parties to standard Sony recording or production agreements entered into at any time during the period of January 1, 1965 to the date of the filing of the complaint in 1998. The complaint alleged that Sony had a policy of treating the value added tax on foreign sales of recordings improperly thereby impermissibly reducing the royalties paid or credited to the class members. Justice DeGrasse of the New York State Supreme Court determined that class certification was appropriate and that Gary Puckett (of Gary Puckett & the Union Gap) and jazz musician and composer Robert Watson were appropriate class representatives to represent the class of artists and producers to whom Sony accounts for foreign record royalties.

- *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000). The Firm was lead counsel in this seminal securities fraud case in which the Second Circuit undertook an extensive analysis of the statutory text and the legislative history of the PSLRA and pre-existing Second Circuit case law. Among other things, the Second Circuit held that the PSLRA's pleading standard for scienter was largely equivalent to the pre-existing Second Circuit standard and vacated the district court's dismissal which sought to impose a higher standard for pleading scienter under the PSLRA. The Second Circuit also rejected any general requirement that plaintiffs' confidential sources must be disclosed to satisfy the PSLRA's newly-enacted particularity requirements.

- *In re Advanta Corp. Securities Litigation*, 180 F.3d 525 (3d Cir. 1999). Here, the Firm successfully argued that, under the PSLRA, the requisite scienter is pled by making an adequate showing that the defendants acted knowingly or with reckless disregard for the consequences of their actions. As urged by the Firm, the Third Circuit specifically adopted the Second Circuit's scienter pleading standard for pleading fraud under the PSLRA.

- In *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), the Second Circuit reversed the district court's ruling, which denied plaintiffs leave to amend to assert a cause of action against defendants for failing to disclose that the Trust was unable to utilize proper "hedging" techniques to insure against risk of loss. In the Court's view, taken together and in context, the Trust's representations would have misled a reasonable investor.

- In *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996), the First Circuit remanded plaintiffs' action after affirming, in part, Milbergs' position that in association with the filing of a prospectus related to the issuance of securities, a corporate-issuer must disclose intra-quarter, materially adverse changes in its business, if such adverse changes constitute "material changes" the disclosure of which is required pursuant to the Securities Act of 1933.

- *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493 (S.D.N.Y. 1996). The court certified a class of millions of investors, who were harmed by an industry-wide conspiracy where NASDAQ market-makers set and maintained wide spreads, over defendants' strenuous objections.

- *In re Salomon, Inc. Shareholders Derivative Litigation*, 68 F.3d 554 (2d Cir. 1995). The Second Circuit affirmed the district court's holding that derivative federal securities claims against defendants would not be referred to arbitration pursuant to the arbitration provisions of the Rules of the New York Stock Exchange, but would be tried in district court. Shortly thereafter, the case settled for $40 million.

- *Kamen v. Kemper Financial Services*, 500 U.S. 90 (1991). The Supreme Court upheld the right of a stockholder of a mutual fund to bring a derivative suit without first making a pre-suit demand.

- *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873 (9th Cir.), cert. denied, 469 U.S. 932 (1984). The Ninth Circuit upheld an investor's right to pursue a class action against an accounting firm, adopting statute of limitation rules for §10(b) suits that are favorable to investors.

- *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372 (6th Cir. 1984). The Sixth Circuit very strictly construed, and thus narrowed, the ability of a "special litigation committee" of the board of a public company to terminate a derivative action brought by a shareholder.

- *Fox v. Reich & Tang, Inc.*, 692 F.2d 250 (2d Cir. 1982), aff'd sub nom, *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984). The court held that a derivative action to recover excessive advisory fees may be brought on behalf of an investment company without any prior demand on the board.

- *Rifkin v. Crow*, 574 F.2d 256 (5th Cir. 1978). The Fifth Circuit reversed an order granting summary judgment for defendants in a §10(b) case, paving the way for future acceptance of the "fraud-on-the-market" rationale in the Fifth Circuit.

- *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976). This is the seminal appellate decision on the use of the "fraud-on-the-market" theory, allowing investors who purchase stock at artificially inflated prices to recover even if they were personally unaware of the false and misleading statements reflected in the stock's price. The court stated that class actions are necessary to protect the rights of defrauded purchasers of securities.

- *Bershad v. McDonough*, 300 F. Supp. 1051 (N.D. Ill. 1969), aff'd, 428 F.2d 693 (7th Cir. 1970). The plaintiff obtained summary judgment for a violation of §16(b) of the Securities Exchange Act in which the transaction was structured by the defendants to look like a lawful option. The decision has been cited frequently in discussions as to the scope and purpose of §16(b).

- *Heit v. Weitzen*, 402 F.2d 909 (2d Cir. 1968), rev'g, 260 F. Supp. 598 (S.D.N.Y. 1966). The court held that liability under §10(b) of the Securities Exchange Act extends to defendants who were not in privity with the named plaintiffs or the class represented by the named plaintiffs.

Additionally, in the context of shareholder derivative actions, Milberg has been at the forefront of protecting shareholders' investments by causing important changes in corporate governance as part of the global settlement of such cases. Cases in which such changes were made include:

- *In re Marketspan Corporate Shareholder Litigation*, No. 98-15884 (N.Y. Sup. Ct.). The settlement agreement in this case required modifications of corporate governance structure, changes to the audit committee, and changes in compensation awards and the nominating committee.

- *Abramsky v. Computer Sciences Corp.*, No. 98-00306 (RLH) (D. Nev. 1998). The settlement in this case required significant changes to the company's by-laws and governance procedures to enhance shareholder voting rights and the role of outside directors.

# MILBERG LLP

### *The Firm's Partners*

**JEROME M. CONGRESS** received an A.B. degree with honors from Cornell University. From 1960 to 1962 he was a Fulbright Scholar at Oxford University, England, where he studied philosophy, politics and economics. He received an LL.B. degree *cum laude* from Harvard Law School, where he was an editor of *Harvard Law Review* during 1963-1964.

Since graduating from law school, Mr. Congress has spent the bulk of his practice in commercial and securities litigation.

Mr. Congress is admitted to practice in the courts of the State of New York, as well as the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second Circuit.

**MICHAEL C. SPENCER** graduated from Yale University in 1973 with a B.A. degree, *magna cum laude*, with distinction, in philosophy. While at Yale, he was elected to Phi Beta Kappa. Mr. Spencer received a J.D. degree from Harvard Law School, *cum laude*, in 1976.

Mr. Spencer focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation.

Mr. Spencer began his legal career as a law clerk to the Honorable Wm. Matthew Byrne Jr., United States District Court, Central District of California, in 1976-77. He then returned to New York and joined Cravath, Swaine & Moore as an associate, where he worked until 1986 on antitrust, banking, real estate, commercial, and securities litigation matters. In his later years at Cravath, he represented the bond fund trustee in connection with bond defaults of Washington Public Power Supply System nuclear plants.

In 1986, he joined Milberg as an associate and became a partner later that year. He worked on the WPPSS securities fraud litigation and many of the Firm's other cases, including representation of the FDIC in its failed bank audit litigation involving the Butcher Brothers banks in Tennessee, which led to a year-long trial and a global settlement of all bank-

related claims against Ernst & Whinney just before closing arguments to the jury in late 1992. He has since worked on many of the Firm's securities fraud cases, and cases in other areas, including representation of a broad coalition of union health care funds seeking to recover costs for treating smoking-related illnesses from the tobacco industry; Year 2000 litigation; cases involving alleged kickbacks in the mortgage insurance industry; and consumer and securities fraud cases against insurance companies selling deferred annuities into qualified retirement plans.

Mr. Spencer is admitted to practice in the courts of the States of New York and California, as well as the United States District Courts for the Southern and Eastern Districts of New York, the Central District of California, and the United States Courts of Appeals for the Second, Third, Fourth, Seventh, Ninth, Eleventh, and D.C. Circuits.

**ROBERT A. WALLNER** received his B.A. degree from the University of Pennsylvania in 1976 graduating *magna cum laude*. He attended New York University School of Law, earning his J.D. degree in 1979. He was elected to the law school's Order of the Coif and served as an editor of *New York University Law Review*.

Prior to joining Milberg, Mr. Wallner was associated with Cravath, Swaine & Moore.

While at Milberg has litigated complex securities, consumer, and antitrust class actions throughout the country. He currently represents investors in *In re Initial Public Offering Securities Litigation* (S.D.N.Y) and *In re CMS Energy Corporation Securities Litigation* (E.D. Mich.). He has also represented consumers in *In re Synthroid Marketing Litigation* (N.D. Ill.) and the *Mercedes-Benz Tire Litigation* (D.N.J.).

Mr. Wallner is a frequent lecturer on securities and complex litigation issues, and serves on the editorial board of *Securities Litigation Report*, published by West Legalworks. He served as a member of the Federal Courts Committee of the Association of the Bar of the City of New York, and as a faculty member of the American Bar

Association's First Annual National Institute on Securities Litigation and Arbitration. Mr. Wallner is a member of the New York bar.

**SANFORD P. DUMAIN** attended Columbia University where he received his B.A. degree in 1978. He graduated *cum laude* from Benjamin N. Cardozo School of Law of Yeshiva University in 1981.

Mr. Dumain represents plaintiffs in cases involving securities fraud, consumer fraud, insurance fraud, and violations of the antitrust laws.

Mr. Dumain began his career as a law clerk to Judge Warren W. Eginton, United States District Court for the District of Connecticut 1981-1982. During the early years of his practice, he also served as an Adjunct Instructor in Legal Writing and Moot Court at Benjamin N. Cardozo School of Law.

Mr. Dumain has lectured for ALI-ABA concerning accountants' liability and has prosecuted several actions against accounting firms.

Mr. Dumain served on the trial team for a six-month trial in which the firm represented the City of San Jose, California, that resulted in a verdict for the City against the defendants for violations of the securities laws. More recently, he was Co-Lead Counsel in the Tyco Securities Litigation in which a $3.2 billion settlement was recovered for investors.

Judge Janet C. Hall of the District of Connecticut made the following comment in *In re: Fine Host Securities Litigation*, (No. 97-2619): "The court also finds that the plaintiff class received excellent counseling, particularly from the Chair of the Plaintiffs' Executive Committee, Attorney Dumain."

Mr. Dumain is admitted to practice in the State of New York, United States District Court for the Southern and Eastern Districts of New York, and District of Connecticut, and United States Courts of Appeals for the First, Second, Third, Sixth, Seventh, and Eighth Circuits.

**GEORGE A. BAUER III** earned his B.B.A. degree *magna cum laude* in 1976 from Bernard M. Baruch College of the City University of New York, where he majored in accounting. He was awarded the Andrew J. Coppola prize in Law from Baruch College. Mr. Bauer attended New York University School of Law and graduated with a J.D. degree in 1979.

Mr. Bauer's practice concentrates on class action settlements and settlement administration. He has played a lead role in documenting and effectuating many of the largest and most complex securities litigations settlements ever obtained, notably including:  the proposed $1.14 billion settlement for cash and stock of the *In re Nortel Networks Corp. Securities Litigation* No. 01-1855 (RMB) (S.D.N.Y.); the $1.027 billion settlement of the *In re NASDAQ Market-Makers Antitrust Litigation*, MDL No. 1023, (S.D.N.Y.); settlements relating to the $2 billion estate of the Drexel Burnham Lambert, including *In re Drexel Burnham Lambert Group*, No. 90-6954 (MP) (S.D.N.Y.) and the $1.3 billion settlement of the *In re Michael Milken & Associates Securities Litigation*, MDL 924 (S.D.N.Y.); settlements worth over $775 million in *In re Washington Public Power Supply Systems Securities Litigation*, MDL 551 (D. Ariz.); settlements including cash and securities worth over $615 million in *In re Lucent Technologies Inc. Securities Litigation*, No. 00-621 (JAP) (D. N.J.); the $200 million settlement in *In re PaineWebber Limited Partnerships Litigation*, No. 94-8547 (SHS) (S.D.N.Y.); the settlement for cash and securities worth over $137.5 million in *In re Microstrategy Inc. Securities Litigation*, No. 00-473 (E.D. Va, Alexandria Division); the settlements for securities worth over $133.5 million in *In re Computer Associates Class Action Securities Litigation*, No. 98-4839 (TCP), and *In re Computer Associates 2002 Class Action Securities Litigation*, No. 02-1226 (TCP) (E.D.N.Y.); and the $110 million settlement in *In re Prudential Securities Inc. Limited Partnerships Securities Litigation*, MDL 1005 (MP) (S.D.N.Y.).

Mr. Bauer was admitted as a member of the New York Bar in January 1980 and is also admitted to the United States District Court for the Southern and Eastern Districts of New York. Mr. Bauer is admitted to practice before the United States Supreme Court and the United States Courts of Appeals for the Second and Fourth Circuits.

Mr. Bauer is a member of the Firm's Library Committee. He is also a member of the American Bar Association, the New York State Bar Association, the Association of Trial Lawyers of

America, and the New York County Lawyers Association.

**BARRY A. WEPRIN** graduated from Harvard College in 1974. He received a J.D. degree from the New York University School of Law in 1978, and a master of public affairs from the Woodrow Wilson School of Princeton University in 1978. While in law school, Mr. Weprin was notes and comments editor of *New York University Law Review*.

Since joining Milberg in 1989, Mr. Weprin has specialized in securities and insurance litigation. He has served as co-lead counsel in a number of complex securities class action litigations, including *In re AremisSoft Securities Litigation* (D.N.J.), *In re All Star Inns Securities Litigation* (S.D.N.Y.), *In re York Research Securities Litigation* (S.D.N.Y.), and *Bharucha v. Reuters, PLC* (E.D.N.Y.). He was one of the principal attorneys in the sales practice litigations against The New York Life Insurance Company, The New England Life Insurance Service Company, The John Hancock Mutual Life Insurance Company, and The Prudential Life Insurance Company.

Previously, Mr. Weprin served as law clerk to the Honorable Charles P. Sifton of the United States District Court for the Eastern District of New York. Prior to joining Milberg, he was associated with the law firm of Wachtell Lipton Rosen & Katz, where he specialized in commercial and securities litigation. From 1985 to 1989 he served as general counsel to the New York State Housing Finance Agency and the New York State Medical Care Facilities Finance Agency, two agencies that issue tax exempt bonds for financing nonprofit medical facilities and qualified housing projects.

In approving the settlement in the *Allstar Inns* case, Judge Peter Leisure stated:

We have a situation here which is a classic example of the benefits to be derived through the class action vehicle, to have the high quality representation of the class. The reputation of counsel . . . Barry Weprin of Milberg Weiss, precedes them to this court and I'm familiar in other matters with the case in which these lawyers work.

The class was indeed fortunate to have lawyers of this caliber on this matter and the court is satisfied that the class was well-represented and had the benefits of the quality of representation that would not have otherwise been available if the class action vehicle had not been used.

Mr. Weprin is a frequent lecturer on complex litigation issues.

Mr. Weprin is a member of the American Bar Association, the Association of the Bar of the City of New York, the New York County Lawyers Association, and the New York State Bar Association. Mr. Weprin is admitted to practice in New York, the United States District Court for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second Circuit, and the United States Supreme Court.

**RICHARD H. WEISS** received an A.B. degree *summa cum laude* from Princeton University in 1979. In 1980, he received an M.Phil. degree in international relations from Cambridge University, England. He graduated from Yale Law School in 1983.

Mr. Weiss is admitted to practice in the State of New York, the United States District Court for the Eastern and Southern Districts of New York, the District of New Jersey, and the District of Arizona; the United States Courts of Appeals for the Second, Sixth, Seventh, Eighth, and Tenth Circuits, the United States Claims Court, and the United States Supreme Court.

**BRAD N. FRIEDMAN** received a B.A. degree in government from Cornell University in 1982 and a J.D. degree, *cum laude*, from New York University School of Law in 1986, where he was an editor of the Law Review.

Mr. Friedman began his legal career as a clerk for the Honorable Max Rosenn, United States Court of Appeals for the Third Circuit. He was an associate at Simpson, Thacher & Bartlett for seven years before joining Milberg.

Mr. Friedman specializes in complex commercial matters, including securities, consumer, and life insurance class actions. He has recovered billions of dollars on behalf of injured plaintiffs, including as lead counsel in numerous "vanishing premium" and "churning" life insurance sales practice class actions (including cases against Prudential and Metropolitan Life). In 2002, Mr. Friedman acted as lead counsel on behalf of various asbestos committees in the W.R. Grace bankruptcy, and successfully recovered approximately $1 billion

through a fraudulent conveyance litigation that settled on the eve of trial.

Mr. Friedman is a member of the Federal Bar Council, the American Bar Association, the American Trial Lawyer Association, the New York State Bar Association and the New York City Bar Association.

Mr. Friedman is admitted to practice in the States of New York and New Jersey, as well as the United States Courts of Appeals for the Third and Fifth Circuits, and the United States District Courts for the Southern and Eastern Districts of New York and the District of New Jersey.

**JOSHUA H. VINIK** graduated with honors from the State University of New York at Oneonta in 1983, where he majored in economics. After graduating *cum laude* from Brooklyn Law School, Mr. Vinik clerked for Magistrate (now Judge) Carol B. Amon of the United States District Court for the Eastern District of New York.

Mr. Vinik's practice focuses primarily on class actions on behalf of defrauded investors, as well as complex commercial litigation, including accountants' liability actions and derivative actions. Mr. Vinik's extensive litigation efforts on behalf of aggrieved investors include many actions which have led to significant recoveries for investors, including *In re Baan Securities Litigation* (D.D.C.); *Lasky v. Brown (United Companies Financial Securities Litigation)* (M.D. La.), *Kaufman v. Motorola, Inc.* (N.D. Ill.), and *In re Salomon Inc. Shareholders Derivative Litigation* (S.D.N.Y.).

Mr. Vinik is a member of the American Bar Association, The New York State Bar Association and the Association of the Bar of the City of New York. Mr. Vinik is admitted to practice in the courts of the State of New York, as well as the United States District Courts for the Southern and Eastern Districts of New York and the United States Courts of Appeals for the Second, Third, and Fifth Circuits.

**JEFF S. WESTERMAN** received his B.A. degree from Northwestern University in 1977, where he was selected to be a member of two senior honorary societies. He received his J.D. degree from the University of Pittsburgh in 1980, where he was a member of the Law Review.

Mr. Westerman's practice is primarily in the areas of securities fraud class actions, shareholder derivative actions, and corporate mergers and acquisition litigation. He has served as lead or co-lead counsel in cases resulting in significant corporate governance changes, and resulting in plaintiff recoveries and recognized increased value to plaintiffs totaling more than $800 million. In 2005, *The Daily Journal* recognized him as one of the top 30 securities litigators in California.

Mr. Westerman has also been the moderator or speaker for programs on complex litigation, developments in class action practice, settlements, the Sarbanes-Oxley Corporate Responsibility Act, shareholder derivative actions and trends in business litigation.

Mr. Westerman was a member (2001-2003) and Co-Chair (2002-2003) of the Central District of California Attorney Delegation to the United States Ninth Circuit Judicial Conference. He serves on the Central District of California, U.S. Magistrate Judge Merit Selection Panel (2003-present) and the standing committee on Attorney Discipline (2004-present). He is also a member of the Central District of California Attorney Settlement Officer Panel (1998-present).

Mr. Westerman was the president of the Association of Business Trial Lawyers (2004-2005); a member of the Board of Governors (1997-2005), Treasurer (2001-2002), Secretary (2002-2003) and Vice President (2003-2004). He is also on the Board of Governors of the Consumer Attorneys Association of Los Angeles (2003-present).

Mr. Westerman is a member of the Los Angeles County Bar Executive Committee for the Litigation Section and the Board of the Los Angeles Chapter of the Federal Bar Association. He is also Chair of the LA County Bar Complex Courts Bench-Bar Committee, and a member of the Bench-Bar Civil Courts Committee; and served as Judge Pro Tem in the Los Angeles Small Claims Court in 1987-1988, 1990, 1992-1993 and 1996-1997. He is a member of the Los Angeles County and Federal Bar Associations. He was on the California State Bar Task Force on Complex Litigation, and Chair of the Judicial Education Subcommittee (1997). In 2007, he was named one of Lawdragon's 3000 Leading Plaintiffs' Lawyers In America.

Mr. Westerman is admitted to practice in the courts of the State of California, as well as the

United States District Courts in California, the United States Court of Appeals for the Ninth Circuit, and the United States Supreme Court.

**JANINE L. POLLACK** graduated from Rutgers University in 1986, with high honors, with a B.A. She majored in English and French and was a member of Phi Beta Kappa. In 1989, Ms. Pollack earned her J.D. from the University of Pennsylvania School of Law, where she was a member of the International Journal of Business Law.

Since joining Milberg in 1991, Ms. Pollack has prosecuted numerous different class actions, including securities, consumer fraud, sex discrimination, and annuities cases. She is a member of the Firm's Hiring Committee; runs the Firm's CLE program; and is in charge of, and a mentor in, the Firm's Mentor program. Ms. Pollack has spoken at numerous conferences and CLE programs, including Mealey's and the Firm's in-house CLE program.

Ms. Pollack is co-chair of the Committee on Cy Pres for the Justice Center, the pro bono affiliate of the Association of the Bar of the City of New York. In addition, she is co-chair of the Women's Initiative for the National Association of Shareholder and Consumer Attorneys (NASCAT).

Ms. Pollack is a member of the American Bar Association. She was admitted to the New York State Bar in 1990. She was also admitted to the New Jersey State Bar in 1989, as well as the U.S. District Court for the District of New Jersey. In 1990, Ms. Pollack was admitted to the U.S. District Court for the Southern and Eastern Districts of New York.

**KIRK E. CHAPMAN** graduated *cum laude* from Harvard University in 1985 with a B.A. degree in biochemistry. He received his J.D. in 1989 from the University of Chicago where he was a member of the *Legal Forum* publication. Mr. Chapman's major practice areas are securities fraud class actions and employment discrimination matters.

Mr. Chapman is admitted to practice in the Courts of the State of New York as well as the United States District Courts for the Southern and Eastern Districts of New York.

**ARIANA J. TADLER** graduated from Hamilton College in 1989 with a B.A. degree. In 1992, she received her J.D. from Fordham University School of Law, where she was the Articles and

Commentary Editor of the Fordham Urban Law Journal, a member of the Moot Court Board, and the 1990 recipient of the American Jurisprudence Award in Criminal Law.

Ms. Tadler specializes in class action litigation, with an emphasis on securities fraud cases. She has extensive experience litigating complex and fast-paced cases. Currently, she is one of the principal plaintiffs' liaison counsel in the *Initial Public Offering Securities Litigation*, pending in the United States District Court for the Southern District of New York. In that capacity, she manages the litigation of several hundred separate class actions, which have been consolidated for pretrial purposes.

Ms. Tadler has chaired or spoken at numerous lectures and seminars nationwide on topics relating to electronic discovery and securities litigation. In addition, she is a member of the advisory board of Georgetown University Law Center's Advanced E-Discovery Institute.

Ms. Tadler is involved in various charity and community organizations. She currently chairs the board of directors of MFY Legal Services, Inc., a non-profit organization that seeks to provide disadvantaged New Yorkers equal access to the judicial system through community-based representation.

Ms. Tadler is admitted to the Bars of the States of New York and New Jersey, as well as the United States District Court for the Southern and Eastern Districts of New York, the District of New Jersey and the United States Court of Appeals for the Third Circuit.

**LORI G. FELDMAN** is a daughter of retired public employees and understands the importance of protecting the investments of all workers and their families against corporate fraud. In 2002-2003 and 2004-2005, she was named a "Rising Star of Washington Law" by practitioners in Seattle.

In addition to lecturing on class action practice, she has served as Co-Chair of the Continuing Legal Education Committee of the Federal Bar Association for the Western District of Washington. Recently, Ms. Feldman has participated as panel faculty in continuing legal education programs on ERISA and securities fraud class actions arising from the subprime and liquidity crisis.

Ms. Feldman's representative recoveries exceed $100 million. Recently, she recovered millions of dollars for class members in litigation involving ConAgra Foods, Inc. (D. Neb.), Amazon.com (W.D. Wash.), Paradigm Medical Industries (D. Utah), SpectraLink Corporation (D. Colo.) and Cutter & Buck (W.D. Wash.). She is currently representing shareholders in litigation involving, among several others, Beazer Homes (N.D. Ga.), China Life (S.D.N.Y.), Washington Mutual, Inc. (W.D. Wash.), Select Medical (E.D. Pa.), Rhythms Net Connections (D. Colo.), Gilead Sciences, Inc. (N.D. Cal.), and Digimarc Corporation (D. Oregon). She is also currently representing participants of defined contribution retirement plans in ERISA litigation involving, among others, General Electric (N.D.N.Y.), Fremont General Corp. (C.D. Cal.), Boston Scientific Corp. (D. Mass.), Dell Inc. (W.D. Tex), First American Corp. (C.D. Cal.), Macy's, Inc. (S.D. Ohio), Citigroup, Inc. (S.D.N.Y.), Merrill Lynch & Co., Inc. (S.D.N.Y.), and Morgan Stanley & Co., Inc. (S.D.N.Y.).

Ms. Feldman graduated from Albany Law School in 1990, where she served as an Executive Editor of the *Albany Law Review*. She has interned at the Civil Division of the United States Attorney's Office in Brooklyn, New York. She is admitted to the Bars of the States of Washington and New York and federal district and appellate courts throughout the country.

**BENJAMIN Y. KAUFMAN** earned his B.A. degree from Yeshiva University in 1988 and his J.D. degree from Benjamin N. Cardozo School of Law, Yeshiva University, in 1988, where he was a Belkin Fellow, Belkin Scholar, and a member of the *Cardozo Arts and Entertainment Law Journal*. Mr. Kaufman also received an M.B.A. degree in finance from the Stern School of Business, New York University in 1999. Prior to joining Milberg in August of 1998, Mr. Kaufman was a Court Attorney for the New York State Supreme Court, New York County (1988-1990) and Principal Law Clerk to Justice Herman Cahn of the Commercial Division of the New York State Supreme Court, New York County (1990-1998).

Mr. Kaufman focuses on class action litigation on behalf of defrauded investors and consumers as well as complex commercial litigation. Mr. Kaufman is a member of the bars of New York, New Jersey, the United States District Courts for

the Districts of New York and New Jersey, and the United States Court of Appeals for the Fourth Circuit.

**CLIFFORD S. GOODSTEIN** earned his A.B. degree from Harvard University in 1988 and his J.D. degree from New York University School of Law in 1993. After graduation, he served as a law clerk to the Honorable Alex T. Howard, Jr., Chief Judge of the United States District Court for the Southern District of Alabama, and then as an associate at Reboul, MacMurray, Hewitt, Maynard & Kristol, and Baker & Botts, prior to joining Milberg in January of 1998.

Mr. Goodstein practices in the areas of consumer fraud, securities, antitrust, and health care litigation. Mr. Goodstein is a member of the bars of New York and New Jersey.

**PETER SAFIRSTEIN** graduated from George Washington University in 1978 with a B.A. degree. He received an M.A. degree in government (concentration in international relations) from Georgetown University in 1980. In 1985, he earned his J.D. degree from Brooklyn Law School, where he was a member of the *Brooklyn Law Review* and the Moot Court Honors Society. Prior to joining Milberg, Mr. Safirstein was in private practice. In addition, Mr. Safirstein served as a staff attorney in the Enforcement Division for the U.S. Securities and Exchange Commission from 1985-1990. In 1988-89, Mr. Safirstein was designated as a special assistant United States attorney in the Southern District of New York, where he was part of the trial team which prosecuted *United States v. Regan*, (the "Princeton/Newport" case) and *United States v. Lisa Jones*. Mr. Safirstein later served as an assistant United States attorney in the Southern District of Florida.

Mr. Safirstein is a member of the American Bar Association and the Association of the Bar of the City of New York. Mr. Safirstein is a member of the Bars of the States of New York and New Jersey and is also admitted to practice before the Supreme Court of the United States, the United States Courts of Appeals for the Second and Third Circuits, the District Court of the Southern and Eastern Districts of New York and the District Court of New Jersey.

**PETER E. SEIDMAN** earned his B.A., *cum laude*, from Hobart College in 1979, following which he served as a Peace Corps volunteer living

and working among the Guarani, an indigenous tribe in Paraguay. He earned an M.A. degree in journalism in 1982 from the University of Michigan and subsequently worked as a journalist for a variety of publications. In 1994, he earned a J.D. degree, *cum laude*, from the University of Michigan Law School.

Mr. Seidman joined Milberg in 2000. His practice involves the investigation and prosecution of securities litigation on behalf of defrauded investors. Before joining Milberg, he was an associate with the New York law firm of Orans, Elsen & Lupert LLP, where he was active in both civil and white collar criminal litigation in federal and state courts.

Mr. Seidman is admitted to practice in the courts of the State of New York, as well as the United States District Courts for the Northern, Southern, and Eastern Districts of New York.

**ANITA KARTALOPOULOS** graduated with a B.A. degree from the University of Toledo, with honors in 1974, majoring in classics, and graduated from Seton Hall Law School in 1982, with an emphasis on health care law. Ms. Kartalopoulos works primarily in the areas of insurance, consumer fraud, securities, and managed care. Before joining Milberg in 1998, she was in government service in the State of New Jersey, holding several positions, including deputy commissioner of insurance for life and health, director of legal regulatory affairs for the Department of Health and Senior Services, and executive director of the New Jersey Real Estate Commission.

As deputy commissioner of insurance she managed the New Jersey Insurance Department's Multi-State Task Force investigating the sales practices of the Prudential Insurance Company. She also served on the Board of Directors of MBL Insurance Company as a rehabilitator and managed litigation pursuant to the company's rehabilitation.

Thereafter as director of legal and regulatory affairs for the Department of Health and Senior Services, Ms. Kartalopoulos was responsible for litigation management, the development of all regulations implementing the New Jersey Healthcare statutes, the development and implementation of a streamlined Certificate of Need (CN) law, and the development of stringent prompt payment regulations to ensure that HMO's meet

contractual obligations to physicians and ensure the stability of the health care network for the benefit of consumers.

As executive director of the New Jersey State Real Estate Commission, Ms. Kartalopoulos was responsible for implementing consumer disclosure/protection regulations which had been long opposed by the New Jersey real estate industry. She was also responsible for all disciplinary investigations and hearings against realtors, the inspection and registration of out of state land sales marketed in the State of New Jersey, continuing licensing of 84,000 realtors and brokers and the on-going development of real estate regulations. Ms. Kartalopoulos also worked with New Jersey Attorney General Deborah Poritz in the development of Megan's Law.

Prior to government service, Ms. Kartalopoulos specialized in local government law and land use, representing a number of municipal governments, planning boards, and boards of adjustment. She was responsible for litigation before both state and federal courts, and negotiated significant settlements with the New Jersey Council on Affordable Housing (COAH) for the benefit of low income residents of the State.

Ms. Kartalopoulos has co-authored the following publications on the subject of securities and shareholder litigation: *Deterring Executive Compensation Excesses: Regulatory Weaknesses, Litigation Strengths* (03/05) and *Vintage Wine In New Bottles: The Curious Evolution of the Concept of Loss Causation* (11/05).

Ms. Kartalopoulos is admitted to the bar of the State of New Jersey. She is also admitted to appear in the United States District Court for the District of New Jersey and the U.S. Courts of Appeals for the Federal Circuit and the Third Circuit.

**KAREN ROGERS** earned her B.A. degree from the University of California, Irvine, in 1983, her M.B.A. degree from Pepperdine University in 1990, and her J.D. degree from Southwestern University School of Law in 1996.

Ms. Rogers specializes in representing individual and institutional investors in securities fraud class actions and shareholder derivative litigation. Ms. Rogers has been with the Firm since March 1997. While at Milberg, Ms. Rogers has successfully litigated numerous class action

lawsuits which have resulted in multi-million dollar recoveries for defrauded investors, including, among others, cases such as *Mattel Securities Litigation, Accelerated Securities Litigation,* and *Hoeck v. CompUSA.*

While at Southwestern, Ms. Rogers was on the Dean's List from 1994-1995 and a member of the Law Review from 1995-1996. Ms. Rogers authored "Embryo Theft: The Misappropriation of Human Eggs at an Irvine Fertility Clinic Has Raised a Host of New Legal Concerns for Infertile Couples Using Reproductive Technologies," 26 Sw. U.L. Rev. 1133 (1997). In 1996, Ms. Rogers served as judicial extern for The Honorable Ronald S.W. Lew, United States District Court for the Central District of California.

Prior to law school, Ms. Rogers earned an NASD Series 7 securities license and worked in the securities industry for five years at Drexel Burnham Lambert's Beverly Hills office.

Ms. Rogers is a member of the Association of Business Trial Lawyers, as well as the Los Angeles County, San Fernando Valley, and American Bar Associations. Ms. Rogers is admitted to practice in the courts of the State of California, as well as the United States District Court for the Central District of California.

**CHRISTOPHER S. POLASZEK** earned his B.S. degree from Florida State University in 1992, *cum laude,* his M.B.A. degree from Florida State University in 1997, his J.D. degree from Florida State University in 1997, *cum laude,* and his LL.M. degree in Securities Regulation from Georgetown University in 2000. While in law school, Mr. Polaszek interned with the Florida Senate and United States Senator Bob Graham.

Mr. Polaszek currently specializes in securities fraud litigation. Prior to joining Milberg, Mr. Polaszek spent several years practicing commercial litigation with an emphasis on securities litigation and arbitration. In this regard, in addition to litigating matters in state and federal courts, he has represented numerous clients in securities arbitration proceedings conducted by the National Association of Securities Dealers, Inc., the New York Stock Exchange, and the American Arbitration Association.

Mr. Polaszek is a member of the Bar of State of Florida and is also admitted to practice before the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the United States District Courts for the Northern, Middle, and Southern Districts of Florida. Mr. Polaszek is also a member of the Federal Bar Association and the American Bar Association.

**MATTHEW GLUCK** was a litigation partner in Fried, Frank, Harris, Shriver & Jacobson LLP prior to joining Milberg. He frequently represented U.S. and foreign businesses and individuals in major litigation and other complex matters. He has also assisted clients in both formal bankruptcies and out-of-court restructurings of financially troubled companies.

Mr. Gluck served as adviser to the court in the restructuring of the Manville Trust in *In re Johns-Manville Corp.,* No. 85-8922 (S.D.N.Y.) and as the legal representative for future claimants in the Chapter 11 filing of Keene Corporation in *In re Keene Corp.,* No. 93-46090 (Bankr. S.D.N.Y.).

**NEIL R. FRASER** graduated from the University of Massachusetts, Amherst in 1989 with a B.A. degree in political science. In 1992, he received his J.D. degree from Whittier Law School. While in law school, Mr. Fraser externed for the Hon. Vincent P. Zurzolo, United States Bankruptcy Judge for the Central District of California.

Mr. Fraser focuses his practice in the areas of securities, mass torts, and employment discrimination. He represented the plaintiffs in the recently settled class action alleging employment discrimination at the Jacob K. Javits Convention Center, *Cokely v. NYCCOC* (S.D.N.Y.). In addition, Mr. Fraser is a key part of the team representing over 330 individuals relating to injuries they sustained by their ingestion of the diet drug combination known as *Fen-Phen* in *In re Diet Drug Litigation Venued in Bergen County.* In securities, he worked on the successfully resolved *In re Racing Champions Securities Litigation* (N.D. Ill.) and is currently a member of the team handling the landmark *In re IPO Securities Litigation,* alleging various forms of market manipulation.

Mr. Fraser is admitted to practice in New York, New Jersey, and the United States District Courts for the Southern District of New York, the Eastern District of New York, and the District of New Jersey.

**SABRINA KIM** graduated from the University of California, Los Angeles, in 1992, Phi Beta Kappa, *magna cum laude*, with a B.A. degree in Sociology. She received her J.D. degree from the University of California, Hastings College of Law in 1996.

Ms. Kim focuses primarily on securities and consumer class actions on behalf of defrauded investors and consumers. Ms. Kim came to Milberg from the California Department of Justice, where she was a deputy attorney general in the Consumer Law Section for six years. During her tenure as a state prosecutor, Ms. Kim prosecuted several high-profile, complex state and federal consumer fraud cases, including those against major predatory lenders, insurance companies, annuity mills, and others who engaged in unlawful and deceptive business practices. At Milberg, Ms. Kim was one of the principal attorneys responsible for petitioning and briefing two major California Supreme Court cases involving consumer rights: *Branick v. Downey Savings & Loan Association,* 39 Cal.4th 235 (Cal. 2006) and *Pioneer Electronics (USA) v. Superior Court (Olmstead)*, 40 Cal.4th 360 (Cal. 2007).

Ms. Kim has served as a speaker on Business and Professions Code Section 17200 and Proposition 64 for the Los Angeles County Bar Association Symposium, Mealey's Section 17200 Conference, Consumer Attorneys of California, and the American Bar Association. Ms. Kim has also taught Consumer Law as an adjunct professor at Loyola Law School, is a board member of the Association of Business Trial Lawyers, and was named a "Southern California Rising Star" (Securities Litigation) by Los Angeles Magazine in 2006 and 2007.

Ms. Kim is admitted to practice in the courts of the State of California, as well as the United States District Court for the Central, Eastern, and Northern Districts of California, and the United States Court of Appeals for the Ninth Circuit.

**MATTHEW A. KUPILLAS** graduated from the State University of New York at Albany in 1990 with a B.A. degree in philosophy. In 1994, Mr. Kupillas received his J.D. degree from New York University School of Law. Mr. Kupillas focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation. He is a member of

the bar of the State of New York and is admitted to practice before the United States District Court for the Southern and Eastern Districts of New York, the District of Colorado, the Eastern District of Wisconsin, and the United States Court of Appeals for the Tenth Circuit.

**ROSS B. BROOKS** earned his B.A. degree from Cornell University in 1992, *cum laude*, and his J.D. degree from the University of Chicago Law School in 1997.

Mr. Brooks focuses his practice on representation of whistleblowers, public and private payors, and injured consumers in litigation involving healthcare fraud and abuse, including False Claims Act, mass torts, class action, and other complex litigation. Mr. Brooks is a member of the New York State Bar Association, the New York City Bar Association, Taxpayers Against Fraud, the American Health Lawyers Association and the American Association for Justice. Mr. Brooks is also a member of the Health Law Committee of the New York City Bar Association.

Mr. Brooks is admitted to practice in the courts of the State of New York, as well as the United States District Court for the Southern District of New York.

**PAUL J. ANDREJKOVICS** graduated from Union College in 1992, Phi Beta Kappa, *magna cum laude*, with a B.A. degree in political science. In 1995, Mr. Andrejkovics received his J.D. degree from Albany Law School. He was admitted as a member of the New York Bar in 1996 and is also admitted to the United States District Court for the Northern, Southern, and Eastern Districts of New York.

His practice concentrates on class action settlements and settlement administration. Mr. Andrejkovics has played a supporting role in documenting and effectuating some of the largest and most complex securities litigations settlements ever obtained, including: the proposed $1.14 billion settlement for cash and stock of the *In re Nortel Networks Corp. Securities Litigation*, No. 01-1855 (RMB) (S.D.N.Y.); and the settlements for securities worth over $133.5 million in *In re Computer Associates Class Action Securities Litigation*, No. 98-4839 (TCP) and *In re Computer Associates 2002 Class Action Securities Litigation*, No. 02-1226 (TCP) (E.D.N.Y.).

**KENT A. BRONSON** received a B.A. from State University of New York at Binghamton in 1994. He graduated *cum laude* from University of Pittsburgh School of Law in 1998. During law school, Mr. Bronson was a research editor on the Law Review and a recipient of the Dean's Scholarship.

Mr. Bronson is currently involved in litigating numerous complex class action cases in various state and federal courts, including, among others, *In Re Biovail Corp. Securities Litigation* (in which Milberg LLP served as co-lead counsel on behalf of the Local 282 Welfare Trust Fund, and which has been tentatively settled, subject to Court approval, for $138 million and certain corporate governance modifications), *In Re Citigroup Pension Plan ERISA Litigation*, *In Re American Express Securities Litigation*, and *In Re Topps Company, Inc. Shareholder Litigation*.

Mr. Bronson is admitted to practice in New York State courts, the United States District Courts for the Southern, Eastern and Northern Districts of New York, and the United States Courts of Appeals for the Second and Tenth Circuits.

**LEIGH SMITH** focuses her practice primarily on class actions on behalf of defrauded investors. She also has significant experience with complex commercial litigation. Her involvement in the *In re*

*Tyco Int'l Ltd. Securities Litigation*, No. 02-1335, helped recover an aggregate settlement of $3.2 billion.

While at Rutgers University, Ms. Smith majored in French and was elected to Phi Beta Kappa and Phi Sigma Iota. As a graduate student, she studied French literature and film and spent a year in France working as an assistant English teacher. Ms. Smith taught French at Rutgers and at the University of Iowa prior to law school. During law school, Ms. Smith served as the Acquisitions Editor for the *Cornell Journal of Law and Public Policy* and was a member of the Cornell Moot Court Board. She was a finalist in the Cuccia Cup Moot Court Competition and received a CALI Award for Outstanding Achievement for her work in Cornell's Legal Aid Clinic. She also was active in a number of student organizations.

Prior to joining Milberg, Ms. Smith worked at large law firms in New York and New Jersey. She is admitted in the United States District Courts for the Southern District of New York, the Eastern District of New York, the District of New Jersey, and the District of Massachusetts.

### Of Counsel

**SOL SCHREIBER** received a B.A. degree, *cum laude*, in 1952 from the City College of New York, and his LL.B. degree from Yale Law School in 1955.

From 1971 through 1978, Mr. Schreiber was a United States Magistrate Judge in the United States District Court for the Southern District of New York, where he conducted more than 1,500 criminal and 3,500 civil pretrial hearings and settled approximately 1,000 civil cases. In addition to trying numerous civil and criminal cases, Mr. Schreiber supervised pretrial practice in derivative, class and complex actions in the admiralty, antitrust, aviation, securities, directors' and officers' and product liability fields, including *Berkey v. Kodak, Litton v. ATT*, the *Penn Central Commercial Paper Litigation*, the *New York Times* and *Readers' Digest* gender discrimination, the Argo Merchant-Nantucket stranding, and the Tenerife 747 collision cases.

From November 1978 to January 1982, when he joined Milberg, Mr. Schreiber served as the President and Chief Executive Officer of a unit of the Federation of Jewish Philanthropies of New York which provided centralized legal, risk management and insurance services for the Federation's hospitals, homes for the aged, and health, education and community service agencies. He was Trial Counsel from 1955 through 1971 and Resident Counsel from 1966 through 1971 of the Brooklyn office of Liberty Mutual Insurance Co.

Mr. Schreiber has been a participant in numerous special project committees for the American Bar Association and the Second Circuit. From 1960 to present, Mr. Schreiber has been the Planning and Program Chairman of more than 125 national programs, including ALI-ABA and PLI Continuing Professional Education national courses of study on

evidence, civil practice and employment discrimination litigation in federal and state courts. He has been a frequent lecturer at professional programs and workshops on federal and state court civil procedure, federal and state court trial evidence and federal criminal practice and procedure. Mr. Schreiber was a reporter for the ABA Advocacy Task Force (1970-1971), which led to the formation of the National Institute for Trial Advocacy.

From 1972 to 1987, he served as an adjunct professor at Fordham Law School teaching courses in trial advocacy, product liability, mass torts and insurance disputes. He has been editor for more than 40 CLE course handbooks and major publications on civil practice and litigation, including ALI-ABA's three-volume *Civil Practice Guide, Litigation in Federal and State Courts* (8th ed. 1998). Mr. Schreiber is a member of the Board of Editors, *Moore's Federal Practice* (2d ed.).

Mr. Schreiber served as a Court-Appointed Special Master in the *Marcos Human Rights Litigation*. He was Special Master in the Pan American Lockerbie cases, the *Agent Orange Litigation* (March 1982-January 1984), and a series of other complex federal civil cases.

Mr. Schreiber was Judicial Member, Anglo American Exchange on Civil Procedure (March 1974), and Hearing Officer, N.Y. State Master Energy Plan (fall 1979). He is the recipient of the Francis Rawle Award for outstanding achievements in post-admission legal education (ALI-ABA, July 1985) and the Presidential Award, Legal Aid Society (November 1984). Mr. Schreiber is also the founder and co-chair of the Ovarian Cancer Research Fund, Inc.

Mr. Schreiber is a member of the American Bar Association, the New York State Bar Association, the Association of the Bar of the City of New York and the American Law Institute. He is admitted to the Bar of the State of New York, to the United States District Courts for the Southern and Eastern Districts of New York, and to the Second Circuit Court of Appeals.

**ANDREW MORGANTI** practices in the fields of antitrust and securities litigation. He is one of the attorneys responsible for the prosecution of the *Initial Public Offering Securities Litigation* pending in the United States District Court for the Southern District of New York. Prior to joining Milberg in November 2006, Mr. Morganti managed his own boutique antitrust and shareholders' rights practice. In addition, between 1999 and 2003, Mr. Morganti practiced antitrust litigation with firms based in Chicago and Washington, D.C. He also served as an intern at the Federal Reserve Bank of Boston and Department of Justice of Canada, Civil Litigation Division.

## *Senior Counsel*

**JEFFREY MESSINGER** received his B.A. from the State University of New York at Stony Brook in 1980, and his J.D., from Boston University School of Law in 1985. Mr. Messinger focuses his practice primarily in the following areas: mass tort litigation, employment discrimination and False Claims Act litigation. Currently, he represents hundreds of individuals in Vioxx, Bextra, Fen Phen and Medtronic litigation. He has also obtained significant settlements on behalf of victims of employment discrimination.

**ARVIND B. KHURANA** received his B.A. from State University of New York at Albany in 1993, and a J.D. from St. John's University School of Law in 1999, *Dean's List Graduate*. While in law school, Mr. Khurana was on the Dean's List from 1995-1999 and a member of the *American Bankruptcy Institute Law Review*.

Mr. Khurana focuses his practice primarily on class actions on behalf of defrauded investors and consumers, as well as complex commercial litigation. Prior to joining Milberg in August 2005, Mr. Khurana worked as an associate with a major international law firm in New York, concentrating in the area of complex commercial litigation.

Mr. Khurana is a member of the Federal Bar Council and admitted to practice in the state and federal courts of New York.

### Special Counsel

**JAMES M. SHAUGHNESSY** graduated *cum laude* from Adelphi University in 1967 with a B.A. degree in political science and *cum laude* from New York University School of Law in 1969. While at N.Y.U., Mr. Shaughnessy was elected to the Order of the Coif, was the administrative director of the moot court program, and, upon graduation, received the Benjamin F. Butler Award for scholarship and outstanding service to the law school.

Mr. Shaughnessy joined the firm of Casey, Lane & Mittendorf in New York City as a litigation associate in 1969 and became a litigation partner at that firm in 1976. In 1982, Mr. Shaughnessy joined the firm of Haythe & Curley as a litigation partner, and he was the managing partner of the firm for two years. In 1987, Mr. Shaughnessy joined the firm of Windels, Marx, Davies & Ives (now known as Windels, Marx, Lane & Mittendorf, LLP) as a litigation partner. He was the chairman of the Windels, Marx Litigation Department from 1988 through 1998, and was a member of the firm's Executive Committee from 1990 to 1992. Mr. Shaughnessy joined Milberg in 2001.

Over the course of his career, Mr. Shaughnessy has specialized in commercial, securities, insurance, aviation and bankruptcy litigation. Mr. Shaughnessy was lead defense counsel for Pan American World Airways, Inc. in *In re Air Disaster at Lockerbie, Scotland on December 21, 1988*, M.D.L. 799 (E.D.N.Y.), and tried that case on behalf of Pan Am to a jury for three months.

Mr. Shaughnessy is a member of the American Bar Association, the New York State Bar Association, the Association of the Bar of the City of New York, and Federal Bar Council. Mr. Shaughnessy is admitted to practice in New York, California and New Jersey as well as before the United States Supreme Court, the United States Courts of Appeals for the Second, Fifth and Ninth Circuits, the United States District Courts for the Southern, Eastern, Northern and Western Districts of New York, the Southern District of California and the District of New Jersey, and the United States Tax Court.

### Associates

**LAUREN BLOCK** received a B.A. degree, *cum laude*, from University of Pennsylvania in 1982, and a J.D. degree from George Washington University Law School in 1985.

Ms. Block focuses her practice on class actions on behalf of defrauded investors, as well as complex commercial litigation. She was admitted to the bars of New York and Pennsylvania in 1986.

**JENNIFER S. CZEISLER** graduated from Hofstra University in 1994 with a B.A. degree in psychology. After completing graduate degree work at Hunter School of Social Work (1994-95), she pursued a J.D. degree, which she earned in 1999 from the University of Miami School of Law, where she graduated *cum laude*. Ms. Czeisler was on the editorial board of the *Law Review of Psychology, Public Policy & Law* and earned numerous awards, including the CALI excellence for the Future Award, Dean's Certificate of

Achievement Award, and membership in the Phi Delta Phi National Honor Society.

Ms. Czeisler is admitted to practice in the State of New York and is a member of the American Bar Association, where she is committed to her *pro bono* work with the American Bar Association Commission on Legal Problems of the Elderly.

**LISA DEROSE** received a B.A. degree, *cum laude,* from Dartmouth College in 1994 and a J.D. degree from New York University in 1997.

Ms. DeRose focuses her practice primarily on securities class action litigation. Prior to joining Milberg, Ms. DeRose was an associate at a New Jersey law firm where she practiced general commercial litigation.

**ANNA DOVER** received a B.A. degree from Wesleyan University in 1995, and a J.D. degree from the University of California at Davis School of

Law in 2001. While in law school, Ms. Dover was a member of the *UC Davis Law Review.*

Ms. Dover focuses her practice on class actions on behalf of defrauded investors and consumers. She currently represents shareholders in actions against various mutual fund families in which Milberg has been appointed lead counsel, including *In re American Mutual Funds Fee Litigation* (C.D. Cal.).

She is admitted to practice in the courts of the States of California and New York.

**CARLA FREDERICKS** graduated *magna cum laude* from the University of Colorado in 1997 and from Columbia Law School in 2001. While at Columbia, she was a Public Interest Fellow, a Charles Evans Hughes Scholarship recipient, Executive Editor of the Columbia Journal of Environmental Law, and Treasurer of the Columbia Native American Law School Association. Prior to law school, Ms. Fredericks served as an AmeriCorps volunteer in Colorado. She has performed extensive *pro bono* work on behalf of community organizations and the wrongfully convicted.

Ms. Fredericks joined Milberg in 2005. She focuses her practice on securities and class action litigation. She also has significant experience in civil rights litigation and labor and employment law.

Ms. Fredericks is admitted to practice in the courts of the State of New York. She is a member of the New York State Bar Association, the Federal Bar Association, the National Native American Bar Association, the New York County Lawyers Association, and the National Congress of American Indians.

**SARA FUKS** graduated from New York University with a B.A. degree in Politics, *summa cum laude*, in 2001. In February 2005, she earned her J.D. degree from Fordham University School of law, *cum laude*. During law school, she was a member of the *Fordham Law Review.*

Ms. Fuks focuses her practice primarily on ERISA litigation and is actively involved in a number of matters including *In re Boston Scientific Corp. ERISA Litigation* (D. Mass.), *In re Morgan Stanley ERISA Litigation* (S.D.N.Y.), and *In re First American Corp. ERISA Litigation* (C.D. Cal.).

Ms. Fuks's practice also includes class actions on behalf of defrauded investors and *qui tam* cases.

Prior to joining Milberg in 2006, Ms. Fuks worked at the New York office of Dewey Ballantine LLP, focusing her practice on general commercial litigation.

Ms. Fuks is admitted to practice law in the Eastern and Southern Districts of New York as well as the State Court of New York.

**MICHELLE FURUKAWA** focuses her practice on securities class actions on behalf of defrauded investors. While in law school at UCLA, Ms. Furukawa served as editor in chief of the *Asian Pacific American Law Journal,* clerked for the U.S. Securities & Exchange Commission, Division of Enforcement, and was a judicial extern for the Honorable Sheri Bluebond, U.S. Bankruptcy Court, Central District of California. Ms. Furukawa is a member of the Japanese American Bar Association of Greater Los Angeles, Association of Business Trial Lawyers, and the Los Angeles County Bar Association.

**STEPHANIE HATZAKOS** received a B.A. degree from the University of South Florida in 1995. She earned her J.D., *cum laude,* from Touro Law School in 1997. Ms. Hatzakos focuses her practice primarily on mass torts litigation, representing injured consumers in actions brought against pharmaceutical and medical device manufacturers. Prior to joining Milberg in 2006, Ms. Hatzakos worked as a court attorney at the New York Appellate Division, Second Department and as an associate with law firms in New York, concentrating in the areas of both personal injury and insurance defense.

**TODD KAMMERMAN** received his B.A. degree *cum laude* in politics from Brandeis University in 1999. In 2002, he received his J.D. degree from the Benjamin N. Cardozo School of Law. While at Cardozo, Mr. Kammerman was named an Alexander Fellow, through which he worked as a judicial intern in the chambers of the Honorable Joseph A. Greenaway, Jr., U.S.D.J. in Newark, New Jersey. Mr. Kammerman is a member of the bars of the States of New York and New Jersey and is admitted to practice before the United States District Court for the District of New Jersey.

**JOSHUA KELLER** graduated from the University of North Carolina in 1998 and from

Albany Law School of Union University in 2004. Prior to entering law school, Mr. Keller was a Trial Preparation Assistant in the New York County District Attorney's Office. While in law school, Mr. Keller was associate editor of *Albany Law Review* and participated in the Senior Prize Trials competition.

Mr. Keller focuses his practice on securities class action litigation on behalf of defrauded individual and institutional investors. He currently represents classes in several securities fraud and consumer fraud class actions.

Mr. Keller is admitted to practice in the courts of the States of New York and Colorado. He is also admitted to practice in the United States District Court for the Southern District of New York and Northern District of Illinois.

**TODD KUSSIN** received his B.A. degree from Cornell University in 1997 and his J.D. degree from Hofstra University School of Law in 2002. While in law school, Mr. Kussin served as Research Editor of the *Hofstra Law Review*. He also worked for the Unemployment Action Center, providing counsel to indigent clients seeking unemployment insurance.

Mr. Kussin focuses his practice primarily on securities class action litigation on behalf of defrauded individual and institutional investors. Prior to joining Milberg, Mr. Kussin was an associate at Clifford Chance US LLP.

Mr. Kussin was admitted to the New York State Bar in 2003.

**JULIE KWON** received her B.S. from Cornell University in 2003, and a J.D. from Brooklyn Law School in 2007. During law school, Ms. Kwon fulfilled an externship at MFY Legal Services, Inc., a non-profit legal services provider. Since joining Milberg LLP, she has helped establish the firm's community service initiative.

Ms. Kwon focuses her practice primarily on securities class action litigation on behalf of defrauded individual and institutional investors.

She is admitted to the bars of New York and New Jersey, and is admitted to practice in the United States District Court of New Jersey. She is a member of the New York State Bar Association, New York County's Lawyers Association, and Asian American Bar Association of New York.

**BERNA M. LEE** graduated from Dartmouth College with a B.A. degree in 1991 and earned a J.D. from Georgetown University Law Center, *cum laude*, in 1999.

Ms. Lee focuses her practice on securities class action and complex commercial litigation. Prior to joining Milberg, Ms. Lee gained significant experience in the areas of white collar crime, securities fraud, and complex insurance coverage matters. She has performed extensive *pro bono* work on behalf of the wrongfully convicted.

**JEAN LEE** graduated from New York University with a B.A. degree in Politics and Psychology and a M.S.W. in Social Work. Ms. Lee received her J.D. degree from Rutgers School of Law. During law school, she served as a Senior Editor of the *Rutgers Law Record*. Upon graduation from law school, Ms. Lee was a law clerk to the Honorable John J. Hughes, United States Magistrate Judge, in the District of New Jersey.

Currently, Ms. Lee devotes her practice to representing the interests of defrauded investors in securities class actions. She is admitted to practice law in New York and New Jersey. Ms. Lee is also a licensed social worker.

**ROLANDO MARQUEZ** received a B.S. degree from Brown University in 1994 and his M.S. degree from New York University in 1998. In 2003 he received his J.D. degree from Fordham Law School.

Mr. Marquez is part of the False Claims Act practice group, representing whistleblowers in actions primarily involving Medicare and Medicaid fraud. He was also part of the Milberg team that served as co-lead plaintiffs' counsel in a securities fraud and accountant liability class action suit that settled for over $3 billion.

Prior to joining Milberg, Mr. Marquez was an associate at a patent boutique firm, where he concentrated on patent litigation matters involving medical device, computer software, and consumer electronic device technologies.

Mr. Marquez is also admitted to practice in the United States District Courts for the Southern and Eastern Districts of New York and the United States Patent and Trademark Office.

**JOHN R. S. MCFARLANE** received a B.Comm. degree from Dalhousie University School of

Business Administration in 1996, and an LL.B from Dalhousie Law School in 2002. Mr. McFarlane focuses his practice on class actions on behalf of defrauded investors, as well as actions against various mutual fund families in which Milberg has been appointed lead counsel, including *In re American Express Financial Advisors Securities Litigation* (S.D.N.Y.). Prior to joining Milberg , he practiced securities law at Cassels, Brock & Blackwell LLP in Toronto, Ontario.

Mr. McFarlane was admitted to the Law Society of Upper Canada in 2003 and the New York State Bar in 2006.

**KRISTI STAHNKE MCGREGOR** received her B.A. degree in political science, Phi Beta Kappa, from the University of Florida in 1995. She spent two years, 1993-94 and 1995-96, studying political science and economics at the Rheinische Friedrich-Wilhelms-Universitaet Bonn in Bonn, Germany. In 1999, Ms. McGregor received her J.D. degree from Emory University School of Law, where she was the Research Editor of the *Emory International Law Review* and student law clerk to Justice Norman Fletcher of the Georgia Supreme Court.

After graduating from law school, Ms. McGregor was a recipient of the German Chancellor Fellowship through the Alexander Von Humboldt Foundation, which allowed her to attend the Westfaelische Wilhelms-Universitaet Muenster in Muenster, Germany and receive her LL.M. degree *magna cum laude* in German civil law in 2001.

Prior to joining Milberg in 2002, Ms. McGregor practiced in the international section of a large Atlanta law firm. She focuses her practice primarily on class actions on behalf of defrauded investors, as well as complex commercial litigation. She has particular experience in international litigation, primarily involving European companies. She is fluent in German. Ms. McGregor was admitted to the Georgia Bar in 1999, the New York Bar in 2003, and the Florida Bar in 2004.

**ROLAND RIGGS** received a B.A. from Trinity College in Hartford, Connecticuit in 1999, and a J.D. *cum laude* from Case Western Reserve in 2004. Prior to joining the Firm, he worked at Abraham, Fruchter & Twersky, LLP, where his practice areas included ERISA and securities litigation.

**WILLIAM B. SCOVILLE, JR.** received a B.A. degree from Yale University in 1985 and a J.D. degree with Specialization in International Legal Affairs from Cornell Law School in 1992. As a law student, he participated in Cornell's Legal Aid Clinic, Criminal Justice Clinic, and Prison Project.

Mr. Scoville's practice consists primarily of complex securities litigation. He is fluent in French, Spanish, and Russian and has assisted in prosecuting the claims of an international class of plaintiffs in *In re Vivendi Universal, S.A. Securities Litigation.*

**ANDREW SOKOLOWSKI** graduated from UCLA with a B.A. degree in History in 1997. He received his J.D., *cum laude,* from Loyola Law School. During law school, Mr. Sokolowski served as Articles Editor for the *Loyola of Los Angeles Law Review* and graduated in the top 5% of his class. He was admitted to the California bar in 2003.

Mr. Sokolowski currently focuses his practice on consumer and securities class actions. He is a member of the Los Angeles County Bar Association and the Association of Business Trial Lawyers.

**JENNIFER J. SOSA** graduated from Northeastern University with a B.S. degree in Chemical Engineering, cum laude, in 2002. In 2005, she earned her J.D. degree from Temple University Beasley School of Law. During law school, she was a member of the Environmental Moot Court Team and was awarded the David Sive Award for Best Brief overall in the 2004 Pace National Environmental Law Moot Court Competition.

Ms. Sosa focuses her practice on ERISA litigation and is actively involved in a number of matters including In re Boston ScientificCorp. ERISA Litigation (D. Mass.), In re Morgan Stanley ERISA Litigation (S.D.N.Y.), and In re First American Corp. ERISA Litigation (C.D. Cal.). Ms. Sosa has also concentrated part of her practice on class actions against defrauded stockholders in cases such as South Ferry LP # 2 v. Killinger, et al. (W.D. Wash.), as well as the investigation and prosecution of antitrust and consumer protection actions.

Ms. Sosa is admitted to practice law in the Eastern and Southern Districts of New York and the

District of New Jersey, as well as New York and New Jersey state courts. aw school, Ms. Sosa worked as a Chemical Engineer.

**TED J. SWIECICHOWSKI** received his B.A. degree from Marquette University in 1989 and his J.D. from The Catholic University of America, Columbus School of Law in 1996. He focuses his practice on securities class action litigation on behalf of defrauded individual and institutional investors. Mr. Swiecichowski was employed previously by MortgageIT Holdings, Inc. (a residential mortgage REIT) and Liddle & Robinson, LLP (a firm specializing in securities and employment arbitrations). Mr. Swiecichowski's experience also extends to the securities industry, having been employed as an Equity Research Associate in UBS's Global Technology Equity Research Group and as a consultant with Deutsche Bank's Mergers & Acquisitions group. He currently represents shareholders in securities fraud cases, including *In re Xerox Securities Litigation*.

**ANNE MARIE VU** received her B.A. degree in Political Science and French from the University of Portland in 2000. She spent an academic year studying at the Université de Paris-IV (La Sorbonne) in Paris, France. Ms. Vu earned her J.D. degree from the Benjamin N. Cardozo School of Law in 2003. During law school Ms. Vu was a member of the Willem C. Vis International Commercial Moot. She also worked as a legal intern for the Federal Trade Commission, where she received a Certificate of Appreciation for Outstanding Contribution. Following law school Ms. Vu provided *pro bono* legal assistance to the New York office of Reporters Without Borders from 2003 to 2004.

Ms. Vu concentrates her practice primarily on securities fraud litigation. She is one of the attorneys prosecuting the *In re Vivendi Universal, S.A. Securities Litigation* pending in the United States District Court for the Southern District of New York.

Ms. Vu is a member of the New York State Bar Association, the California Young Lawyers Association, the American Bar Association, the National Asian Pacific American Bar Association, and the Moot Alumni Association. She is admitted to the Bars of the States of New York and California.

**CHERYL WILLIAMS** currently specializes in securities fraud litigation. Prior to joining Milberg, Ms. Williams practiced commercial litigation with an emphasis on products liability and Business and Professions Code Section 17200 actions. In this regard, Ms. Williams represented Fortune 500 companies in high profile, complex litigation including several trials. Ms. Williams also has a personal and professional interest in developing a practice in Native American Law. In addition to studying in the field throughout law school and beyond, Ms. Williams has represented Native American clients on a *pro bono* basis including members of the Wabauskang Nation in Ontario, Canada (her own Tribal affiliation).

Ms. Williams is also a member of the Federal Bar Association, the Native American Bar Association, the American Business Trial Lawyers Association, and the Consumer Attorneys Association of Los Angeles.

**JENNIFER L. YOUNG** received a B.A. degree from University of South Carolina in 1996. She graduated *cum laude* from the University of South Carolina School of Law in 2002. During law school, Ms. Young was Associate Editor in Chief of the *South Carolina Law Review*, as well as a member of the South Carolina Moot Court Bar.

Ms. Young focuses her practice primarily on consumer fraud and complex commercial litigation. Ms. Young is admitted to practice in the courts of the States of South Carolina and New York. Ms. Young sits on the junior board of Court Appointed Special Advocates (New York), a non-profit organization that shepherds children through New York City's foster care system. Ms. Young is an active member of the New York Inn of Court.

### Staff Attorneys

**HENRY KELSTON** received a B.S. degree, *cum laude*, from Tufts University in 1975, and a J.D.

degree from New York University School of Law in

1978, where he was a member of the Annual Survey of American Law.

Mr. Kelston has extensive experience in state and federal court litigation, administrative proceedings and arbitrations. Prior to joining Milberg, he practiced at Proskauer Rose in New York and Siegel, O'Connor & Kainen in Connecticut.

Mr. Kelston is admitted in the courts of the States of New York and Connecticut, as well as the United States District Courts for the Southern District of New York, the Eastern District of New York and the District of Connecticut.

**JOSEPH MUZINGO** concentrates his practice on compliance matters. Prior to joining Milberg, he practiced law in Detroit in the areas of medical malpractice and general litigation.

Mr. Muzingo received an academic scholarship to attend Michigan State Law School, from which he graduated in 2003. While in Law School, Mr. Muzingo served as a member of the Moot Court board for three semesters and was awarded the Moot Court Eve August Award for Best Advocate during his second year of law school.

Mr. Muzingo is admitted to practice law in New York and Michigan.

**SANFORD SMOKLER** received a B.A. degree from Syracuse University in 1993 and a J.D. degree from Brooklyn Law School in 1996. Mr. Smokler's practice focuses on mass torts and product liability litigation including the representation of injured consumers in actions against pharmaceutical and medical device manufacturers.

Prior to joining Milberg in 2006, Mr. Smokler specialized in the litigation of asbestos and silicone gel filled breast implant product liability actions on behalf of plaintiffs.

# EXHIBIT B

# ZIMMERMAN REED    FIRM RESUME



MINNEAPOLIS
Zimmerman Reed, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, Minnesota 55402
t: 612.341.0400
f: 612.341.0844
zimmreed.com

SCOTTSDALE
Zimmerman Reed, PLLP
14646 North Kierland Blvd., Suite 145
Scottsdale, Arizona 85254
t: 480.348.6400
f: 480.348.6415
zimmreed.com

# TABLE OF CONTENTS

**The Firm's Practice and Achievements**................................................................... 1

**Attorney Biographies**................................................................................ 1

     Charles S. Zimmerman......................................................................... 1

     Barry G. Reed..................................................................................... 2

     Ronald S. Goldser................................................................................ 3

     Robert R. Hopper................................................................................ 3

     J. Gordon Rudd, Jr.............................................................................. 4

     Carolyn G. Anderson ......................................................................... 5

     Hart L. Robinovitch............................................................................ 5

     Timothy J. Becker............................................................................... 6

     David M. Cialkowski........................................................................... 7

     Stacy K. Hauer................................................................................... 7

     Anne T. Regan................................................................................... 7

     Brian C. Gudmundson......................................................................... 8

     Kirsten D. Hedberg............................................................................. 8

**Case Resume: Recent Leadership Positions**................................................. 9

  **Cases By Practice Group**

     Consumer Litigation........................................................................... 9

     Defective Drugs and Devices................................................................ 10

     Securities, Investment Fraud, Corporate Governance and Antitrust.................... 11

     ERISA Litigation............................................................................... 12

     Employment Violations – Wage and Hour Litigation........................................ 12

     Environmental and Toxic Torts.............................................................. 13

     Healthcare Litigation.......................................................................... 14

     Homeowner – Mortgage Litigation.......................................................... 14

FIRM PRACTICE AND ACHIEVEMENTS

Zimmerman Reed is a nationally recognized leader in complex and class action litigation and has been appointed as lead counsel in some of the largest and most complex cases in federal and state courts across the country. The firm was founded in 1983 and has successfully represented thousands of consumers and injured individuals nationwide in significant and demanding cases. The firm's practice includes a wide range of legal issues and class actions involving consumer fraud, tobacco, pharmaceutical drugs, shareholder actions, environmental torts, dangerous or defective products, human rights violations and privacy litigation.

ZIMMERMAN REED PARTNERS

**Charles S. Zimmerman**, founding partner of Zimmerman Reed, is a nationally recognized leader in complex and class action litigation. He frequently speaks at industry conferences, CLEs and is the author of a newly published book on complex litigation. During more than 30 years of practice, Bucky has successfully represented thousands of clients through individual actions and nationwide class actions. His cases have involved the tobacco industry, pharmaceutical companies and shareholder actions. Bucky has served as lead counsel, PSC member and liaison counsel in numerous major pharmaceutical and medical device cases over the last 15 years. He currently serves as Lead Plaintiffs' Counsel in the Guidant MDL 1708, Medtronic MDL 1726 and Baycol MDL 1431. Through his leadership in these and other groundbreaking cases, Bucky continues to advance the interests of his clients and the legal profession.

In addition to his case work, Bucky continues to lecture and periodically teach courses on complex litigation and working with the media in high profile cases for a variety of organizations including the Minnesota State Bar Association, Minnesota Continuing Legal Education, the University of Minnesota Law School, William Mitchell College of Law, the Minnesota Trial Lawyers Association (MTLA) and Mealy's Publications. In 2006 Bucky authored "Pharmaceutical and Medical Device Litigation," a mass tort manual published by Thompson/West.

Through his solid leadership and abilities as a litigator and negotiator, Bucky continues to serve and advance the interests of the firm's clients and the legal profession. He has been recognized yearly as a "Super Lawyer" by *Minnesota Law & Politics* since 2000.

Bucky is a 1972 graduate of the University of Minnesota Law School. He also received his undergraduate degree from the University of Minnesota and was a three letter winner, Williams Scholar, and captain of the varsity U of M tennis team his junior and senior years. Mr. Zimmerman is a member of the United States Professional Tennis Association obtaining national ranking, and has won gold and silver medals at the world Maccabiah and Pan American Maccabiah games.

Charles Zimmerman is admitted to practice before, and is a member in good standing of, the Bar of the State of Minnesota and the United States District Court for the District of Minnesota, District of Colorado, District of North Dakota, and the United States Supreme Court. He is also admitted to the Third, Fifth, Sixth, and Eighth United States Circuit Courts of Appeals.

1

Mr. Zimmerman has been a lecturer and selected to teach courses for the Minnesota State Bar Association, University of Minnesota School of Law, William Mitchell College of Law, the Minnesota Trial Lawyers Association (MTLA), Association of Trial Lawyers of America (ATLA), American Conference Institute and Mealey's Publications. In September 2000, Bucky served as co-chairman of the Advisory Committee for Mealey's Propulsid Litigation Conference and he chaired the faculty of a Minnesota Institute for Legal Education seminar, "Dealing with Complex Litigation." Mr. Zimmerman has also lectured and served as a member of the faculty at Mealey's "Norplant Conference," Mealey's "Breast Implant Conferences," Andrew's Publications' "Medical Devices Litigation Conference", as well as numerous conferences on the subject of Tobacco Litigation and "Youth and Addiction." Additionally, he was a guest lecturer on the subject of Complex Litigation at the University of Minnesota School of Law in conjunction with course work prepared by Professor Robert J. Levy, and the William Mitchell College of Law in conjunction with course work prepared by the Honorable Thomas Carey.

Bucky's memberships include the Association of Trial Lawyers of America (ATLA), the Minnesota Trial Lawyers Association (MTLA), the Federal Bar, the Minnesota State Bar Association, the Hennepin County Bar Association, and the Bar Associations of the Fifth and Eighth Federal District Courts.

**Barry G. Reed** is a founding partner of the firm. He has been in practice since 1977 when he joined the law firm of Robins, Davis, and Lyons. In 1982, along with his partner Bucky Zimmerman, Barry Reed formed the firm now known as Zimmerman Reed.

At Zimmerman Reed, Barry focuses his practice on complex litigation and has a long history representing consumers in many large class actions including cases challenging the legality of lender payments to mortgage brokers, claims of improper mortgage escrow accounting practices, challenging the legality of credit card-financed Internet gambling transactions, disputing credit card company practices and advocating for communities injured by environmental torts. Barry's skill at legal analysis and his thorough preparation serve his clients and the firm well.

A native of England, Mr. Reed is a 1977 graduate of the University of California at Los Angeles School of Law. He received his Bachelor of Arts, *summa cum laude,* from U.C.L.A. in 1974 and was a member of Phi Beta Kappa. Barry has been a presenter at numerous conferences and CLE seminars including, "Internet Sales of Consumer Financial Services: Emerging E-Commerce Litigation Issues" sponsored by the Practicing Law Institute. In 2002 and 2003, Barry was recognized by his peers in Minnesota as a "Super Lawyer" as compiled by *Minnesota Law & Politics.* Barry divides his time between offices in Minneapolis and Scottsdale.

Mr. Reed is admitted to practice before, and is a member in good standing of, the Bars of the States of Arizona and Minnesota as well as the United States District Court for the Districts of Arizona, Minnesota, North Dakota, the Northern District of Illinois, the Eastern District of Wisconsin, and the Eastern District of Michigan. He is also admitted before the Third, Sixth, Seventh, Eighth, Ninth and Eleventh Circuit Courts of Appeals as well as the United States

Supreme Court. Barry's memberships include the Minnesota State Bar Association and the Hennepin County Bar Association.

**Ronald S. Goldser** joined Zimmerman Reed in 1985, coming from an active personal services law practices in the Twin Cities. He has been a partner in the firm since 1987 and has been Chief Financial Officer since 1994. He is currently a member of the Firm's Management Committee. Mr. Goldser graduated *cum laude* from Yale University in 1975 where he received his Bachelor of Arts degree in Urban Studies. While at Yale, Mr. Goldser engaged in numerous poverty and consumer law endeavors including work with the Connecticut Citizen Action Group.

Ron received his law degree in 1978 from the University of Minnesota. During his years at the University of Minnesota, he worked with the Alcohol and Drug Abuse Programming group within the University's College of Pharmacy. This work included counseling and supervised representation of individuals charged with drug offenses. In addition, together with others, Ron taught Law for Health Sciences in the College of Pharmacy.

At Zimmerman Reed, Mr. Goldser focuses on the medical device and pharmaceutical drug practice, mass tort litigation and the consumer law litigation practice. Ron has been a lead attorney in cases involving orthopedic bone (pedicle) screw, Fen-Phen diet drugs, Propulsid, Rezulin, Baycol and other prescription medication litigation as well as collateral protection insurance and bankruptcy reaffirmation litigation.

Mr. Goldser is admitted to practice in Minnesota and Wisconsin, in the United States Courts of Appeals for the Third, Fourth, Fifth, Sixth, and Eighth Circuits, and in the United States District Court for the Districts of Minnesota, Eastern Wisconsin, Western Wisconsin, and North Dakota. He is a member of the Minnesota State Bar Association and the Hennepin County Bar Association.

**Robert R. Hopper** has been a partner in the firm since 1991 after being Of Counsel for a short time. Mr. Hopper's practice focuses on complex civil litigation and government relations, with an emphasis on the public policy, legislative, and substantive legal issues that lie at the nexus of these two disciplines. Prior to joining Zimmerman Reed, Mr. Hopper practiced with Larkin, Hoffman, Daily & Lindgren in that firm's Government Relations and Litigation Departments. He also has held numerous positions in the public and private sectors including: work on a White House - sponsored urban education program in inner city Atlanta and both Harlem and the South Bronx, New York City; a Manager of Public Affairs for the Cummins Engine Company and as Program Officer in its corporate foundation; as Director of State Development Planning for the State of Minnesota; as an Advisor on a special Economic Development program serving Minnesota Governor Al Quie; and Finance Director for the successful Ramstad for Congress Campaign.

In 1987, Randy graduated from the William Mitchell College of Law. Upon graduation, he was awarded the Excellence in Trial Advocacy Award having been previously distinguished by the Association of Trial Lawyers of America (ATLA) through a National Trial Competition as one

of the top ten student trial advocates in the United States. Prior to law school, Mr. Hopper attended the University of Tennessee where he majored in Psychology and Pre-med and in 1976 graduated with honors. In his senior year, Mr. Hopper was distinguished by the Dean of the College of Liberal Arts for outstanding work on "Off-Campus/Independent Study." Mr. Hopper also studied Political Philosophy and Social Ethics at the Hubert H. Humphrey Institute of Public Affairs at the University of Minnesota and at the Union Theological Seminary in New York City.

Mr. Hopper is admitted to practice in Minnesota and several Federal Courts including the United States District Courts for the Districts of Minnesota; Arizona; the Eighth Circuit Court of Appeals; and the Eleventh Circuit Court of Appeals. Randy is a member in good standing of the American Bar Association, the Minnesota State Bar Association and the Hennepin County Bar Association, as well as a member in good standing of both ATLA and the Minnesota Trial Layers Association. He is also a member of the Minnesota Governmental Relations Council and a founding member of the Winston S. Churchill Center for Policy Studies at George Washington University, Washington, D.C. He has been a member of the adjunct faculty at William Mitchell College of Law teaching "Corporate Ethics and Advising Corporate Clients." Mr. Hopper is chair of the CLE "Dealing with the Media in High Profile Cases" and is a member of the faculty in the CLE "Managing Complex Litigation."

**J. Gordon Rudd, Jr.** is a partner with Zimmerman Reed practicing in the areas of commercial class action litigation and complex mass tort litigation. Mr. Rudd is a member of the Firm's Management Committee and is the partner in charge of the Minneapolis office operations.

Mr. Rudd concentrates his practice in complex consumer and product liability class actions. He has been appointed class counsel in cases venued in state and federal courts throughout the country. Gordon has been active in many of the highest profile cases of the past decade and has taken a leadership role in collateral protection insurance litigation, Silicone Gel breast implants, Teletronics Pacemaker litigation and in Direct Merchants Bank credit card litigation. Mr. Rudd was able to obtain a meaningful recovery on behalf of students that were incorrectly told they had failed the 2000 Minnesota Basic Standards Test. Mr. Rudd was a contributor to the *Report on Mass Tort Litigation* presented to Chief Justice Rehnquist in 1999. Presently, he is serving as liaison counsel and as a member of the Executive Committee in the multi-district litigation, *In re St. Jude Silzone Heart Valves Product Liability Litigation*, MDL 1396, in which the Honorable John R. Tunheim has certified national classes on behalf of personal injury and medical monitoring classes. Gordon has also been instrumental in representing the residents of Minot, *In re Soo Line Railroad Company Derailment of January 18, 2002 in Minot, N.D*, who were affected by the toxic spill caused by the derailment of a Canadian Pacific Railway train.

Gordon is a 1986 graduate of Connecticut College and a 1991 graduate of the University of Cincinnati College of Law where he received the American Jurisprudence Award in legal research and writing. Mr. Rudd also attended Bowdoin College and studied in London, U.K. during his undergraduate training.

4

Mr. Rudd is licensed to practice before, and is a member in good standing of, the Bar of the State of Minnesota and the United States District Court for the District of Minnesota. Gordon is admitted to the United States Court of Appeals for the Eighth Circuit. He has been admitted to appear *pro hac vice* in cases pending in the states of California, Oregon, Arizona, New Mexico, Texas, North Dakota, Ohio, Florida, Georgia, Tennessee, and Michigan. He is a member of the Minnesota State Bar Association and the Hennepin County Bar Association.

**Carolyn Anderson** is Managing Partner at Zimmerman Reed and focuses her practice primarily on securities matters. Since joining Zimmerman Reed, Carolyn has successfully represented individual investors with claims of securities fraud, institutional clients in PSLRA actions and minority shareholders, related to mergers and acquisitions. She has served in a leadership role in obtaining numerous significant awards in both individual actions and multi-state class actions. Recently, Carolyn was appointed Class Counsel in the Minnesota Corn Processors shareholder action involving the ADM merger, and Lead Counsel in the Metropolitan Airports Commission class action. She also currently serves as Lead Counsel for a nationwide class in a PSLRA securities case brought against Boston Scientific, representing the Public Employees Retirement System of the State of Mississippi. Carolyn maintains strong ties' with NAAG, with individual state Attorneys General, state pension fund officers and other institutional investors.

Carolyn is a frequent lecturer at colleges, law schools as well as a Legal Education faculty member on the topics of complex litigation, legal ethics, securities law and other topics.

Carolyn graduated from Trinity College, where she received a Bachelor of Arts degree, *cum laude*, in Psychology. She received her law degree *cum laude* from Hamline University School of Law where she was a Dean's Scholar, received the Cali Award for Excellence in Constitutional Law, and was on Hamline Law Review. Her case note article was selected for publication. Carolyn also studied law at Hebrew University in Jerusalem, Israel in course-work focusing on Law, Religion, & Ethics.

Carolyn is admitted to practice before, and is a member in good standing of, the Bar of the State of Minnesota, the United States District Court for the District of Minnesota and the Court of Appeals for the Eighth Circuit, First Circuit and the U.S. Supreme Court. In addition to these courts, Ms. Anderson works on cases with local counsel nationwide. She is a member of the National Association of Shareholder and Consumer Attorneys (NASCAT), the Federal Bar Association, the Minnesota Bar Association, and the Hennepin County Bar Association and Minnesota Women Lawyers.

**Hart L. Robinovitch** is a partner with Zimmerman Reed, working in the firm's Scottsdale Arizona office. Hart is a strong and effective consumer advocate, focusing his practice in the areas of mortgage banking, shareholder actions and general civil and business litigation.

For the past decade, Hart has represented clients in a series of class action lawsuits contesting mortgage lenders' excessive billing and deposits practices for mortgage escrow accounts. Mr. Robinovitch is now involved in numerous Federal court lawsuits around the country alleging that mortgage banks and lenders have violated federal and state laws. These cases allege

payment of kickbacks and/or illegal and unearned referral fees by the banks and lenders to mortgage brokers who refer mortgage clients who are then charged inflated interest rates on the mortgages. In addition, he represents consumers in other actions contesting the imposition of overcharges and improper fees or other contractual violations in various mortgage transactions. He has worked with co-counsel in state and federal courts across the country.

Mr. Robinovitch, a native of Canada, earned his degree from the University of Toronto Law School in 1992 where he served as an Associate Editor on the University of Toronto Faculty of Law Review. He received his Bachelor of Science degree in 1989 from the University of Wisconsin-Madison.

Hart is admitted to practice before, and is a member in good standing of, the Bars of the States of Arizona and Minnesota and the United States District Court for the Districts of Arizona, Minnesota, the Northern and Middle Districts of Alabama, the Northern District of Georgia, the District of Hawaii, and the Northern District of Oklahoma. Mr. Robinovitch is also licensed to practice law before the United States Courts of Appeals for the Sixth, Eighth, Ninth and Eleventh Circuits and the United States Supreme Court. Hart's memberships include the National Association of Consumer Advocates.


**Timothy J. Becker** is a partner with Zimmerman Reed, practicing primarily in the areas of complex class action commercial litigation including the areas of Third Party Payor and Healthcare Litigation. With cases all over the country, Mr. Becker has demonstrated his ability to vigorously represent clients on both the national and local level. Recently, Tim was instrumental in obtaining class certification on behalf of 5,400 former shareholders of Minnesota Corn Processors. Mr. Becker's work has included cases with an emphasis in complex commercial and anti-trust issues including Bankruptcy Reaffirmation and *In re Vitamins* anti-trust litigation.

Mr. Becker is a 1992 graduate of the University of Illinois, Chicago where he received his Bachelor of Arts degree in History. In 1995, he earned his *Juris Doctorate* from William Mitchell College of Law where he graduated *cum laude*. Mr. Becker served as a Staff Member of the *William Mitchell Law Review* from 1993 to 1994, and as an Associate Editor from 1994 through 1995. He has been a member of the Minnesota Bar since 1995 and the Federal Bar since 1997.

Mr. Becker is a member of the Minnesota Trial Lawyers Association and Minnesota State Bar Association. His articles include, "Is the Doctor In? Reasonableness and the Neal Decision," published in the *Hennepin County Lawyer*, 1998. In 1999 he was recognized by his peers in Minnesota as a "Rising Star" as compiled by *Minnesota Law & Politics* and in 2000 was inducted into *Stratmore's Who's Who*. Tim was again recognized by his peers in Minnesota by being named a "Super Lawyer" in 2002, 2003 and 2004 as compiled by *Minnesota Law & Politics*.

**David M. Cialkowski** joined Zimmerman Reed in 2001 and dedicates a substantial portion of his practice to the area of complex and mass tort litigation, with a primary focus on consumer protection and products liability litigation.

In 1995, Mr. Cialkowski earned his undergraduate degree from the University of Illinois's College of Liberal Arts and Sciences *cum laude* with High Distinction in the Department of English. Additionally, he participated in the honors program as a James Scholar, received the Elizabeth and Charles Ellis Merit Scholarship and was a member of Phi Beta Kappa. Mr. Cialkowski graduated in 1998 from the University of Illinois College of Law, where he participated in the civil litigation clinic, was an editor for the Poetic Justice literary magazine, and was voted one of the top ten percent of university teaching assistants.

Mr. Cialkowski is licensed to practice and a member in good standing, for the Bars of the State of Minnesota and the State of Illinois. His professional associations include membership in the Minnesota State Bar Association and Hennepin County Bar Association.

ZIMMERMAN REED ASSOCIATES

**Stacy K. Hauer** primarily represents clients who have been injured as a result of defective drugs or faulty medical devices. For the past several years, she has devoted much of her practice to pharmaceutical litigation, including products liability actions relating to Baycol, Fen-Phen, Serzone, Meridia, Vioxx, Celebrex and Bextra. Stacy also dedicates a portion of her practice to toxic torts, including the welding rod litigation and healthcare litigation, including PBM litigation. Ms. Hauer's extensive background in biochemistry and pharmaceuticals make her uniquely qualified for drug and device litigation and other litigation in the healthcare industry.

Ms. Hauer graduated *cum laude* from the University of Minnesota Law School. She received a her Masters Degree from the College of Pharmacy at the University of Minnesota. Stacy's graduate education provides her with an understanding of the science behind pharmaceuticals. Stacy received her Bachelor degree in Biochemistry, Molecular Biology and Chemistry from the University of Minnesota, Duluth.

Additionally, Stacy has a background working in the health care industry which has given her a compassionate perspective in advocating for clients who have been injured by defective drugs and medical devices. Her publications include, "Pharmacology for Lawyers", *TRIAL* magazine, March 2005.

**Anne T. Regan's** focuses her practice on complex litigation involving wage and hour, securities, and consumer protection laws. Ms. Regan has successfully represented employees and shareholders of national and Minnesota-based companies. The breadth and depth of her legal skills make her a forceful advocate for her clients.

7

Ms. Regan graduated *cum laude* from the University of Minnesota Law School, where she served as a Managing Editor of the *Minnesota Law Review*. Prior to law school she attended Washington University in St. Louis, Missouri, where she graduated *magna cum laude* and was a member of Phi Beta Kappa.

Ms. Regan is licensed to practice law in the States of Minnesota and Illinois, and is admitted to the United States District Court for the District of Minnesota. She is a member of the Minnesota State Bar Association, the Federal Bar Association, the Hennepin County Bar Association, and Minnesota Women Lawyers. Anne also is an adjunct legal writing instructor for the University of Minnesota Law School legal writing program.

**Brian C. Gudmundson** recently joined Zimmerman Reed and focuses his practice in Complex Commercial Class Actions including the areas of Third Party Payor and Healthcare Litigation. Prior to joining the firm, Mr. Gudmundson was a member of a litigation team that achieved a $2.5 billion settlement against AOL - Time Warner on behalf of investors.

Brian is a 2004 *cum laude* graduate of the University of Minnesota Law School where he was a member of both the Dean's List and Dean's List with an A Average, a faculty research assistant and a member of the National Moot Court. He was also honored with the Minnesota Justice Foundation public service award. Prior to law school, he attended the University of Minnesota earning his Bachelor of Arts degree in Psychology. Mr. Gudmundson has co-authored two articles, discussing the civil RICO act, that were published by www.ricoact.com.

Bringing professional insight from previous experience, Brian cuts through the issues surrounding his clients to obtain meaningful outcomes.

**Kirsten Hedberg** recently joined Zimmerman Reed practicing primarily on complex cases involving wage and hour litigation and securities violations. Bringing a distinguished research background combined with her knowledge of the law affords Kirsten the tools to litigate effectively on behalf of her clients.

Prior to joining the firm, Ms. Hedberg served as a judicial law clerk to the Honorable Michael J. Davis on the United States District Court for the District of Minnesota. Additionally, Kirsten gained substantial experience during her legal fellowship with the Reporters Committee for Freedom of the Press in Washington D.C. working in the areas of defamation, reporter's privilege, and privacy law. During this fellowship, she was a contributing author of various articles published in their quarterly magazine, *The News Media and the Law*.

Kirsten is a 2003 graduate of the University of Minnesota Law School. While at the University of Minnesota she was awarded the Silha Fellowship, performing extensive legal research for the Silha Center for the Study of Media Ethics and Law. An honors graduate of the University of Iowa, Ms. Hedberg earned her Bachelor of Arts degree in English in 1997.

CASE RESUME:  RECENT LEADERSHIP POSTIONS

**Consumer Litigation**

- *Dearmon, et al. v. Mercury Finance Company*, Fourth Judicial District Court, State of Minnesota

- *DeLillo, et al. v. NCS Pearson, et al.*, Fourth Judicial Court, State of Minnesota

- *Diamond, et al. v. AVCO Auto Finance, et al.*, Superior Court of California, Monterey County

- *Drobnak, et al. v. Andersen Windows, Inc*, United States District Court, District of Minnesota

- *Fischl, et al. v. Direct Merchants Bank*, Fourth Judicial District, State of Minnesota

- *Grant, et al. v. Regions Mortgage Co. f/k/a First Commercial Mortgage Co.*, Superior Court of California, Ventura County

- *Gutter, et al. v. Bank One Louisiana*, Orleans Parish Civil District, State of Louisiana

- *In re Castano Tobacco Litigation*, United States District Court for the Eastern District of Louisiana

- *In re Consolidated Zicam Product Liability Cases*, Superior Court of Arizona, Maricopa County

- *Kurvers, et al. v. National Computer Systems, Inc.*, Fourth Judicial District Court, State of Minnesota

- *Minnerath, et al. v Zurn Pex Inc.*, United States District Court, District of Minnesota

- *O'Hara, et al. v. Marvin Lumber, et al.*, Fourth Judicial Court, State of Minnesota

- *Pistilli, et al. v. Life Time Fitness*, Fourth Judicial District, State of Minnesota

- *Sara Lee Meat Contamination Litigation*, Cress v. Sara Lee, Circuit Court of Cook County, State of Illinois, Court File No. 98 L 15072

- *Schermer, et al. v. State Farm Fire and Casualty Company, et al.* Fourth Judicial Court, State of Minnesota

- *Scott v. American Tobacco Co., Inc., et al.*, Court File No.: 96-8461, Civil District Court for the Parish of New Orleans, Louisiana

- *Wright, et al. v. Malt-O-Meal Company*, Fourth Judicial District, State of Minnesota

**Defective Drugs and Devices**

- *Hammitt, et al. v. Medtronic, Inc.,* United States District Court, District of Minnesota

- *Hunter v. Medtronic, Inc., et al.,* Fourth Judicial Court, State of Minnesota

- *In re Baycol Products Litigation* MDL 1431 (Co-Lead Counsel), United States District Court, District of Minnesota

- *In re Bextra Products Liability Litigation,* MDL 1694

- *In re Breast Implant Litigation* MDL 926 (Member of settlement committee; co-state liaison for Minnesota), United States District Court, Eastern District of Michigan

- *In re Diet Drugs Products Liability Litigation* (Phentermine / Fenfluramine / Dexfenfluramine) MDL 1203, United States District Court, Eastern District of Pennsylvania

- *In re Ephedra Products Liability Litigation,* MDL 1598, United States District Court, Southern District of New York

- *In re Guidant Implantable Defibrillators Products Liability Ligitation,* MDL 1708

- *In re Intergel Products Litigation*

- *In re Meridia Products Liability Litigation,* MDL 1481, United States District Court, Northern District of Ohio

- *In re Medtronic Implantable Defibrillators Products Liability Litigation* MDL 1726, United States District Court, District of Minnesota

- *In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation,* MDL 1905, United States District Court, District of Minnesota.

- *In re Neurontin "Off-Label" Marketing Litigation,* MDL 1629, United States District Court, District of Massachusetts

- *In re Orthopedic Bone Screw Litigation* MDL 1014 (Member of Discovery Committee), United States District Court, Eastern District of Pennsylvania)

- *In re Phenylpropanolamine (PPA) Products Liability Litigation,* MDL 1407

- *In re Propulsid Products Liability Litigation* MDL 1355 (Member of Plaintiffs' Steering Committee), United States District Court, Eastern District of Louisiana

- *In re Rezulin Products Liability Litigation,* MDL 1348, United States District Court, Southern District of New York

- *In re Serzone Products Liability Litigation,* MDL 1477, United States District Court, Southern District of West Virginia

- *In re St. Jude Silzone Heart Valves Product Liability Litigation,* MDL 1396, United States District Court, District of Minnesota

- *In re Sulzer Inter-Op Orthopedic Hip Implant Litigation* MDL 1401 (Special Counsel to Plaintiffs Steering Committee), United States District Court, Northern District of Ohio

- *In re Telectronics Pacemaker Litigation* MDL 1057 (Member of Plaintiffs Steering Committee

10

- *In re TMJ Implant Litigation* MDL 1001 (Member of Plaintiffs Steering Committee)
- *In re Vioxx Products Liability Litigation,* MDL 1657, United States District Court, Eastern District of Louisiana
- *Foster, et al. v. St. Jude Medical, Inc.,* United State District Court, State of Minnesota
- *Olsen v. Medtronic, Inc., et al.,* Fourth Judicial Court, State of Minnesota
- *O'Neill, et al. v. St. Jude Medical Inc.,* Ramsey County District Court

## Securities, Investment Fraud, Corporate Governance and Antitrust

- *Atkinson v. Morgan Keegan & Co.,* United States District Court, Western District of Tennessee
- *City of Ann Arbors Employees' Retirement System v. MoneyGram International, Inc.,* United States District Court, District of Minnesota
- *Gaither v. Computer Network Technology Corporation, et al.,* Fourth Judicial District, State of Minnesota
- *Haritos, et al. v. American Express Financial Advisors,* U.S. District Court, District of Arizona
- *In re ADC Telecommunications, Inc. Securities Litigation,* United States District Court, District of Minnesota
- *In re Boston Scientific Corporation Securities Litigation,* U.S. District Court, District of Massachusetts
- *In re Ceridian Corporation,* United States District Court, District of Minnesota
- *In re E.W. Blanch Holdings Securities Litigation,* United States District Court, District of Minnesota
- *In re Pemstar, Inc. Securities Litigation,* United States District Court, District of Minnesota
- *In re The St. Paul Companies, Inc., et al.,* United States District Court, District of Minnesota
- *In re Stellent, Inc. Securities Litigation,* United States District Court, District of Minnesota
- *In re SuperValu, Inc. Securities Litigation,* United States District Court, District of Minnesota
- *In re Synovis Life Technologies, Inc. Securities Litigation,* United States District Court, District of Minnesota
- *In re Vitamins Antitrust Litigation,* United States District Court, District of District of Columbia
- *In re Xcel Energy, Inc. Securities Litigation,* United States District Court, District of Minnesota
- *In re Zomax, Inc. Securities Litigation,* United States District Court, District of Minnesota
- *Klosek, et al. v. Ameriprise Financial, Inc., et al.,* United States District Court, District of Minnesota

11

- *Landers, et al. v. Morgan Keegan & Co.,* Chancery Court of Tennessee, Thirtieth Judicial District , Shelby County

- *Rupp, et al. v. Thompson et al.* (Minnesota Corn Processors), Fifth Judicial District Court, State of Minnesota

- *Schmidt, et al. v. eFunds Corporation, et al.,* Superior Court of Arizona, Maricopa County

- *Thomas, et al. v. Metropolitan Life Insurance Company, et al.,* United States District Court, Western District of Oklahoma

## ERISA Litigation

- *In re Merrill Lynch & Co., Inc. Securities, Derivative & ERISA Litigation,* United States District Court, Southern District of New York

- *Moeckel, et al. v. Caremark, Inc.,* United States District Court, Middle District of Tennessee

- *Glanton, et al. v. Advanced PCS Health, L.P.,* United States District Court, District of Arizona

- *In re Medco Health Solutions, Inc., Pharmacy Benefits Management Litigation,* United States District Court, Southern District of New York

- *In re Express Scripts, Inc., PBM Litigation,* United States District Court, Eastern District of Missouri

## Employment Violations – Wage and Hour Litigation

- *Bernstein, et al. v. M.G. Waldbaum, Inc., et al.,* United States District Court, District of Minnesota

- *Christman, et al. v. FPMI Solutions, Inc.,* United States District Court, Northern District of California

- *Daud, et al. v. Gold'n Plump Poultry, Inc.,* United States District Court, District of Minnesota

- *DeKeyser, et al. v. ThyssenKrupp Waupaca, Inc.,* United States District Court, Eastern District of Wisconsin

- *Ford, et al. v. Townsends, Inc.,* United States District Court, Eastern District of Arkansas

- *Frank, et al. v. Gold'n Plump Poultry, Inc.,* United States District Court, District of Minnesota

- *Grabman, et al. v. Brakebush Brothers, Inc.,* United States District Court, Eastern District of Wisconsin

- *In re Fedex Ground Package System, Inc.,* MDL 1700, *United States District Court, Northern District of Indiana*

- *Helmert, et al. v Butterball, LLC,* United States District Court, Eastern District of Arkansas

- *Hudson, et al. v. Butterball, LLC,* United States District Court, Western District of Missouri

12

- *Milner, et al. v. Farmers Insurance Exchange,* United States District Court, District of Minnesota

- *Phelps, et al. v. Green Bay Dressed Beef, LLC,* United States District Court, Eastern District of Wisconsin

- *Robinson, et al. v. Novellus Systems, Inc.,* United States District Court, Northern District of California

## Environmental and Toxic Torts

- *Cooksey v. Hawkins Chemical Company,* Hennepin County District Court File No. 95-3603

- *Cuff, et al. v. Brenntag North America, Inc., et al.* United States District Court, Northern District of Georgia Atlanta Division

- *Fastrip, Inc., et al. v. CSX Corporation,* United States District Court, Western District of Kentucky

- *In re MTBE Water Contamination Litigation,* MDL 1358, United States District Court, Southern District of New York

- *In re Soo Line Railroad Company Derailment of January 18, 2002 in Minot, N.D.,* Hennepin County District Court File No. 06-1833

- *In re Welding Rods Products Liability Litigation,* MDL 1535, United States District Court, Northern District of Ohio

- *Martin, et al. v. BioLab, Inc., et al.,* United States District Court, Northern District of Georgia Atlanta Division

- *McGruder, et al. v. DPC Enterprises, LP, et al.,* Maricopa County Superior Court, State of Arizona

- *Adams, et al. v. DPC Enterprises, LP, et al.,* Jefferson County Circuit Court, State of Missouri

- *Mehl, et al. v. Canadian Pacific Railway, et al.,* United States District Court,  District of North Dakota

- *Ponce, et al. v. Pima County, et al.,* Maricopa County Superior Court, State of Arizona

- *Weincke, et al. v. Metropolitan Airports Commission,* State of Minnesota, Hennepin County District Court

**Healthcare Litigation**

- *In re Not-For-Profit Hospital Litigation [Fields, et al. v. Banner Health]*, United States District Court, District of Arizona

- *In re Not-For-Profit Hospital Litigation [Kern, et al. v. Allina Health System]*, United States District Court, District of Minnesota

- *In re Not-For-Profit Hospital Litigation [Peterson, et al. v. Fairview Health Services]*, United States District Court, District of Minnesota

**Improper Homeowner Charges – Mortgage Litigation**

- *Henry, et al. v. Associate Home Equity Services*, United States Bankruptcy Court, Southern District of California

- *In re Mortgage Escrow Litigation,* MDL 899 (Lead counsel), United States District Court, Northern District of Illinois

- *Anderson, et al. v. The Money Store,* United States District Court, District of South Carolina

- *Logan, et al. v. Norwest Mortgage Bank Minnesota, N.A.*, Fourth Judicial District Court, State of Minnesota

- *Boschee v. Burnet Title Company,* Fourth Judicial District, State of Minnesota

- *Boschee v. Burnet Title Company,* United States District Court, District of Minnesota

- *Schlink v. Edina Realty Title,* Fourth Judicial District, State of Minnesota

- *Lund v. Universal Title Company,* Fourth Judicial District, State of Minnesota

- *Ricci, et al. v. Ameriquest Mortgage Company,* Fourth Judicial District, State of Minnesota

- *Nobles, et al. v. Countrywide Home Loans,* Alameda County Superior Court, State of California

- *Holland v. Countrywide Home Loans,* Nassau County Supreme Court, State of New York

- *Stepan v. Edina Realty Title,* Fourth Judicial District Court, State of Minnesota

- *Edwards / White, et al. v. Long Beach Mortgage Company / Washington Mutual Bank F.A., et al.,*  Fourth Judicial District Court, State of Minnesota

# EXHIBIT C



Founded in 1978, Lockridge Grindal Nauen P.L.L.P. has extensive experience in antitrust, securities, environmental, employment, health care, commercial, intellectual property and telecommunications law.

Our clients include pension funds, unions, agri-businesses, business enterprises, banks, local governments, trade and industry associations, real estate developers, telecommunications providers, health care professionals, casualty insurers, publishers and authors, and a major computer manufacturer and retailer.

Lockridge Grindal Nauen attorneys are assisted by more than 20 paralegals and government relations specialists, and an extensive support staff. The firm has offices in Minneapolis, Minnesota and Washington, D.C.

## Richard A. Lockridge

Richard A. Lockridge is a partner in Lockridge Grindal Nauen P.L.L.P. He is a graduate of the University of Iowa Law School (J.D., with high distinction, 1974) where he served as Managing Editor of the Iowa Law Review. Thereafter, from 1974 to 1976, he served as a law clerk to the Honorable Myron H. Bright of the United States Court of Appeals for the Eighth Circuit. From 1976 to 1978 he handled civil litigation as a Minnesota Special Assistant Attorney General.

During almost thirty years of practice, Mr. Lockridge has been continuously active in class action and other complex litigation, including the following cases in which he has been lead or co-lead counsel:

- In re Select Comfort Corporation Securities Litigation, Master File No. 99-884 (D. Minn.);

- In re Baycol Products Litigation, MDL No. 1431 (D. Minn.);

- In Re Microcrystalline Cellulose Antitrust Litigation, MDL 1402 (E.D. Pa.);

- In re Monosodium Glutamate Antitrust Litigation, MDL No. 1328 (D. Minn.);

- In Re Lutheran Brotherhood Variable Insurance Products Co. Sales Practices Litigation, MDL No. 1309 (D. Minn.);

- Gary Meyers v. The Guardian Life Insurance Company of America, Inc. Litigation, Civil No. 2:97CV35-D-B (N.D. Miss.);

- Alan B. Spitz and Linda Spitz, and Ann Novacheck v. Connecticut General Life Insurance Company, MDL No. 1136 (C.D. Cal.);

- In re Summit Medical Systems, Inc. Securities Litigation, Master File No. 97-558 (D. Minn.);

- In re Digi International Inc. Securities Litigation, Master File No. 97-5 (D. Minn.);

- In re Catfish Antitrust Litigation, MDL No. 928 (N.D. Miss.);

- Benacquisto, et al. v. American Express Financial Corp. et al., Master File No. 00-1980 (D. Minn.), Civil Action No. 96-18477 (Hennepin County District Court Minn.) (insurance class action);

- Gary G. Smith, et al. v. Little Caesar Enterprises, Inc., et al. (Little Caesar Franchise Litigation), Civil No. 93 CV 74041 DT (E.D. Mich.);

- In re Piper Funds, Inc. Institutional Government Income Portfolio Litigation, Master File No. 3-94-587 (D. Minn.);

- In re Residential Doors Antitrust Litigation, MDL No. 1039 (E.D. Pa.);

- In re Carpet Antitrust Litigation, MDL No. 1075 (N.D. GA);

- In re LaserMaster Technologies, Inc. Securities Litigation, Master File No. 4-95-631 (D. Minn.);

- Richard J. Rodney, Jr., et al. v. KPMG Peat Marwick, 4-95-CIV-800 (D. Minn.);

- In re Citi-Equity Group, Inc. Securities Litigation, Master File No. 3-94-1024 (D. Minn.);

- Lockwood Motors, Inc., et al. v. General Motors Corporation, Master File No. 3-94-1141 (D. Minn);

- David L. Antonson, et al. v. Leon H. Robertson, et al. (American Carriers Securities Litigation) Civ. No. 88-2567 (D. Kan.);

- In re Steel Drums Antitrust Litigation, MDL No. 887 (S.D. Ohio);

- *In re New Steel Pails Antitrust Litigation*, Master File No. C-1-91-213 (S.D. Ohio);

- *In re Unisys Savings Plan Litigation*, Master File No. 91-3067 (E.D. Pa.); and

- *George Guenther, et al. v. Cooper Life Sciences, et al.* (Cooper Life Sciences Securities Litigation), C 89-1823 MHP (N.D. Cal.).

Mr. Lockridge also is or has been involved in the following litigation:

- *In re Air Cargo Shipping Services Antitrust Litigation*, 1:06-md-1775-CBA-VVP (E.D.N.Y.);

- *Funeral Consumers Alliance, Inc., et al. v. Service Corporation International, et al.*, No. H-05-3394 (S.D. Tex.);

- *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, MDL 1720 (E.D.N.Y.);

- *In re Worldcom, Inc. Securities Litigation* No. 02-CV-3288 (S.D.N.Y.);

- *In re Credit Suisse – AOL Securities Litigation*, Case No. 1:02-CV-12146-NG (D. Mass.);

- *Haritos, et al. v. American Express Financial Advisors, Inc.*, 02-2255-PHX-PGR (D. Ariz.);

- *In re King Pharmaceuticals, Inc. Securities Litigation*, No. 2:03-CV-77 (E.D. Tenn.);

- *In re Delphi Corporation Securities, ERISA, and Shareholder Derivative Litigation*, Master Case No. 05-md-1725 (E.D. Mich.);

- *In re Merck & Co., Inc., Securities, Derivative & ERISA Litigation*, 3:050cv-1151 (D.N.J.);

- *In re AOL Time Warner Securities Litigation*, MDL No. 1500 (S.D.N.Y.);

- *In re Vioxx Product Liability Litigation*, MDL No.1657 (E.D.La.);

- *In re Scientific-Atlanta, Inc. Securities Litigation*, No. 1:01-CV-1950 (N.D. Ga.);

- *In re OM Group, Inc. Securities Litigation*, No. 1:02 CV 2163 (N.D. Ohio);

- *Ohio Public Employees Retirement System, et al. v. Freddie Mac, et al.*, MDL No. 1584 (S.D.N.Y.) (Federal Home Loan Mortgage Corporation Securities Litigation);

- *In re Federal National Mortgage Association Securities, Derivative and ERISA Litigation*, MDL No. 1668 (D. D.C.);

- *Rodney v. OCA, Inc., et al.*, No. 05-2219 (E.D. La.);

- *In re Telxon Securities Litigation*, No. 5:98-CV-2876 (N.D. Ohio);

- <u>In re Retek, Inc. Securities Litigation</u>, Master File No. 02-4209 (D. Minn.);
- <u>Aviva Partners, LLC, v. Navarre Corp., et al.</u>, Master File No. 05-1151 (D. Minn.);
- <u>In re Chronimed Inc., Securities Litigation</u>, Master File No. 01-1092 (D. Minn.);
- <u>Glen Lewy 1990 Trust v. Investment Advisers, Inc., et al.</u>, No. CT-00-17047 (Henn. Cty. Dist. Ct.);
- <u>Fink v. Rainforest Café</u>, No. MC 00-451 (Henn. Cty. Dist. Ct.);
- <u>Crosby v. Aid Association for Lutherans</u>, Master File No. 00-CV-2112 (D. Minn.);
- <u>In re Rezulin Litigation</u>, MDL 1348 (S.D. N.Y.);
- <u>In re Serzone Productions Liability Litigation</u>, MDL No. 1477 (S.D.W.V.);
- <u>In re Tamoxifen Citrate Antitrust Litigation</u>, MDL No. 1408 (E.D. N.Y.);
- <u>In re Western Union Money Transfer Litigation</u>, Master File No. CV 01 0335 (E.D.N.Y.);
- <u>In re Meridia Products Liability Litigation</u>, MDL No. 1481 (N. D. Ohio);
- <u>In Re Propulsid Products Liability Litigation</u>, MDL No. 1355 (E.D. LA);
- <u>In re Methionine Antitrust Litigation</u>, MDL No. 1311 (N.D. Cal.);
- <u>In re Flat Glass Antitrust Litigation</u>, MDL No. 1200 (W.D. PA);
- <u>Chemical Distribution, Inc., et al. v. Akzo Nobel Chemicals, et al.</u>, MDL No. 1226 (N.D. Cal.);
- <u>Durocher v. American Family Life Insurance Co.</u>, Case No. 97-CV-292 (Marinette Co. Dist.);
- <u>Marksman Partners, L.P., et al. v. Chantal Pharmaceutical Corporation, et al.</u>, Master File No. CV-96-0872-WJR (C.D. Cal.);
- <u>In re Connecticut General Life Insurance Co. Premium Litigation</u>, MDL No. 1336 (C.D. Cal.);
- <u>In re Lease Oil Antitrust Litigation</u>, MDL No. 1166 (S.D. Tex.);
- <u>In re Tricord Systems, Inc. Securities Litigation</u>, Master File No. 3-94-746(D. Minn.);
- <u>In re Riscorp, Inc. Securities Litigation</u>, Master File No. CV-96-2374-CIV-T-23A (M.D. Fla.);
- <u>In re Nasdaq Market-Maker Antitrust Litigation</u>, MDL No. 1023 (S.D.N.Y.);

- <u>John S. Lawrence v. Philip Morris Companies, Inc., et al.</u> (Philip Morris Securities Litigation), Civ. No. 94-1494 (E.D.N.Y.);

- <u>Leetate Smith, et al. v. Merrill Lynch & Co., et al.</u> (Orange County Bond Litigation), No. SACV-94-1063-LHM(EEx) (C.D. Cal.);

- <u>Nelsen v. Craig-Hallum</u> (Craig-Hallum Securities Litigation), Master File No. 4-86-135 (D. Minn.);

- <u>Johnson v. Kives</u> (K-Tel Securities Litigation), Master File No. 4-85-1216 (D. Minn.);

- <u>In re Endotronics Securities Litigation</u>, Master File No. 4-87-130 (D. Minn.);

- <u>In re Wirebound Box Antitrust Litigation</u>, MDL No. 793 (D. Minn.);

- <u>American Telephone and Telegraph Antitrust Litigation</u>, Civil Action No. 81-2623 (D.D.C.);

- <u>In re Domestic Air Transportation Antitrust Litigation</u>, MDL No. 861 (N.D. Ga.);

- <u>In re Painewebber Securities Litigation</u>, 86 Civ. 6776 (S.D.N.Y.);

- <u>In re ICN/Viratek Securities Litigation</u>, 87 Civ. 4296 (S.D.N.Y.);

- <u>In re Bioplasty Securities Litigation</u>, Master File No. 4-91-689 (D. Minn.);

- <u>Low Density Polyethylene Resin Antitrust Litigation</u>, No. 82 Civ. 1093 (S.D.N.Y.);

- <u>Dixie Brewing Company, Inc. v. John Barth, Inc.</u> (In re Hops Antitrust Litigation), Civ. No. 8404434 (E.D. Pa.);

- <u>Steven S. Mitchell v. Thousand Trails, Inc.</u> (Thousand Trails Security Litigation), Civ. No. C86-146 (W.D. Wash.); and

- <u>Spencer v. Comserv Corporation</u> (Comserv Securities Litigation), Master File No. 4-84-794 (D. Minn.).

- <u>In re Medtronic, Inc. Implantable Defibrillator Products Liability Litigation</u>, MDL No. 05-1726 (JMR/AJB)

- <u>In re Guidant Corp. Implantable Defibrillators Products Liability Litigation</u>, MDL No. 05-1708 (DWF/AJB)

- <u>In re Tyco International, Ltd.</u>, ERISA Civil File No. 02-cv-1357 (D. NH)

Mr. Lockridge acted as co-lead defense counsel for the target defendant in <u>Mid-State Oil v. Simonson Oil</u> (price fixing) Civil No. A3-79-18 (D.N.D.); plaintiff's counsel in <u>Superlines Co.</u>

v. E.W. Wylie Corp., 1981-2 Trade Cases (CCH) (D. Minn. 1981); and one of the defense counsel in Ray Adduono v. World Hockey Association, Master File No. 3-82-586 (D. Minn.).

Mr. Lockridge spent one year in Houston, Texas working on the trial of the Corrugated Container Antitrust Litigation, MDL No. 310 (S.D. Tex), a case which resulted in one of the largest verdicts (in excess of $1 billion) ever awarded by a jury in antitrust litigation. He was also part of the plaintiffs' trial team for In re High Pressure Laminates Antitrust Litigation, MDL No. 1368 (S.D.N.Y.), which was recently tried in the Southern District of New York, a case in which settlements totaled over $40 million.

Mr. Lockridge was one of the attorneys who successfully represented West Publishing Company in a monopolization and attempted monopolization case brought by West against Mead Corporation (the then owner of "LEXIS"), and in a monopolization and attempted monopolization case brought by Mead against West (the "LEXIS v. Westlaw" antitrust cases).

## Gregg M. Fishbein

Gregg M. Fishbein is a partner in the Lockridge Grindal Nauen P.L.L.P. firm. He is a 1989 graduate (J.D., with honors) of Drake University Law School. He graduated from the University of Northern Iowa (B.A. Accounting) in 1986 and is a Certified Public Accountant. He was admitted to the bar in 1989, Minnesota, U.S. District Court, District of Minnesota and United States Tax Court. In 1995, he was admitted to the bar for United States Court of Appeals for the Eighth Circuit. He is a member of the Federal Bar Association, Minnesota State Bar Association, and Hennepin County Bar Association.

Since joining the firm in July of 1994, Mr. Fishbein has specialized in class action and other complex commercial litigation. During the past fourteen years of practice, he has been

continuously active in class and complex litigation, including representation of plaintiff classes.

He has worked on, among others, the following complex class action matters:

- Fink v. Rainforest Café, File No. MC 00-451 (Henn. Cty. Dist. Ct.);
- Freberg v. Merrill Corp., et al., Civ. No. 99-10063 (Henn. Cty. Dist. Ct.);
- George Siepel, et al. v. Bank of America, N.A., et al., File No. 05-2393 (E.D. Mo.);
- Guenther, et al. v. Cooper Life Sciences, et al., No. C-89-1823-MHP (N.D. Cal.);
- Haritos, et al. v. American Express Financial Advisors, Inc., 02-2255-PHX-PGR (D. Ariz.);
- Harris v. Hospital Corporation of America, No. 3-89-0995 (M.D. Tenn.);
- In re American Express Financial Advisors Securities Litigation, Civil Action No. 1:04-CV-1773 (S.D.N.Y.);
- In re Ancor Communications, Inc. Securities Litigation, File No. 97-1696 (D. Minn.);
- In re AOL Time Warner Securities Litigation, MDL No. 1500 (S.D.N.Y.);
- In re Boston Chicken, Inc. Securities Litigation, Civ. No. 97-WM-1308 (D. Col.);
- In re Boston Scientific Corp. Securities Litigation, File No. 05-11934 (D. Mass.);
- In re Buffets, Inc. Shareholders Litigation, File No. 19-CV-00-8130 (Dak. Cty. Dist. Ct.);
- In re Ceridian Corp. Securities Litigation, File No. 97-2044 (D. Minn.);
- In re Chronimed, Inc. Securities Litigation, Master File No. 01-CV-1092 (D. Minn.);
- In re Citi-Equity Group, Inc. Securities Litigation, File No. 3-94-1024 (D. Minn.);
- In re Destron Fearing Securities Litigation, File No. 99-CV-137 (D. Minn.);
- In re Digi International Inc. Securities Litigation, File No. 97-5 (D. Minn.);
- In re Equisure, Inc. Securities Litigation, File No. 97-2056 (D. Minn.);
- In re GT Interactive Software Corp. et al., File No. 98-CV-0085 (S.D. N.Y.);
- In re IKON Office Solutions, Inc. Securities Litigation, File No. 98-CV-4286 (E.D. Pa.);

- In re Iomega Securities Litigation, File No. 98-CV-00185 (D. N.J.);
- In re K-Tel Securities Litigation, File No. 98-2520 (D. Minn.);
- In re Mara Fund Securities Litigation, File No. 97-8603-CIV (D. Fla.);
- In re LaserMaster Technologies, Inc. Securities Litigation, File No. 4-95-631 (D. Minn.);
- In re Merck & Co., Inc., Securities, Derivative & ERISA Litigation, 3:050cv-1151 (D.N.J.);
- In re OM Group, Inc. Securities Litigation, No. 1:02 CV 2163 (N.D. Ohio);
- In re Oxford Health Plans, Inc. Securities Litigation, File No. 3-97-CV-2567 (D. Conn.);
- In re Navarre Corp. Securities Litigation, File No. 99-CV-1955 (D. Minn.);
- In re OM Group, Inc. Securities Litigation, 1:02 CV 2163 (N.D. Ohio);
- In re Photran Corp. Securities Litigation, File No. 97-1138 (D. Minn.);
- In re Piper Funds, Inc. Institutional Government Income Portfolio Litigation, File No. 3-94-587 (D. Minn.);
- In re Reliance Group Holdings, Inc. Securities Litigation, File No. 00-CV-4653 (S.D. N.Y.);
- In re Retek, Inc. Securities Litigation, Master File No. 02-4209 (D. Minn.);
- In re Safety-Kleen Corp. Securities Litigation, MDL 1378;
- In re Select Comfort Corp. Securities Litigation, Civil No. 99-884 (D. Minn.);
- In re Summit Medical Systems, Inc. Securities Litigation, File No. 97-558 (D. Minn.);
- In re Telxon Securities Litigation, No. 5:98-CV-2876 (N.D. Ohio);
- In re Tricord Systems Inc. Securities Litigation, File No. 3-94-746 (D. Minn);
- In re Worldcom, Inc. Securities Litigation 02-CV-3288 DLC (S.D.N.Y.);
- John S. Lawrence, et al. v. Philip Morris Co., et al., File No. CV-94-1494 (E.D. N.Y.);
- Ellen Jane Kutten, et al. v. Bank of America, N.A., et al, File No. 06-937 (E.D. Mo.);
- Glen Lewy 1990 Trust, et al. v. Investment Advisers, Inc., et al., Civil File No. CT 00-17047 (Hennepin County);

- Little Gem Life Sciences LLC v. Orphan Medical, Inc., et al., File No. 06-1377 (D. Minn.);
- McFarlin v. Ernst & Young, LLP, File No. 99-CV-553 (D. Minn.);
- Ohio Public Employees Retirement System, et al. v. Freddie Mac, et al., MDL No. 1584 (S.D.N.Y.) (Federal Home Loan Mortgage Corporation Securities Litigation);
- Rainforest Café, Inc. v. State of Wisconsin Investment Board, et al., Case No. A03-0813 (D. Minn.);
- Richard J. Rodney, Jr., et al. v. KPMG Peat Marwick, 4-95-CV-800 (D. Minn.);
- Russell v. Spanlink Communications, Inc., et al., File No. 00-CV-945 (D. Minn.);
- Leetate Smith, et al. v. Merrill Lynch & Co., et al., File No. SACV-94-1063-LHM (C.D. Cal.) (Orange County Bond Litigation); and
- Wright v. Engineering Animation Inc., et al., Civ. No. 4-99-CV-10590 (S.D. Ia.).

## **Karen Hanson Riebel**

Karen Hanson Riebel is a partner in Lockridge Grindal Nauen P.L.L.P. A 1991 dual-degree program graduate (J.D., B.A., Cum Laude) from the Boston University School of Law and the Boston University College of Liberal Arts, Ms. Riebel joined the firm in 1992.

During her tenure at the firm, she has been extensively involved in a number of complex class action matters including:

- Funeral Consumers Alliance, Inc., et al. v. Service Corporation International, et al., No. H-05-3394 (S.D. Tex.);
- In re Air Cargo Shipping Services Antitrust Litigation, 1:06-md-1775-CBA-VVP (E.D.N.Y.);
- In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, MDL 1720 (E.D.N.Y.);
- In re Delphi Corporation Securities, ERISA, and Shareholder Derivative Litigation, Master Case No. 05-md-1725 (E.D. Mich.);
- In re Fremont General Corporation ERISA Litigation, Case No. 02:07-cv-02693 (C.D. Cal.);

- In re Tyco International Ltd., ERISA Litigation, Civil File No. 02-cv-1357 (D. N.H.);

- Boland et al v. Merrill Lynch & Co., Inc. ERISA Litigation, Civil File No. 07-cv-11054 (S.D.N.Y.);

- In re St. Jude Medical, Inc. Securities Litigation, 06-CV-01379 (D. Minn.);

- In re Credit Suisse – AOL Securities Litigation, Case No. 1:02-CV-12146-NG (D. Mass.);

- In re Worldcom, Inc. Securities Litigation No. 02-CV-3288 (S.D.N.Y.);

- In re AOL Time Warner Securities Litigation, MDL No. 1500 (S.D.N.Y.);

- In re King Pharmaceuticals, Inc. Securities Litigation, No. 2:03-CV-77 (E.D. Tenn.);

- In re Delphi Corporation Securities, ERISA, and Shareholder Derivative Litigation, Master Case No. 05-md-1725 (E.D. Mich.);

- In re Merck & Co., Inc., Securities, Derivative & ERISA Litigation, 3:050cv-1151 (D.N.J.);

- In re Federal National Mortgage Association Securities, Derivative and ERISA Litigation, MDL No. 1668 (D. D.C.);

- In re Scientific-Atlanta, Inc. Securities Litigation, No. 1:01-CV-1950 (N.D. Ga.);

- In re OM Group, Inc. Securities Litigation, No. 1:02 CV 2163 (N.D. Ohio);

- Ohio Public Employees Retirement System, et al. v. Freddie Mac, et al., MDL No. 1584 (S.D.N.Y.) (Federal Home Loan Mortgage Corporation Securities Litigation);

- In re Select Comfort Corporation Securities Litigation, Master File No. 99-884 (D. Minn.);

- In Re Lutheran Brotherhood Variable Insurance Products Co. Sales Practices Litigation, MDL No. 1309 (D. Minn.);

- Rodney v. OCA, Inc., et al., No. 05-2219 (E.D. La.);

- Danis v. USN Communications, Inc., et al., No. 98 C 7482 (N.D. Ill.);

- In re Digi International Inc. Securities Litigation, Master File No. 97-5 (D. Minn.);

- In re Summit Medical Systems, Inc. Securities Litigation, Master File No. 97-558 (D. Minn.);

- In re LaserMaster Technologies, Inc. Securities Litigation, Master File No. 4-95-631 (D. Minn.);

- In re Ancor Communications, Inc. Securities Litigation, Master File No. 97-1696 (D. Minn.);
- In re Ceridian Corp. Securities Litigation, Master File No. 97-2044 (D. Minn.);
- In re K-Tel Securities Litigation, Master File No. 98-2520 (D. Minn.);
- In re Riscorp, Inc. Securities Litigation, Master File No. CV-96-2374-CIV-T-23A (M.D. Fla.);
- In re Lease Oil Antitrust Litigation, MDL No. 1166 (S.D. Tex.);
- In re Wirebound Box Antitrust Litigation, MDL No. 793 (D. Minn.);
- David L. Antonson, et al. v. Leon H. Robertson, et al. (American Carriers Securities Litigation), Civ. No. 88-2567 (D. Kan.);
- In re Tonka II Securities Litigation, Civ. No. 3-90-318 (D. Minn);
- In re Catfish Antitrust Litigation, MDL No. 928 (D. Miss.);
- In re ICN/Viratek Securities Litigation, 87 Civ. 4296 (S.D.N.Y.);
- Joseph D. Chutich v. Green Tree Acceptance, Inc., Master File No. 3-88-869 (D. Minn.); and
- Richard J. Rodney, Jr., et al. v. KPMG Peat Marwick, Master File No. 4-95-800 (D. Minn.).
- In re Tyco International, Ltd., ERISA Civil File No. 02-cv-1357 (D. NH)

During the summer of 1996, Ms. Riebel spent three months in New York as a member of the team of lawyers that tried the In re ICN/Viratek Securities Litigation in the Southern District of New York before the Honorable Kimba Wood. The case was settled for $14.5 million after the jury returned a partial verdict.

Ms. Riebel spent seven months in Anchorage, Alaska, in 1994, as a member of the trial team that secured a jury verdict for punitive damages in the amount of $5 billion for a mandatory punitive damages class in In re The Exxon Valdez, Case No. A89-0095-CV (D. Alaska). For their efforts, Ms. Riebel and the other members of the trial team were awarded the Trial Lawyers' For Public Justice Trial Lawyers of the Year award in 1994. In addition, Ms. Riebel is extensively involved in the administration and evaluation of the more than 50,000 claims submitted in that litigation.

Ms. Riebel is admitted to practice before the United States Courts of Appeals for the Eighth Circuit, and the federal and state courts of Minnesota.

# EXHIBIT D



# HARWOOD FEFFER LLP

## FIRM DESCRIPTION

The law firm of Harwood Feffer LLP ("Harwood Feffer" or the "Firm") specializes in complex, multi-party litigation with an emphasis on securities class actions, shareholder derivative and ERISA litigation. The Firm also handles more general complex commercial litigation involving allegations of breach of contract, breach of fiduciary duty, fraud, and negligence, as well as litigation involving consumer fraud, anti-competitive conduct, and other commercial claims.

Harwood Feffer is dedicated to prosecuting socially useful actions in the most efficient manner and with the highest level of professional competence. The structure of the Firm allows us a far greater degree of independence, flexibility, and satisfaction than a large firm environment, without sacrificing the quality of representation necessary to successfully litigate complex actions throughout the country. The Firm maintains an excellent reputation -- among both the plaintiffs' and defense bars. Our adversaries and co-counsel know that we take a case to trial, if necessary, to achieve a satisfactory result for our clients.

Harwood Feffer has been acknowledged by courts and by its peers to be one of the leaders in the plaintiffs' shareholder advocacy bar. In this regard, we have developed new law in the areas of tender offers, fiduciary duty of corporate insiders to public shareholders in mergers and takeovers, and general principles of required disclosure to shareholders and institutional investors in public companies.

As a result, the Firm has been designated as lead, co-lead or special counsel in numerous complex cases and other actions involving shareholder rights and corporate governance. In the vast majority of such actions, the Firm's skill and



**HARWOOD FEFFER LLP**
PAGE 2

expertise has led to the recovery of substantial monetary and equitable benefits for investors, stockholders, corporations, and partnerships. By way of example, the following litigated actions, in which the Firm served in a leadership capacity, were all brought to highly successful conclusions:  1) In re First Capital Holdings Corporation Financial Products Securities Litigation, MDL 901 (C.D.Cal.) (restoration of over $1 billion in insurance policies and benefits); 2) In re Royal Dutch/Shell Transport ERISA Litigation, (D.N.J.) (creation of settlement fund of $90 million plus implementation of structural relief); 3) In re Prudential Bache Energy Income Partnerships Securities Litigation, MDL 880 (E.D.La.) (creation of settlement fund in excess of $90 million); 4) In re JWP Inc. Securities Litigation, (S.D.N.Y.) (creation of settlement fund in excess of $37 million); 5) Morse v. McWhorter, (M.D. Tenn.)(creation of a settlement fund of $49.5 million on behalf of investors in Columbia/HCA Healthcare Corp.); 6) In re BankOne Securities Litigation, (N.D. Ill.) (creation of a $45 million settlement fund); and 7) Sidney Morse, et al. v. Abbott Laboratories, et al., (N.D. Ill.) (creation of a $14.1 million settlement fund following a jury verdict for plaintiffs).

Courts have often recognized the Firm's skill in class actions.  For example, in In re Electro-Catheter Securities Litigation, Judge Nicholas Politan of the District of New Jersey stated:

> [C]ounsel in this case are highly competent, very skilled in this very specialized area and were at all times during the course of the litigation that I participated in, which was perhaps the major part of the Court litigation here, always well prepared, well spoken, and knew their stuff and they are a credit to their profession.  They are the top of the line.



**HARWOOD FEFFER LLP**
PAGE 3

## THE ATTORNEYS OF THE FIRM

**Robert I. Harwood**, senior partner of the Firm, graduated from William and Mary Law School in 1971, and has specialized in securities law and securities litigation since beginning his career in 1972 at the Enforcement Division of the New York Stock Exchange. He has prosecuted numerous securities, class, derivative, and ERISA actions. He is a member of the Trial Lawyers' Section of the New York State Bar Association and has served as a guest lecturer at trial advocacy programs sponsored by the Practicing Law Institute.

Commenting on Mr. Harwood's abilities, in <u>In re Royal Dutch/Shell Transport ERISA Litigation</u>, (D.N.J.), Judge Bissell stated:

> the Court knows the attorneys in the firms involved in this matter and they are highly experienced and highly skilled in matters of this kind. Moreover, in this case it showed. Those efforts were vigorous, imaginative and prompt in reaching the settlement of this matter with a minimal amount of discovery . . . . So both skill and efficiency were brought to the table here by counsel, no doubt about that.

Likewise, Judge Hurley stated in connection with <u>In re Olsten Corporation Securities Litigation</u>, 97 CV-5056 (E.D.N.Y. Aug. 31, 2001), wherein a settlement fund of $24.1 million was created: "The quality of representation here I think has been excellent." Mr. Harwood was lead attorney in <u>Meritt v. Eckerd</u>, 86 Civ. 1222 (E.D.N.Y. May 30, 1986), where then Chief Judge Weinstein observed that counsel conducted the litigation with "speed and skill" resulting in a settlement having a value "in the order of $20 Million Dollars." Mr. Harwood prosecuted the <u>Hoeniger v. Aylsworth</u> class action litigation in the United States District Court for the



Western District of Texas (SA-86-CA-939), which resulted in a settlement fund of $18 million and received favorable comment in the August 14, 1989 edition of The Wall Street Journal ("Prospector Fund Finds Golden Touch in Class Action Suit" p. 18, col. 1). Mr. Harwood served as co-lead counsel in In Re Interco Incorporated Shareholders Litigation, Consolidated C.A. No. 10111 (Delaware Chancery Court) (May 25, 1990), resulting in a settlement of $18.5 million, where V.C. Berger found, "This is a case that has an extensive record that establishes it was very hard fought. There were intense efforts made by plaintiffs' attorneys and those efforts bore very significant fruit in the face of serious questions as to ultimate success on the merits."

Mr. Harwood recently served as lead counsel in Morse v. McWhorter, (Columbia/HCA Healthcare Securities Litigation) (M.D. Tenn.), in which a settlement fund of $49.5 million was created for the benefit of the Class, as well as In re Bank One Securities Litigation, (N.D. Ill.), which resulted in the creation of a $45 million settlement fund. Mr. Harwood also served as co-lead counsel in In re Safety-Kleen Corp. Stockholders Litigation, (D.S.C.), which resulted in a settlement fund of $44.5 million; In re Laidlaw Stockholders Litigation, (D.S.C.), which resulted in a settlement fund of $24 million; In re JWP Inc. Securities Litigation, (S.D.N.Y.), which resulted in a $37 million settlement fund; In re Oxford Health Plans, Inc. Derivative Litigation, (S.D.N.Y.), which resulted in a settlement benefit of $13.7 million and corporate therapeutics; and In re UNUMProvident Corp. Securities Litigation, (D. Me.), which resulted in the creation of settlement fund of $45 million.



**HARWOOD FEFFER LLP**
**PAGE 5**

**Joel C. Feffer**, one of the senior members of the firm, was the partner supervising the litigation of In re Home Shopping Network, Inc., Derivative Litigation, (S.D. Fla.), which created a settlement benefit in excess of $20 million, and Edge Partners, L.P. v. Dockser, et al., (D. Md.), which created a settlement benefit in excess of $11 million.  In addition, Mr. Feffer was in charge of Dornberger v. Metropolitan Life Insurance Company in the Southern District of New York, which created a settlement benefit of more than $20 million; the successful prosecution of the Regeneron Pharmaceuticals, Inc. Securities Litigation in the Southern District of New York, which created a settlement fund in excess of $4 million; and Croyden Assoc. v. Tesoro Petroleum Corp., et al., (Del. Ch.), which created a settlement benefit of $19.2 million on behalf of holders of preferred stock of Tesoro Petroleum Corp.

Mr. Feffer graduated from Georgetown University Law Center in 1967 and specialized in corporate law and securities litigation.  Mr. Feffer is a member of both the New York State and American Bar Associations.

**Daniella Quitt**, a member of the Firm, graduated from Fordham University School of Law in 1988, is a member of the Bar of the State of New York, and is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and the United States Court of Appeals for the Second and Fifth Circuits.

Ms. Quitt has played a significant role in numerous actions in which Harwood Feffer served as lead or co-lead counsel, wherein substantial benefits were conferred upon plaintiff shareholders, such as In re Safety-Kleen Corp. Stockholders Litigation, (D.S.C.) ( settlement fund of $44.5 million); In re Laidlaw Stockholders Litigation, (D.S.C.) (settlement fund of $24 million; In re

**HARWOOD FEFFER LLP**
**PAGE 6**

UNUMProvident Corp. Securities Litigation, (D. Me.) (settlement fund of $45 million); In re Harnischfeger Industries (E.D. Wisc.) (settlement fund of $10.1 million); In re Oxford Health Plans, Inc. Derivative Litigation, (S.D.N.Y.) (settlement benefit of $13.7 million and corporate therapeutics); In re JWP Inc. Securities Litigation, (S.D.N.Y.) (settlement fund of $37 million; In re Home Shopping Network, Inc., Derivative Litigation, (S.D. Fla.) (settlement benefit in excess of $20 million); In re Rexel Shareholder Litigation, (Sup. Ct. N.Y. County) (settlement benefit in excess of $38 million); and Croyden Assoc. v. Tesoro Petroleum Corp., et al., (Del. Ch.) (settlement benefit of $19.2 million).

Recently, in connection with the settlement of Alessi v. Beracha, (Del. Ch.), a class action brought on behalf of the former minority shareholders of Earthgrains, Chancellor Chandler commented: "I give credit where credit is due, Ms. Quitt. You did a good job and got a good result, and you should be proud of it."

Prior to joining Harwood Feffer in May 1991, Ms. Quitt represented both plaintiffs and defendants in complex commercial litigation. Since her affiliation with Harwood Feffer, Ms. Quitt has focused her practice on shareholder rights but continues to handle general commercial and consumer litigation.

**Matthew M. Houston**, a member of the Firm, graduated from Boston University School of Law in 1988. Mr. Houston is a member of the Bar of the State of New York and the Commonwealth of Massachusetts. Mr. Houston is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and the District of Massachusetts. Since his affiliation with Harwood Feffer in 1992, Mr. Houston has concentrated his practice exclusively in the field of shareholder rights.



**HARWOOD FEFFER LLP**
PAGE 7

Mr. Houston has played a principal role in numerous class actions wherein substantial benefits were conferred upon plaintiffs:  Pace American Shareholder Litigation, 94-92 TUC-RMB (securities fraud class action settlement resulting in a recovery of $3.75 million); In re Bay Financial Securities Litigation, Master File No. 89-2377-DPW, (J. Woodlock) ( D. Mass.) (settlement of action based upon federal securities law claims resulting in class recovery in excess of $3.9 million); Crandon Capital Partners v. Sanford M. Kimmel, C.A. No. 14998 (J. Chandler) (Del. Ch. 1996) (settlement of an action on behalf of shareholders of Transnational Reinsurance Co. whereby acquiring company provided an additional $10.4 million in merger); Goldsmith v. Technology Solutions Company, 92 C 4374 (J. Manning) (N.D. Ill. 1992) (recovery of $4.6 million as a result of action alleging false and misleading statements regarding revenue recognition).

**Samuel K. Rosen**, a member of the Firm, graduated Princeton University in 1965 and cum laude from Harvard Law School in 1968.  Mr. Rosen has had extensive experience in securities class action litigation, as well as complex corporate and commercial litigation. Mr. Rosen has also represented public and private companies in matters of general corporate concern.

In 1979, Mr. Rosen argued in the United States Supreme Court, and won, the landmark case, Park Lane Hosiery Co., Inc. v. Shore, 439 U.S. 322 (1979). Mr. Rosen played a key role in the successful prosecution of Morse v. McWhorter, (M.D. Tenn.) (creation of a settlement fund of $49.5 million on behalf of investors in Columbia/HCA Healthcare Corp.) and In re Olsten Corporation Securities Litigation, (E.D.N.Y.) (creation of a settlement fund of $24.1 million).



**HARWOOD FEFFER LLP**
PAGE 8

**James G. Flynn**, a member of the Firm, graduated <u>cum</u> <u>laude</u> from Fordham College in 1980 and <u>cum</u> <u>laude</u> from St. John's School of Law in 1988. Mr. Flynn is a member of the Bar of the State of New York and is also admitted to the United States District Courts for the Southern and Eastern Districts of New York and to the United States Court of Appeals for the Second and the Fifth Circuits.

Mr. Flynn has played a principal role in numerous class, derivative, and consumer actions wherein substantial benefits were conferred upon investors and consumers, such as <u>In re Executive Telecard, Ltd. Securities Litigation</u>, 94 Civ. 7846 (CLB) (S.D.N.Y.) (settlement benefit in cash and options of over $4 million in Federal securities action); <u>In re Verizon Three Way Calling Litigation</u>, No. 603484-01 (Sup. Ct. N.Y. County) (class action settlement providing full refund of improper three way calling charges of up to $2 million collected); <u>In re Graham-Field Health Products, Inc. Securities Litigation</u>, No. 98-CV-1923 (DRH) (E.D.N.Y.) ($5,650,000 settlement of Federal securities class action); and <u>Geer v. Cox, et al.</u>, Case No. 01-2583-JAR (D. Kan.) (derivative settlement of $2.5 million in class and derivative action).

Prior to joining Harwood Feffer, Mr. Flynn represented both plaintiffs and defendants in commercial and securities litigations and in class actions. Since his affiliation with Harwood Feffer in 1994, Mr. Flynn has focused his practice in the field of shareholder and consumer rights but continues to handle general and complex commercial litigation as well.

**Jeffrey M. Norton**, a member of the Firm, graduated with honors from Arizona State University in 1992 where he also earned a Junior Fellowship position within the Political Science Department. Mr. Norton graduated cum laude from Pace University School of Law in 1997 where he received a Dean's Grant as well as



**HARWOOD FEFFER LLP**
**PAGE 9**

a Public Interest Law Scholarship for his work with the Center for Constitutional Rights in New York City and Pace University's Social Justice Center. Mr. Norton has argued matters before numerous state and federal courts and played a key role in numerous securities and ERISA actions in which substantial benefits were conferred upon class members, including In re Royal Dutch/Shell Transport ERISA Litigation, (D.N.J.) (creation of a settlement fund of $90 million plus implementation of structural relief); Graden v. Conexant Systems, Inc., 496 F.3d 496 (3d cir. 2007)(argued and won an appeal in the United States Court of Appeals for the Third Circuit establishing statutory standing under ERISA for millions of otherwise disqualified former employees).

Prior to joining Harwood Feffer, Mr. Norton represented both plaintiffs and defendants in a wide range of commercial and civil litigation matters, including civil rights, voting rights, mass tort and complex class action litigation, products liability, consumer protection, and professional liability litigation. He drafted supplement to Paul D. Rheingold, MASS TORT LITIGATION (1996) and assisted in litigating the seminal voting rights case of Goosby v. Town Board of the Town of Hempstead, 981 F. Supp. 751 (E.D.N.Y. 1997), aff, 180 F.3d 476 (2d. Cir. 1999), cert. denied, 528 U.S. 1138 (2000). Mr. Norton is admitted in the State Courts of New York and Connecticut as well as the United States District Courts for the Southern and Eastern Districts of New York, the Eastern District of Michigan, the United States Courts of Appeals for the Second, Third, Fourth, and Eleventh Circuits, and the United States Supreme Court.



**Peter W. Overs, Jr.**, an associate of the firm, was admitted to the New York Bar in 1994 and the U.S. District Court, Southern and Eastern Districts of New York in 1995. He is a graduate of St. Johns University (J.D., 1993) and New York University (B.A., magna cum laude, departmental honors in Philosophy, 1990). Mr. Overs authored "U.S. v. Fagg: Stretching the Bounds of Privacy," 66 St. Johns L. Rev. 1193 (1993). He is a member of the Association of the Bar, City of New York. Upon graduation from law school, Mr. Overs served as law clerk to the Honorable Paul J. Kelly, Jr., Circuit Judge, Unites States Court of Appeals for the Tenth Judicial Circuit. Prior to becoming an associate of the Firm, Mr. Overs represented both plaintiffs and defendants in antitrust and securities class actions, complex commercial litigation and federal appeals.

**Jennifer K. Hirsh**, an associate at the Firm, graduated from Brown University with a Bachelor of Arts in History. She received her J.D. from the Benjamin N. Cardozo School of Law in 2001, where she was the Senior Articles Editor of the Journal of International and Comparative Law. Ms. Hirsh is a member of the Bar of the State of New York. Prior to joining the Firm, Ms. Hirsh represented plaintiffs in a variety of complex commercial, securities, class action, and shareholder litigation, including as senior member of the trial team in In re Walt Disney Deriviative Litig.

**Tanya Korkhov**, an associate of the firm, was admitted to the bar in 2006. Ms. Korkhov graduated from New York University with a Bachelor of Arts in English and American Literature. She received her J.D. from the Benjamin N. Cardozo School of Law in 2005, where as a member of the Securities Arbitration Clinic, she represented clients in securities-related matters.   Ms. Korkhov represented



Cardozo on a four-member team in the 2005 and 2004 annual Willem C. Vis International Commercial Arbitration Moot Competition held in Vienna, Austria. She is admitted to the United States District Courts for the Southern and Eastern Districts of New York.

**Roy Shimon**, an associate of the Firm, was admitted to the Bar of the State of New York in 2007. Prior to becoming an associate of the Firm, Mr. Shimon served as judicial intern to New York Supreme Court Justice Ronald D. Hollie, and to New York State Supreme Court Justice/Associate Justice Appellate Term Jaime A. Rios.

Mr. Shimon graduated with honors from Franklin & Marshall College in 2003, where he was also inducted into the Pi Sigma Alpha and Alpha Kappa Delta National Honor Societies. He received his J.D. from St. John's University in 2006, where he served on the Board of the Moot Court Honor Society, and as Vice President of the Entertainment & Sports Law Society. Mr. Shimon is admitted to the United States District Courts for the Southern and Eastern  Districts of New York.

# EXHIBIT E

lancaster82205

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL NO. 04-1398

GORDON LANCASTER, et al.,       :
                                :
          Plaintiffs,           :
                                :
          -vs-                  :
                                :
ROYAL DUTCH PETROLEUM, et       :
Al,                             :   TRANSCRIPT OF PROCEEDINGS
                                :
          Defendants.           :
                                :

- - - - - - - - - - - - - - - - - -

Newark, New Jersey
August 22, 2005

B E F O R E:

THE HONORABLE JOHN W. BISSELL
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

LITE DEPALMA GREENBERG & RIVAS
BY:  JOSEPH J. DE PALMA, ESQ.,
For the Plaintiffs.

Pursuant to Section 753 Title 28 United States
Code, the following transcript is certified to be
an accurate record as taken stenographically in the
above-entitled proceedings.

Joanne M. Caruso, CSR, CRR
Official Court Reporter
(908)334-2472

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

2

lancaster82205

APPEARANCES CONTINUED:

MILBERG WEISS
BY:   BRAD N. FRIEDMAN, ESQ.,
        And
WECHSLER HARWOOD
BY:   ROBERT I. HARWOOD, ESQ.,
        And
SCOTT & SCOTT
BY:   DAVID R. SCOTT, ESQ.,
For the Plaintiffs.

LEBOEUF, LAMB, GREENE & MACRAE
BY:   RALPH C. FERRARA, ESQ.,
        ANN M. ASHTON, ESQ.,
For the Corporate Defendants.

9

MAYER, BROWN, ROWE & MAW
BY:   BRUCE M. BETTIGOLE, ESQ.,
For Defendant Watts.

11

FOLEY & LARDNER
BY:   NANCY J. SENNETT, ESQ.,
For Defendant Boynton.

13

SMYSER KAPLAN & VESELKA
BY:   LARRY R. VESELKA, ESQ.,
For Defendant Thomas, Jr.

15

DEWEY BALLANTINE
BY:   MIKE STENGLEIN, ESQ.,
For U.S. Trust.

17

STEPHEN TSAI, ESQ.,
For Jay Lambert.

19

20

21

22

23

24

25

☐

August 22, 2005

lancaster82205
2        THE COURT:    Good morning.

3            The Court is prepared to proceed with the fairness

4    hearing in the matter of In Re Royal Dutch/Shell Transport

5    ERISA litigation.

6            I apologize in the first instance.  I think I'm

7    getting over a case of laryngitis rather than contracting one,

8    but nevertheless, this may be a blessing in disguise.  You may

9    not listen to me as much as might otherwise be the case.

10            In any event, I'll take appearances first on behalf

11    of the plaintiffs.

12        MR. DePALMA:    Joseph DePalma of Lite, DePalma for the

13    plaintiffs.

14            Your Honor, I'd like to introduce co-lead counsel,

15    Robert Harwood.

16        MR. HARWOOD:    Good morning.

17        MR. FRIEDMAN:  Brad Friedman from Milberg Weiss.

18        MR. SCOTT:  Good morning.

19            Daivd Scott, from Scott & Scott.

20        MR. DePALMA:    With the Court's permission, we would

21    like to split the argument.  Mr. Harwood is prepared to

22    address the fairness of the settlement and Mr. Friedman the

23    fee issues, if that is okay.

24        THE COURT:    Counsel, the gentlemen to your immediate

25    right, I didn't catch the name.

ⁿ

4


1        MR. SCOTT:  David Scott, Scott & Scott.

2        THE COURT:    Thank you.

3        Counsel?

lancaster82205

4          MR. FERRARA:  Ralph Ferrara, appearing for the

5   corporate defendants.

6          MS. ASHTON:  Ann Ashton, also from LeBoeuf, Lamb.

7          THE COURT:  We have some applications for admissions

8   pro hac and persons who have sought to present positions on

9   behalf of objectors.

10          We'll continue with that.

11          MR. BETTIGOLE:  Bruce Bettigole for Sir Philip Watts.

12          MS. SENNETT:  Nancy Sennett for Judith Boynton.

13          MR. MORIN:  Phil Morin for defendant Pervis Thomas,

14   Jr.

15          MR. VESELKA:  Larry Veselka.  I'm the subject of one

16   of the pro hac motions.

17          THE COURT:  Thank you.

18          MR. VESELKA:  On behalf of Pervis Thomas, Jr.

19          THE COURT:  You're Mr. Thomas?

20          MR. THOMAS:  Yes.

21          THE COURT:  Welcome.

22          Mr. Veselka, I'll deal first with your motion to be

23   admitted pro hac on behalf of Mr. Thomas.  I've read the

24   papers involved.

25          Is there any objection on behalf of the other parties

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

▯

5

1   to the case?

2          MR. DePALMA:  There is no objection.

3          MR. FERRARA:  No, your Honor.

4          THE COURT:  Thank you.

5          Your papers are in order.  I'll sign the order.

Page 4

lancaster82205
6   Welcome to this court.

7           MR. VESELKA:   Thank you, your Honor.

8           THE COURT:   Mr. Stenglein?

9           MR. STENGLEIN:   Yes.

10          THE COURT:   Will you join the Court in the well,

11   please?  Find a seat wherever you can.

12          MR. STENGLEIN:   Thank you, your Honor.

13          THE COURT:   Mr. Stenglein, I have your application

14   for admission pro hac on behalf of U.S. Trust Company.  Is

15   that correct?

16          MR. STENGLEIN:   Correct.

17          THE COURT:   I note that you're being moved by Mr.

18   Krovatin who is one of the best advocates in this entire

19   district.  If he were here, I was going to ask him if he

20   needed your help, but since he isn't, I won't.

21          Your papers are in order.

22          Any objection to the admission of Mr. Stenglein pro

23   hac in this case?

24          MR. DePALMA:   No objection.

25          MR. FERRARA:   No.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

                                                          6


1           THE COURT:   Thank you.

2           I'll sign the order.

3           MR. STENGLEIN:   Thank you.

4           THE COURT:   Now, we had an objection filed on behalf

5   of one Jay Lambert by a Stephen Tsai.

6           MR. TSAI:   That's me.

7           THE COURT:   You're present, sir?

lancaster82205
8        MR. TSAI:  Yes, sir.

9        THE COURT:   I'll enter your appearance.

10        MR. TSAI:  Stephen Tsai, appearing for class member

11   and objector, Jay Lambert.

12        THE COURT:   Thank you.

13        I received an objection by letter from a William S.

14   Gill of Kingwood, Texas, who apparently was not represented by

15   counsel and presented a position to the Court pro se

16   contesting only the amount of the allowance of plaintiffs'

17   attorneys' fees in this case.

18        Is Mr. Gill in court or anyone on his behalf?

19        All right.  That's an issue that's common to many of

20   the objections advanced today.  We'll address that in turn.

21        Are there any other persons present here in court who

22   are lodging objections to the terms of the settlement in this

23   matter?

24        Court notes no presentation.

25        Mr. Tsai, I'll hear you first on behalf of Mr.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

1   Lambert.

2        I've read your papers, of course, as well as those

3   submitted in response and I'll hear anything you would like to

4   add at this time.

5        MR. TSAI:  At this point, I'll just highlight a few

6   main points, I'm not going to belabor the Court's time.

7        We feel, your Honor, that there are certain

8   deficiencies in the notice and also in the release.  The

9   notice, your Honor, does not provide enough information about

lancaster82205

10  how many class members there are, how many employees there
11  are, what is the aggregate value of the settlement, what are
12  the damages that are computed such that a class member could
13  determine what is the value of the settlement to him or her in
14  terms of percentage of losses.

15          THE COURT:    Let us assume for the moment that I
16  would accept your argument, at least in part. We've had
17  papers submitted here in response to those objections which I
18  believe set forth a valid estimation of the potential number
19  of class members, that have talked in terms of what would
20  appear to be a reasonable maximum recovery of $115 million in
21  this case by the plaintiffs' own calculation.

22          Frankly, I haven't -- I don't believe you specified
23  much about what the deficiencies in the plan of allocation,
24  which I reread not ten minutes ago and which seem fairly
25  explicit on its face.  Have any of the papers that have been

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

8

1  filed here in answer to some of the objections that you have
2  raised, in fact, answered them adequately?

3          MR. TSAI:   Your Honor, they seem to be fairly -- I
4  would just say that they're estimates only, one person's best
5  estimate.  Your Honor, we feel that more specific information
6  be more appropriate.

7          THE COURT:    Are you aware of the complexities
8  involved in this matter in connection with the terms of the
9  release, potential losses are?

10          MR. TSAI:  Sorry to interrupt.

11          I'm aware that it is very complex, yes.

Page 7

lancaster82205
12          THE COURT:    Anything further?

13          MR. TSAI:   Your Honor, we also felt that the

14   release's overbroad.   It seemed to release not only the

15   defendants, but also related parties and entities which have

16   privity with the defendant and the parties related to it,

17   perhaps possibly for claims or causes of action that are not

18   related to the subject matter of this litigation.

19          THE COURT:    Well, are you referring to specifically

20   to the Texas action or a greater overbreadth of the release?

21          MR. TSAI:   I'm sorry.

22          THE COURT:    Are you referring specifically to the

23   Texas action or to the general overbreadth of the release?

24          MR. TSAI:   The general overbreadth.

25          THE COURT:    Thank you.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

                                                                9


1          Anything further?

2          MR. TSAI:   Nothing.

3          THE COURT:    Thank you.

4          Counsel, in support -- as far as the deficiencies

5   raised by Mr. Lambert regarding anything other than the scope

6   of releases, this Court determines that they have not been

7   substantiated here.

8          The Court, in the course of its ultimate findings of

9   fact and conclusions of law, will address the adequacy of the

10   notice and its terminology.   Excuse me, I may have taken a

11   step in advance.   It doesn't appear that other objectors here

12   are joined, at least in writing, in the objections by Mr.

13   Lambert.

lancaster82205
14          Do any of the other objectors, in quotes, here

15    endorse or want to be heard further on the Lambert objection?

16    I note none.

17              I'll continue with my analysis.

18              So the Court's findings of fact and conclusions of

19    law will encompass the determinations with regard to the lack

20    of merit in the Lambert allegation.

21              What about the question of scope of releases,

22    however?  While I'm not inclined to feel that that is

23    overbroad under the entire circumstances of this case, I think

24    I would like a response on that point.

25              I'll be happy to hear one on behalf of the

☐

1    plaintiffs, perhaps with a synopsis with the scope of releases

2    because they are rather lengthy documents.

3              MR. HARWOOD:  It is, your Honor.  If it pleases the

4    Court, Robert Harwood, co-lead counsel.

5              The releases release agents and others in privity

6    with the defendants is the objection that Mr. Lambert has

7    lodged without excluding certain actions that are not part of

8    the lawsuit, he says.  But, in fact, I think the release's

9    narrowly tailored to include only the claims that were

10    asserted or could have been asserted in this lawsuit.  He also

11    argues that --

12              THE COURT:  And in the Texas action as I understand

13    it.

14              MR. HARWOOD:  I was about to mention the Texas

15    action.  He also mentions that we are releasing valuable

lancaster82205
16  claims that could be asserted in the Texas action.  My firm
17  filed the Texas action.  The Texas action is a duplicate, a
18  carbon of the action pending in this court, and it's most
19  likely if we had pushed, if there was a need to push the Texas
20  action, which there isn't, the defendants would have resisted
21  fighting a war on two fronts and the Texas action would have
22  been either dismissed, stayed or most likely transferred to
23  your Honor, which is the way it should be.

24          So this release, in addition, was scrutinized by the
25  independent fiduciary U.S. Trust and they seem satisfied with

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

11

1  the scope of the release.

2          The release was a document, I can tell your Honor,
3  that was contentiously negotiated over.  My co-counsel and I
4  scrutinized that language to make sure that we were releasing
5  only the claims that could have been asserted in this action.
6  Indeed, we vetted that release not only with the Court, with
7  the approval phase, but we vetted that release with the
8  counsel, lead counsel in the parallel securities class action
9  because we wanted to make sure that they wouldn't come in and
10  say you're releasing claims that we're asserting.  That
11  frequently happens.

12          Mr. Bernstein, the Bernstein Liebhard firm was
13  satisfied with the scope of the language of the release, that
14  it wasn't overbroad and wasn't throwing in claims that there
15  was no right.

16          THE COURT:   Transgressing over into the claims that
17  were in the securities action?

Page 10

lancaster82205
18          MR. HARWOOD:   That's right.

19          THE COURT:   Anything further?

20          MR. HARWOOD:   Thank you.

21          THE COURT:   This Court agrees.  The Court also

22    determines that the release is appropriate, sufficiently

23    comprehensive to resolve and, where appropriate, bar claims

24    that are the subject of the settlement, but also determines

25    that it is sufficiently clear with regard to its terms and not

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

12

1    overbroad as argued on behalf of Mr. Lambert.

2          There was, once again, as I said, the proposed

3    findings of fact and conclusions of law, which I'll ask the

4    parties to prepare jointly for the Court at the conclusion of

5    this hearing, should indicate that ruling and its basis.

6          I was advised in papers submitted on behalf of the

7    plaintiffs that a Mr. McGuinniss, who hasn't filed any papers

8    in the court as such, did raise a question with regard to

9    perhaps some deficiency or failing in the settlement because

10    of the fact that the taxability of funds coming to him through

11    this settlement and, of course, through whatever fund he

12    participated in was taxable, whereas those which might be

13    payable to him directly in the course of the lawsuit would

14    not.

15          No one appears on Mr. McGuinniss' behalf and the

16    Court believes that the plaintiffs and defendants both have

17    adequately answered that question; namely that the

18    beneficiaries and recipients of the funds from this settlement

19    are, in fact, the Shell Funds, themselves, so we were not

Page 11

lancaster82205
20  dealing with the prospect of an individual distribution in any
21  case.

22          The taxability, of course, of the ultimate
23  distribution of a portion of the settlement funds here to Mr.
24  McGuinniss or anyone else, among other things, is going to be
25  governed, I presume, by the terms of the fund itself and maybe

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

▯

13

1  their investments and also whatever applicable state and
2  federal tax laws would apply.

3          The Court also denies any objections based upon Mr.
4  McGuinniss' position.

5          I'd like to hear now from counsel on behalf of Mr.
6  Thomas.  I have read your papers, sir.  I'd be happy to hear
7  anything you would like to emphasize.

8          MR. VESELKA:  May it please the Court, Larry Veselka,
9  your Honor.  I appreciate this opportunity.

10          Mr. Thomas appreciates this opportunity.  He
11  understands the somewhat novel nature of his position, but
12  it's a matter of some seriousness to him.

13          Every defendant is entitled to make their own
14  decisions with regard to the process when they're accused of
15  violating fiduciary duties that are crucial to their daily
16  activities and their profession.  It's a serious charge
17  against him.

18          As the Court notes from our papers, Mr. Pervis does
19  not object to the amount of the settlement or most of the
20  terms of the settlement.  He objects mainly that he did not
21  see and have an opportunity to find and decide and approve the

Page 12

lancaster82205

22  final terms of the settlement and would have wanted to have

23  had other treatment.  Therefore, he objects to the statement

24  that he has approved the settlement.

25          He would ask that he be removed as a party signatory

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

14

1   to the settlement and would have wanted to have been, as Mr.

2   Jeroen Van der Veer was, dismissed.  The plaintiffs' response

3   itself in trying to justify their fees explains the task, in

4   trying to explain the benefits that they've brought to the

5   class the problems they were facing.

6           Though Mr. Thomas, as plan administrator, is clearly

7   a fiduciary, a matter he takes seriously and why any

8   allegations of his breaching those fiduciary duties is very

9   serious to him and any implication --

10          THE COURT:    Let me interrupt you.

11          There has been time, of course, since the papers were

12  filed.  Mr. Thomas, presumably with your assistance or other

13  counsel, has had the opportunity to review those papers and

14  let us assume for the moment that he did not have the

15  opportunity to either review or actually approve for execution

16  by his then counsel the proposed final settlement papers and

17  all of their facets.

18          Does he remain opposed to that settlement including

19  his present status in it, or is that not a fair question and

20  should I be measuring this from the time of the purported

21  execution of that consent rather than the latter?

22          MR. VESELKA:   I believe it's a fair question because

23  the Court and various parties engage in these types of

Page 13

24  litigation on a regular basis are used to proceeding in a

25  certain way.  Why Mr. Thomas persisted after seeing the terms


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

15


1   in wanting to raise the motion to reform is because he, as an

2   individual, and as a professional fiduciary, considered it a

3   serious matter that he was not given the opportunity to

4   participate in the final approval because in so doing, he had

5   hoped that he would have been able to negotiate a similar

6   treatment as Mr. Jeroen Van der Veer, if I'm pronouncing that

7   properly, which would he believes mattered significantly to

8   his professional standing.

9           If there were reasons for the benefit of the plan or

10  for reasons for benefit of his employer that he needed to be

11  in the settlement in these various ways, it should have been

12  presented to him to make his choice because he was not

13  presented with the final package to know the specific terms.

14  He never gave that approval.

15          Therefore, that's why we think it is still a matter,

16  even though it's outside the norm of this process, that it is

17  a matter of importance to him individually that the settlement

18  be reformed to reflect that he's not -- that he did not

19  authorize it in that form and he's not a party signatory to

20  it, and he would like to have it reflect that he be dismissed.

21          And the Court need not worry about Rule 23 notice

22  requirements because the Court only needs to provide such

23  notice as is necessary, and the entire class was given a

24  notice that presented a plan where he would be dismissed with

25  prejudice and released at the conclusion, under the terms of

Page 14

16

1  the stipulation and settlement.

2       So rather he's reflected as having been dismissed in
3  the manner as Mr. Jeroen Van der Veer or in the manner as
4  presently written makes no substantive difference to members
5  of the class.  The fund will still flow to them, but it did
6  matter to him.

7       THE COURT:  All right.

8       I think it's bought out in the plaintiffs' papers, I
9  suppose is inherent in the argument you just made in support,
10  they say well, there is no damage to Mr. Thomas because he's
11  not being asked to pay any money.  Your point is there is no
12  adverse impact on the settlement of the settlement funds
13  because if he's released based upon lack of authority to have
14  the document executed on his behalf, then neither the fund nor
15  the settlement nor the certification of the class or anything
16  else is in peril either.  Is that your point?

17       MR. VESELKA:  Yes, your Honor.

18       THE COURT:  Okay.

19       MR. VESELKA:  In response to that specific point, the
20  technical language, it is obviously not the perception of any
21  of the parties on the subject, the technical language does
22  provide for him as one of the defendants to make the payments.
23  Now, obviously he's not paying $90 million.

24       This is one of the reasons he would like to not be
25  listed as a named defendant when it's the named defendant

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

Page 15

lancaster82205

17

1  Shell.  That payment is going to come from the corporate
2  defendant.  That's understood by the parties, but that's not
3  the way it's drawn up.  So that's one of the reasons that he
4  would like to be listed not as being at the time of the
5  settlement a named defendant as part of that stipulation.
6          The Court -- the stipulation of settlement itself,
7  one other argument to make, your Honor, was that the Court
8  can't change a settlement.  Stipulation of settlement itself
9  reflects that the Court can reform or make changes because the
10 parties reserve the right to decide, depending upon what
11 changes or modifications are made, to determine whether
12 they're material and whether to go forward with the settlement
13 or not.
14         The negotiations themselves envision, and the Court
15 has the inherrent authority pursuant to Rule 23 to be able to
16 make those changes.
17         Finally, we'd like to draw attention to the Court the
18 decision of the Superior Court of New Jersey, Appellate
19 Division in Amatuzzo v. Kozmiuk, at 305 New Jersey Superior
20 469 and that's 703, Atlantic 2d., from 1997; the decision
21 where the Court said even though an attorney may have apparent
22 authority, that's only a presumption.  The apparent authority
23 cannot come from actions, words soley of the attorney.  There
24 must be the party itself that must provide grounds for the
25 apparently authority and only that would still only be

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

18

Page 16

lancaster82205

1   apparent authority.  It's a presumption that can be overcome.

2           Mr. Thomas' affidavit which has been submitted to the

3   Court, which we would argue removes that presumption and that

4   that would provide justification under New Jersey authority

5   applicable to this stipulation of settlement to allow the

6   Court to make the reformation, to remove the deletion to his

7   having authorized the settlement and delete paragraph 58(b)

8   out.

9           THE COURT:    Thank you.

10          Before I hear on behalf of counsel either for the

11  plaintiffs or the defendants, counsel who appear here on

12  behalf of the other objectors, et cetera, do they take any

13  positions on the application on behalf of Mr. Thomas?

14          I hear none.

15          I'll hear from the plaintiffs in response to that

16  application.

17          MR. HARWOOD:  Again, unfortunately, this valuable

18  settlement has been sucked up into a dispute between Mr.

19  Thomas and his former counsel, the Cleary, Gottlieb firm.  At

20  the risk of sounding too colloquial, here's what's really

21  going on:   One of the named defendants was Mr. Jeroen Van der

22  Veer.  As the settlement process was coming to fruition, and

23  we were negotiating final round of settlement documents, we

24  were approached and asked to let Mr. Van der Veer out.  He's

25  in a different position, he had different responsibilities and

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

19

1   obligations and we did that and we said at the time, Mr. Van

2   der Veer, but nobody else.  Subsequently everybody else came,

Page 17

lancaster82205

3   as you might expect, and we said no.

4         We said specifically no to Mr. Thomas not because we
5   have it in for him, your Honor. He seems like a perfectly
6   nice gentleman, but he was a plan fiduciary. He was the only
7   named fiduciary in the case for the plans and everybody else
8   was a so-called de facto fiduciary. And had the motions to
9   dismiss been decided, he was certainly the most likely
10  defendant to remain in the case before all the other
11  defendants.

12        So he was given that knowledge. The settlement
13  memorandum of understanding was entered into and we completed
14  our additional and necessary discovery. Mr. Thomas at the
15  time was still represented by the Cleary firm. Mr. Thomas sat
16  for a deposition in New York, represented by the Cleary firm.

17        From our perspective, the Cleary firm had full
18  appearance and apparent authority to continue to negotiate and
19  to sign the documents on behalf of their client, Mr. Thomas,
20  and they did.

21        I think Mr. Thomas has maybe the largest case of
22  buyer's remorse I've ever come across, but he had misgivings,
23  but I don't understand what he wants because when the
24  settlement is approved, he's going to get a dismissal with
25  prejudice. He is not required to pay a single penny. All he

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

20

1   is required to do is to give us a mutual release, and as I
2   understand it, and as his papers make clear, he doesn't oppose
3   giving us that release. So I don't know how to go about
4   satisfying Mr. Thomas. As long as we get that mutual release,
                              Page 18

lancaster82205

5   we're satisfied and I think he is bound by the apparent

6   authority that his counsel had.  If the settlement can be

7   reformed and the mutual releases are forthcoming, we take no

8   position on that.

9           THE COURT:   As I recall also, the terms of the

10  settlement include a recitation of no acknowledgement of

11  liability whatsoever on behalf of any defendant, correct?

12          MR. HARWOOD:  Correct, your Honor.

13          There are other defendants who could also be

14  characterized as professional fiduciaries.  I believe Miss

15  Boynton was a fiduciary of the Polaroid ERISA plans.  He's not

16  being singled out and he doesn't stand alone.

17          THE COURT:   Remind me, when are the settlement funds

18  payable?  Are they being paid in a lump sum?

19          MR. HARWOOD:  A lump sum with interest, I think 30

20  days after the settlement is finally approved.  Thirty days

21  after the settlement becomes final, no longer appealable.

22          THE COURT:   Is it at that point that the dismissals

23  of the individual defendants will become final or do they

24  become final upon the Court's entry of an order concluding

25  today's proceedings?

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

0

21

1           MR. HARWOOD:  Probably 30 days.

2           MR. FRIEDMAN:  I believe, your Honor, when the

3   settlement is no longer subject to appeal.

4           THE COURT:   Fine, thank you.

5           MR. HARWOOD:  One last point, your Honor.

6           The Amatuzzo case that was cited to you by counsel is
                        Page 19

lancaster82205

7   so distinguishable.  The client voiced his vigorous objection,

8   refused to sign the settlement agreement.  It was clear from

9   day one that he was not on board and counsel for plaintiffs

10  knew it.  We did not.

11           Thank you, your Honor.

12           THE COURT:    Thank you.

13           Mr. Veselka, anything to add?

14           MR. VESELKA:   Very briefly.

15           I agree with Mr. Harwood that any concerns between

16  Mr. Thomas and his previous counsel are between them and are

17  not matters that need to be dealt with here.

18           The settlement itself is only signed on I believe

19  July 5, signed July 5, presented to the Court on July 8th.

20  Regardless of why or whether in the dispute with his previous

21  counsel he was entitled to see the final version and/or to see

22  if he could be dismissed as Mr. Jeroen van der Veer was, at

23  the time he did not get that opportunity to present that and

24  to insist on it.  That's why it's so important to him, because

25  he is a fiduciary.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

                                                        22

1            Now, in this release, this case is releasing and he

2   would be released even if this is granted, he would be covered

3   by the releases, as are the other fiduciaries which are

4   trustees which are fiduciaries, which are parties to the Texas

5   case.  He's also a party to the Texas case.  So he's going to

6   be covered by the releases there as well.  He does, as they

7   stated, he does not object to giving the mutual release.

8            What he wants is merely to reflect paragraph 58(B)
                        Page 20

lancaster82205

9    because he did not give approval, to preserve the sanctity of

10   the process of each individual involved in litigation, to be

11   not listed as a named defendant that's one of the people

12   making the payments and, therefore, we submit that

13   respectfully to the Court.

14            THE COURT:    Thank you.

15            Mr. Thomas' objection is denied, essentially on two

16   grounds.  Once again, I'll leave it to the parties to amplify

17   these remarks in the proposed findings of fact and conclusions

18   of law.

19            First, the Court determines that Mr. Thomas' prior

20   attorney was clothed with apparent authority to execute the

21   settlement agreement on his behalf.  Mr. Thomas also was

22   adequately informed of the nature and the state of the

23   proceedings leading up to the settlement agreement so that he

24   presumably was in a position to make his position very clear

25   to his own attorney if, indeed, there were objections to the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

23

1    form of settlement and/or his particular treatment.

2            As we know, the genesis of this argument is that he

3    feels he should have been treated as Mr. Van der Veer was, who

4    was dismissed even prior to the present stage.

5            Secondly, the Court determines that there is no true

6    tangible detriment enuring to Mr. Thomas as a result of the

7    fact that he was not dismissed previously as opposed to

8    remaining in this case as a named defendant through and

9    including the time of the payment of the settlement funds from

10   other sources that would then lead to the final dismissal of

Page 21

lancaster82205

11  himself and all defendants.

12       In connection with that, as his counsel acknowledges,
13  he will receive the full benefit of the releases that are
14  extended to him and for that reason alone will carry no
15  baggage away from this litigation, certainly nothing tangible
16  or measurable.

17       Finally, the Court determines that Mr. Thomas is not
18  left without recourse. If he has sustained some injury, be it
19  to reputation, the need to incur additional expenses in order
20  to present himself to the Court or otherwise as a result of
21  the inappropriate actions of his prior attorneys without
22  authority, in fact, if indeed that is the case, he has
23  recourse against that attorney to be made whole.

24       That's where his main dispute lies, that's where his
25  opportunity for remedies lie and, accordingly, the application

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

24

1  to have the settlement revised with regard to Mr. Thomas'
2  status before this Court is denied.

3       We'll now move ahead I believe to the final item on
4  today's list which is the objections that have been raised to
5  the attorneys' fees sought.

6       Before I do that, is that the one remaining item on
7  the menu? I believe it is based upon things that have been
8  tendered here.

9       I think at this point I'd like to hear on behalf of
10  U.S. Trust. Let's see what your position is on this and then
11  I'll permit others to be heard as the matter presses.

12       MR. STENGLEIN: Good morning. Mike Stenglein, U.S.
                          Page 22

lancaster82205

13   Trust.

14        Anything that I would say would really be just

15   repetitive of what's in our papers.  I will offer no

16   additional argument at this time.  If the Court has any

17   questions about our papers, I'd be happy to try to answer

18   them.

19        THE COURT:  All right.

20        Your view, I guess, essentially is that at the very

21   least this demand ought to be closely scrutinized in

22   connection with the population of ERISA class action

23   settlements with which you're acquainted.  This might appear

24   to be on the high side.  Is that a fair recap?

25        MR. STENGLEIN:  Well, it's a fair recap and I would

□

25

1   add to that that, and I think both parties agree, that also

2   securities class action settlements would also provide the

3   Court with information about what a reasonable attorney fee

4   award would be.

5        In the most recent analysis performed by NERA

6   suggests for a settlement this size, 26 percent is the

7   appropriate number.  Those two data points we wanted to put

8   before the Court for purposes of its decision process.

9        THE COURT:  All right.

10        Counsel on behalf of any of the objectors, Mr.

11   Veselka, do you wish to be heard on this issue?

12        MR. VESELKA:  No, your Honor.

13        THE COURT:  Thank you.

14        Mr. Tsai, do you wish to be heard further on this
                         Page 23

lancaster82205

15  issue?

16          MR. TSAI:  No, your Honor.

17          THE COURT:   Nothing further.

18          Fine.  Anything on behalf of counsel for defendant

19  Boynton?

20          MR. BETTIGOLE:  Nothing.

21          MS. SENNETT:  Nothing, your Honor.

22          THE COURT:   Thank you.

23          Mr. DePalma, I'll hear from you on that point.

24          Mr. Friedman.

25          MR. FRIEDMAN:  Thank you, your Honor.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

                                    26

1          I would begin I guess by saying there really appears

2  to be no dispute among any of the parties, including U.S.

3  Trust, that the Common Funds Doctrine applies to this fee

4  request and that the fees therefore should be based on a

5  percentage of the common fund.

6          As we say in our brief, the general range in this

7  circuit is 19 to 45 percent.  The Court has discretion where

8  to set the fee, but is to go through the seven Gunter factors.

9  The factor that U.S. Trust points to, of course, is only one

10 of those seven factors.  With respect to most of the other six

11 factors, they actually do address the factors and find that

12 those factors weigh in our favor.

13          With the Court's permission, I'd like to go fairly

14 quickly but through the seven factors because I think they're

15 all relevant and not just one.

16          THE COURT:  Please do.
                        Page 24

lancaster82205

17          MR. FRIEDMAN:  The first factor is the size of the
18 fund and the number of people that are benefiting.  That
19 factor we think is strongly in our favor.  This is one of the
20 largest ERISA settlements ever achieved not only on an
21 absolute basis, but as a percentage of the class damages which
22 is a very significant issue.
23          As far as the number of people benefited, we have
24 over 40,000 people which is also a very significant number.
25 U.S. Trust seems to agree that that factor weighs in our

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

27

1 favor.  They write in their objection "the fund is a large one
2 and the number of beneficiaries are many."
3          The next factor we get to is the presence or absence
4 of substantial objections to the settlement terms or the fee
5 request.  Here we had over 42,000 notices and only three
6 actual class members have objected, which is about less than
7 one one-hundreth of a percent and those three class member
8 objections we think really don't even fall within the category
9 of being substantial.
10          We have Mr. Thomas' objection which is really an
11 effort to reform the settlement, and then we have U.S. Trust's
12 objection to the fee request which I won't say is not a
13 substantial issue or substantial reduction, but we think
14 they're wrong for reasons --
15          THE COURT:   I think they brought it out of what they
16 perceive is their duty given their position they're assigned.
17          MR. FRIEDMAN:  Yes, they have that duty and I don't
18 begrudge it.

Page 25

lancaster82205

19        When you go through their objection, what you see is
20   the fund's a large one.  They say the number of beneficiaries
21   are many.

22        They also go through and note, and we appreciate
23   this, that the settlement was rapidly achieved; they recognize
24   "the skill of plaintiffs' counsel is evident and exemplary."
25   They characterize the underlying litigation as, quote unquote,

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

28

1   complex and they note that the settlement "was achieved with
2   diligence and speed."  These are all Gunter factors.  These
3   are all things that weigh in favor of the application.

4        Of course, ultimately both in their objection and
5   more importantly in their independent fiduciary's report, they
6   conclude the settlement is reasonable even net of attorneys'
7   fees, even net of full request, they think the settlement is
8   reasonable and the objection, I think they use the word
9   "fair."  Obviously, we as plaintiffs' counsel think these are
10  statements that the Court ought to take into account when
11  deciding the application.

12        With respect to the skill and efficiency of the
13  attorneys involved, which is the third Gunter factor,
14  plaintiffs' counsel in this case moved the case to resolution
15  with near record speed, and I would submit achieved a result
16  that really speaks for itself; 78 percent recovery which is
17  what we believe we achieved in this case.  We think is really
18  extraordinary and the absolute amount makes it one of the
19  highest ERISA settlement amounts, if not the highest
20  settlement, in the history of ERISA.
Page 26

lancaster82205

21        Again, as I said, U.S. Trust agrees that this factor
22  weighs in our favor, saying the skill of plaintiffs' counsel
23  is evident and exemplary and the settlement was achieved with
24  diligence and speed.

25        The fourth factor is complexity and duration of the

☐

1  litigation.  Now, according to the Third Circuit's opinion in
2  G.M. Trucks, this factor is really intended to capture -- this
3  is language from the case, the probable costs in both time and
4  money of continued litigation.  Clearly, this ERISA case was
5  complex and because we were able to achieve such an early
6  settlement, it is necessarily the case that absent the
7  settlement, there's going to be a lot of continued litigation.

8        Again, U.S. Trust seems to agree this factor weighs
9  in our favor, recognizing that the underlying litigation was
10 complex and that the settlement was rapidly achieved.

11        These are all things they say in their papers.

12        THE COURT:   I don't think there's any doubt,
13 certainly not in my own mind, that had this litigation not
14 settled and eventually gone to the mat, it would have been an
15 extremely complex and difficult litigation, among other things
16 in terms of the assessment of fiduciary duties, whether or not
17 those duties were breached or abdicated and/or the
18 quantification of the relief affordable to respective class
19 members or a formula therefore.  No doubt about that.

20        MR. FRIEDMAN:  Okay.

21        THE COURT:   Please continue.

22        MR. FRIEDMAN:  Actually you've stolen a bit of my
                         Page 27

lancaster82205

23   thunder for the next factor which is the risk of nonpayment.

24   We invested millions of dollars and time in this case and

25   nearly a million dollars in real out-of-pocket expenses with

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

30

1    no guarantee that we'd ever see any recovery at all.

2         Specific risks to this case were particularly high

3    because the law in this area is still developing, but included

4    all of the issues that your Honor just laid out, as well as a

5    serious standing issue.  Many of the defendants raised

6    standing issues not being U.S. citizens and of course there's

7    also the ever-present problem of motion practice, motions to

8    dismiss, briefs for summary judgment, the need to rely on

9    experts, appellate practice.

10        As your Honor may be aware, just last week in the

11   State Farm litigation in Illinois, plaintiffs' counsel who had

12   achieved a billion dollar verdict after trying it and then had

13   that verdict reduced by the appellate court, just in the

14   Illinois Supreme Court the class decertified and the entire

15   verdict thrown out.  So a decade of litigation, millions and

16   millions and millions of dollars both in time and

17   out-of-pockets all gone.  Those lawyers will not see a cent

18   after decades of litigation.

19        There's a real risk of nonpayment in any of these

20   kinds of cases, but for the reasons your Honor set forth, I

21   think were particularly high here.

22        Now, U.S. Trust doesn't address these risks, but

23   instead contend that our risk was, quote unquote, was

24   significantly reduced by the Davis Polk report, claiming that

Page 28

lancaster82205

25  the Davis Polk report provided us with a road map.  We would

☐

31

1   respectfully suggest that the analysis there is wrong.

2           In this case, as your Honor knows, Shell restated the

3   amount of its proved oil reserves.  Now, that restatement

4   established that the accounting treatment was wrong and that

5   restatement, perhaps, reduced our risk somewhat because it did

6   establish that, in fact, the reserves were wrong.

7           The Davis Polk report then puts together a bunch of

8   e-mails which, in essence, establish or blames plaintiff in

9   the securities case will establish scienter.  Scienter is a

10  huge issue in the case, there is no doubt about that, but it's

11  not an issue.  Our issue's standing, existence of a fiduciary

12  duty, who breached the duty, perhaps negligence and damages,

13  the Davis Polk doesn't really help us with that stuff.

14          So in our case, in the ERISA case, the Davis Polk

15  report is really of minor, if any, significance.  Where it is

16  significant is in the 10b-5 securities litigation where they

17  have to fight over scienter, but we don't have that element of

18  our claim.

19          The sixth factor is time devoted to the case.  I

20  won't belabor that because I don't think anybody challenges

21  that.  We put in more than 18,670 hours, more than $6.8

22  million of lodestar and more than $726,000 in reasonable

23  out-of-pocket expenses, actual money out of our pockets.

24          This time was all expended in a concentrated time

25  period so that this case could be quickly concluded, which is

lancaster82205

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

32

1  significant because it means that we were precluded from
2  taking on other work. We didn't sort of spend a few hours a
3  day on this case and slip in a bunch of other stuff.
4          THE COURT:   On the other hand, through its early
5  conclusion you're now free to take on other work whereas your
6  time might be otherwise consumed in this case for several
7  years, correct?
8          MR. FRIEDMAN:  That's true.  That's true.
9          We do say in our papers for lodestar crosscheck
10  purposes, the result and multiplier of 4.4 which we show in
11  the papers is within the range and nobody is contesting that.
12          Where the rubber really seems to be hitting the road
13  is the seventh factor only which is the awards in similar
14  cases.  Now, as we show in our brief and our reply brief, our
15  request of one-third is consistent with awards in similar
16  cases, including as we show in the reply papers, cases with
17  bigger funds than this one.
18          But even if we were wrong about that and I'll explain
19  why we're right, that's only one factor and it's not the be
20  all and end all of the analysis. For example, Judge Wolin
21  ruled in the Prudential litigation in his fee opinion on
22  remand from the Third Circuit, after the Third Circuit
23  remanded the fee back to him, Judge Wolin noted that the Third
24  Circuit held that the size of the recovery is not the only
25  factor in determining a fair fee award; other factors such as

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

Page 30

lancaster82205

33

1  quality of counsel are also very significant and come into
2  play at any given time and so Judge Wolin wrote, "at any given
3  level of recovery, the percentage fee that Courts awarded has
4  varied."  Quote, "there is no perfect correlation between the
5  appropriate percentage and size of the recovery."

6         We can't look only at the seventh factor.  Even if we
7  do, we think we're very, very strong on that factor.  U.S.
8  Trust's first argument is to the Court is don't look at the
9  full range of settlements that are out there in the universe,
10  put on the blinders and only look at the 15 ERISA class action
11  settlements, some but not even all of those having awarded
12  lower fees.  We think that's wrong for three reasons.

13         First, we don't think there's any reason in the
14  world, and U.S. Trust hasn't cited any, that the Court ought
15  to limit its analysis only to ERISA class actions.

16         Second, we think, and this is highlighted, we think a
17  15-case sample size is far too small.

18         Third, and perhaps most important, is that the U.S.
19  Trust's analysis just blindly pointing to these 15 cases fails
20  to account for the differences between those 15 cases and our
21  case here.  Unlike those cases, here the ERISA class is not
22  the tail being wagged by a 10b-5 dog.  Usually in these cases
23  the ERISA case just kind of hobbles along as a tail to the
24  securities case and gets settled when the defendants are ready
25  to settle the securities case.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

34

Page 31

lancaster82205
1       Here, we pushed our case forward ahead of the

2   securities case, we got our briefing -- we got our

3   consolidated amended complaint on file and our briefing on the

4   motions to dismiss done while the securities plaintiffs were

5   still messing around filing and writing their own consolidated

6   amended complaint.  We pushed forward with discovery while

7   they were doing the brief on motions to dismiss and we got our

8   case settled before those plaintiffs ever even got a decision

9   or I think even completed briefing on their motions to

10  dismiss.  We pushed our case and we're not the tail of the

11  10b-5 dog which is different from the other cases.

12       Second, we got an unusually prompt settlement.

13       And, third, as I said before, we achieved a

14  settlement that is extraordinarily rich not only on an

15  absolute basis, but as a percentage of the class's losses.  So

16  we believe that we are entitled to be rewarded for these

17  accomplishments and to get a higher percentage than was

18  recognized in those other 15 ERISA cases.

19       U.S. Trust then argues in the alternative that even

20  if all securities cases are considered, and, Judge, we think

21  that all cases, not just all securities cases, all cases

22  should be considered, they say even if all securities cases

23  are considered, a NERA study found that fee awards in

24  securities class actions where the settlement was between 25

25  and $100 million, average 26 percent.

▯

1       Again, we think there's three problems with the

2   argument.  First, it ignores the specifics of those other

lancaster82205
3   cases just like their ERISA argument, the 15-ERISA case

4   argument did.  For example, settlements in that range, 25 to

5   $100 million range typically are in huge, huge mega cases and,

6   therefore, reflect only a very small percentage of the class

7   damages.  There are cases where maybe the class lost a billion

8   dollars and a recovery of 25 or $100 million is mere pennies

9   on the dollar.

10       Here, we recovered 78 percent of the damages and as I

11  said, we think we deserve to be rewarded for that.  The later

12  dollars after all are the hardest dollars in negotiations to

13  get.  Those are the tough ones.  The defendants came in and

14  they knew what the damages were, they were arguing about the

15  market value of these cases.  Those last dollars are the tough

16  ones to get.

17       Second, the NERA study that U.S. Trust points to is

18  "contradicted by NERA's only slightly earlier study."  They

19  had a study a few years early in 1996, that finds that

20  "regardless of case size, fees average approximately 32

21  percent of the settlement."

22       "Third, U.S. Trust's reliance on the NERA study is

23  limited to averages."  It ignores the median, which is the

24  middle number if you were to lay them all out and the mode,

25  which would be the most frequent.

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

☐

36

1        The NERA study also ignores the median.  It does

2   address the mode, the most frequent.  The one U.S. Trust cites

3   to concedes that "33 percent is still the most frequent

4   percentage, requested in over 40 percent of cases."

Page 33

lancaster82205
5          Finally, in a separate but related argument, U.S.
6   Trust contends that the cases cited in our opening memorandum
7   are not entirely applicable because many of the cases cited
8   are smaller settlements.  So we attempted to address that in
9   our reply brief by showing that there are any number of very
10  large settlements in which the Court awarded fees of at or
11  neared a third.

12          For example, there's a case from this district that's
13  very recent, within the last year, I think it was mid or late
14  November, before Judge Chesler, the Galanti v. Goodyear Tire &
15  Rubber case.  That was a $300 million settlement,
16  substantially more than the settlement in this case.  Judge
17  Chesler awarded a 30 percent or $90 million fee.

18          So as I said at the outset, we believe the Court
19  ought to look at all seven of the Gunter factors.  Indeed,
20  although the fee is a matter in your Honor's discretion, I
21  think the Third Circuit requires that the Court go through all
22  seven of the Gunter factors.  We think all seven of those
23  factors weigh in our favor.

24          Essentially, five or six out of the seven we think
25  U.S. Trust agrees weigh in our favor and even with respect to

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

37

1   comparables, I think when the Court really looks at them, the
2   Court will see that we did better than in those other cases.
3   So we think that we deserve to be on the high end, if indeed,
4   your Honor concludes we are on the high end.
5          THE COURT:   Thank you.
6          Any reply, counsel?

Page 34

lancaster82205

7          MR. STENGLEIN:   Just a short reply, your Honor.

8          We have attached the NERA study as exhibit 15,

9   actually 16 to our papers.  I'll just take issue with a couple

10  of points raised by Mr. Friedman.

11         He's making the assumption in here when he talks

12  about -- which is on page seven of the report, shows for

13  settlements of 25 to $100 million, 26 percent is the average

14  settlement -- average fee award.

15         He says -- he represented to the Court or I guess he

16  was assuming that in those settlements, in the NERA's study

17  that those percentages are based on settlements that are in

18  the billions of dollars.  No where in the NERA report is that

19  issue addressed, so that is for speculation.

20         It doesn't say, frankly, in here for the 26 percent

21  average that it finds for settlements of 25 to 100 million

22  what the claimed damages actually were in those cases, so that

23  is up to speculation.

24         Then as to his point on the NERA's settlement that

25  U.S. Trust doesn't address, that is as he refers to the mode,

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

38

1   he says -- he told the Court, and it's in his papers, that

2   this 40 percent requested number, the interesting point on

3   that is that NERA does conclude that in 40 percent of the

4   cases, counsel requests a 33-percent recovery.  It doesn't

5   mean that in 40 percent of the cases a 33-percent recovery is

6   granted.  In fact, NERA makes clear the 25 to $100 million

7   settlement range, that 26 percent recovery is granted.

8          That's all, your Honor.

Page 35

lancaster82205
9        THE COURT:    Thank you.

10       Court will take a recess until 11:30.  That clock is

11  of no use to you.  It's five minutes after 11.  We'll

12  reconvene at 11:30 and I'll have at least a brief oral

13  presentation and my decision on the counsel fee issue.

14       Thank you.

15       (Recess.)

16       THE COURT:    Remain seated, please, everyone.

17       Before concluding today on a more general note, I

18  will deal specifically with the application for counsel fees.

19       In doing so, I'm, indeed, consulting in depth the

20  particular factors set forth in the Third Circuit Gunter

21  opinion.  I realize these are not to be applied

22  formalistically, and I'll have more to say about that.

23       Let me take them in order.  The first is the

24  reference to the size of the fund and the number of persons

25  benefiting.  For the generation of a $90 million settlement

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

39

1  fund here, approximately 78 percent of the reasonable estimate

2  of punitive damages I believe prepared on the plaintiffs' own

3  behest, if my recollection serves me, it is considerable,

4  certainly weighs in favor of an appropriate award for

5  plaintiffs' counsel.

6       We also have more than 40,000 class members have

7  benefited.  That I think weighs perhaps on both sides of the

8  equation.

9       First, of course, there are a number of persons here

10  who are going to be benefiting by these recoveries, a sizable

Page 36

lancaster82205

11  number who might otherwise have sustained losses, but

12  secondly, that also means that there are a large number of

13  persons who will be participating and who will be looking to

14  this fund to be made whole.

15        I think one has to be concerned, at least somewhat,

16  about the preservation of that portion of the fund which will

17  be available to them as opposed to counsel for the class who

18  are seeking an award as a percentage of the fund.

19        Secondly, the reaction of the class to the terms of

20  the settlement, including, of course, the proposed attorneys

21  fee of 33-and-a-third-percent of the $90 million.  Through the

22  absence of objections, with the few isolated instances that

23  have been addressed in this courtroom today, there has been

24  overwhelming approval or acknowledgement by class members of

25  the appropriateness of the settlement, including at least

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

40

1  inferentially, the amount of the fee requested.  It's not as

2  if dozens and dozens of objectors emerged here contesting the

3  amount of the fee and the impact that that fee would have on

4  the fund available for their recovery.

5        U.S. trustees -- U.S. Trust Company, excuse me, as

6  the independent fiduciary that it is in this matter, validly

7  raised some objection and considerations for the Court and I

8  have done so.  On the other hand, even the U.S. Trust

9  indicated that it had no overall objection to the terms of the

10  settlement, the adequacy of the recovery for the plaintiff

11  class, even on a net basis.  In other words, even a net of 60

12  million would, in U.S. Trust's view, be a good settlement of

Page 37

lancaster82205

13   the class.

14        Item number three, the skill and efficiencies of the

15   attorneys.  First, of course, the Court notes that the

16   attorneys in the firms involved in this matter and they are

17   highly experienced and highly skilled in matters of this kind.

18   Moreover, in this case it showed.  Those efforts were

19   vigorous, imaginative and prompt in reaching the settlement of

20   this matter with a minimal amount of discovery, for instance,

21   all that was needed to make all parties fully informed and

22   without getting into a full-blown battle on threshold motions

23   as a prelude to settlement which is also the case.  It was not

24   necessary here.

25        So both skill and efficiency were brought to the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

41

1   table here by counsel, no doubt about that.

2        I've already commented briefly on the complexity of

3   this litigation and its likely duration if it had gone through

4   all phases to try, and almost necessarily these matters to at

5   least one level of appeals.  The issues would have been

6   complex.  The litigation would have been extensive.  Among

7   other things, the establishment of damages would have been an

8   equally complex matter.

9        Item number five talks about the risk of nonpayment,

10   to wit:   what risks were taken by plaintiffs' counsel about

11   the possibility of pursuing this action vigorously, ultimately

12   though based on the contingent fee arrangement with no

13   ultimate compensation, plus of course a substantial outlay of

14   expenses are not likely recoverable either.  There were,

lancaster82205

15    indeed, factual and legal impediments to the success of the

16    plaintiffs here and also to the detriment of their damages.

17         Needless to say, also, there were uncertainties with

18    regard to the trial and appellate process. That being said,

19    while I agree with plaintiffs' counsel that the Davis Polk

20    report is not a roadmap to success here in the ERISA

21    litigation, it certainly did assist plaintiffs in achieving a

22    basis for the assessment of liability and in large measure at

23    least the assessment of losses due to the impact on the Shell

24    stock, from the activities of those in the Shell security

25    litigation.


JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

42

1          I note we're dealing here only with allegations in

2    that matter which remains pending. I want to be cautious

3    there, but Davis Polk report surely was of some assistance

4    here and I think I can properly infer that that document,

5    perhaps among others, was a significant catalyst to the

6    settlement in this matter, even on behalf of the present

7    defendants.

8          Item number six talks in terms of the time devoted

9    and that's documented here. A sizable number of hours with

10   approximately $6 million plus in lodestar value, if the Court

11   were approaching the awarded fees on a lodestar basis rather

12   than as a proportion of the fund. Plaintiffs suggest that a

13   4.4 multiplier of this lodestar, if I were approaching the

14   case in this fashion, would have been appropriate here. I'm

15   inclined to disagree somewhat on that point.

16         Once again, albeit due to the abilities and the

Page 39

lancaster82205

17   diligence of counsel here, this case did settle in its earlier

18   stages.  While I might be more inclined to apply a multiplier

19   of that sort to a lodestar in the case that went all the way

20   through to conclusion, I'm not sure that I would do so in a

21   case which settled early.  I also don't feel that that

22   approach generates a disincentive to settlement.

23          We then get to the question of awards in similar

24   cases and all parties seem to acknowledge that that is, at

25   best, an inexact science.  The statistics establish that a

JOANNE M. CARUSO, CSR, CRR,   OFFICIAL COURT REPORTER, NEWARK, N.J.

43

1    mode for request in the population of cases comparable to the

2    case at bar is somewhere in the vicinity of 33-and-a-third

3    percent.  The Court doesn't find that particularly surprising.

4    Indeed, of course, it has a traditional relationship to

5    contingent fee arrangements in any number of actions.

6          As U.S. Trust pointed out today, what's applied for

7    doesn't necessarily become awarded.  The cases cited by all

8    parties to this Court would seem to generate recovery in a

9    range of somewhere between 19 and 45 percent.  The ERISA

10   population of cases on which U.S. Trust asks the Court to

11   focus is not the only one considered but it surely was worth

12   considering.

13         As I mentioned before, this is not an exact science.

14   Much of course has to be left up to the Court's own experience

15   and feel for what is fair, because what we are ultimately put

16   to here is a question of what award of counsel fees is fair

17   and reasonable, not only to reflect the efforts of plaintiffs'

18   counsel, but also in terms of the residue of the fund to be

Page 40

lancaster82205
19  remaining for the class members.

20      The Court notes that in the Weiss case and that is

21  Weiss v. Mercedes-Benz of North America, at 899 F. Supp. 1297,

22  1995, the very same counsel before this Court on the

23  plaintiffs' side sought an award of 15 percent. Frankly, that

24  award was -- that application was rather modest and the Court

25  allowed it, although against a different quantification of the

44

1  value of the settlement between that which had been tendered
2  by the plaintiffs.

3      The Court also notes that that fee was awarded over
4  and above the settlement fund or the settlements value.  In
5  other words, it was not taken out of the corpus of the fund
6  made available to the class members.

7      Thus, in this Court's view, considering all of the
8  Gunter factors, and once again realizing that it's ultimately
9  charge is fair and reasonable attorneys fee in this case, both
10  expressed in terms of the percentage allowed and of course the
11  absolute dollars of the recovery which are going to be
12  significant in any case, this Court allows attorneys fees of
13  25 percent against the $90 million or a figure of $22.5
14  million.

15      As I understand it, of course, there will be an
16  additional $1 million paid by defendants in expenses to
17  plaintiffs' counsel that is not to be taken from the fund but
18  is from an outside source.

19      I'll now turn back to the question of the order
20  approving the settlement in this case. The Court determines

lancaster82205
21  that the terms of settlement approved in all of its facets are
22  acceptable, fair, reasonable and are approved by this Court.
23          I have dealt with the respective objections tendered
24  here today and those ones stand and can be reflected in any
25  proposed findings of fact and conclusions of law submitted

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

45

1   here.

2           I considered the factors sometimes known as the
3   Girsch factors, also recited and dealt with seriatim in the
4   Weiss opinion and in doing so, have reached the decision which
5   I have here today with regard to the overall fairness and
6   acceptability of the settlement.

7           Accordingly, merely to summarize here without never
8   to be complete because the findings of fact and conclusions of
9   law obviously will be in greater depth, the Court certifies
10  the class that has been tendered here as an appropriate
11  settlement class, approves the settlement in all its aspects
12  and awards counsel fees of $22.5 million from the $90 million
13  settlement fund, plus the $1 million in expenses also sought.

14          As you know, my tenure on this bench is limited to
15  another nine days and for that reason, I would like to have
16  proposed findings of fact and conclusions of law and any
17  objections to them submitted promptly. I would ask that the
18  plaintiffs and defendants, particularly since you have a
19  sizable familiarity with this matter, submit proposed findings
20  of fact and conclusions of law, as well as proposed finding
21  order or orders as the case may be, electronically filed with
22  the Court by the close of business on this coming Wednesday;

Page 42

lancaster82205

23  that any objections from any corner either to form or content

24  of those papers shall also be electronically filed no later

25  than 12 noon on this Friday.  That will give the Court the

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

46

1  opportunity to review those papers over the weekend and

2  presumably execute them with the proper terms the first of

3  next week.

4           Anything further before we adjourn on behalf of the

5  plaintiffs?

6           MR. HARWOOD:  Your Honor, we have the approved order

7  approving settlement and the judgment.  If your Honor pleases,

8  I can hand these up now.

9           THE COURT:  If you would hand those up now, and I

10  know I've seen them in various forms along the way.  I'm happy

11  to receive them and I can stop my inquiry.

12           MR. HARWOOD:  Paragraph 16 of the order approving the

13  judgment deals with attorneys' fees and there are appropriate

14  blanks in there.

15           THE COURT:  Fair enough.  I can complete them.

16           Anything further on behalf of defendants?

17           MS. ASHTON:  No, your Honor.

18           THE COURT:  Anything on behalf of other counsel?

19           MR. VESELKA:  No, your Honor.

20           MR. BETTIGOLE:  No.

21           MS. SENNETT:  No.

22           THE COURT:  We're adjourned.

23           (Matter concluded.)

24

Page 43

lancaster82205

25

JOANNE M. CARUSO, CSR, CRR,  OFFICIAL COURT REPORTER, NEWARK, N.J.

# EXHIBIT F

# MILBERG LLP

NEW YORK
LOS ANGELES
TAMPA

Arvind Khurana
Direct Dial: (212) 631-8615
akhurana@milberg.com

July 28, 2008

VIA EMAIL, ORIGINAL TO FOLLOW BY U.S. MAIL

Jonathan K. Youngwood, Esq.
Simpson Thatcher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017-3954

Re:   ***DeSousa v. Lehman Brothers Holdings Inc., et al.***
      08-CV-6626 (S.D.N.Y.)

Dear Mr. Youngwood:

On behalf of our client, Maria DeSousa, we write to request certain documents within the scope of Section 104(b) of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 related to the Lehman Brothers Holdings, Inc. 401(k) Savings Plan (the "Plan"). Specifically, we request the following documents and any amendments thereto for the Plan:

1.     summary plan descriptions;

2.     latest annual reports;

3.     bargaining agreements; and

4.     trust agreements, contracts, or other instruments under which the Plan was established or is operated.

In addition, we request the following categories of documents that will enable our client to ascertain the identity of all fiduciaries of the Plan from September 13, 2006 to the present (the "Class Period"):

Jonathan K. Youngwood, Esq.
July 28, 2008
Page 2

5. investment management agreements;

6. notices regarding the Plan including any Summary of Material Modification to any document governing the Plan, and any designation and/or removal of the Plan's investment funds or options;

7. Internal Revenue Service Forms 5500 and 990 filed by the Plan during the Class Period;

8. all Forms 10-K, 11-K and S-8 submitted to the Securities and Exchange Commission relating to the Plan during the Class Period, including any amendments, schedules and attachments thereto;

9. rules, regulations, bylaws and procedures adopted by the Plan (or any committee charged with administration of the Plan whose members have discretionary authority or control with the respect to the disposition of the Plan's assets governing any aspect of the management or operation of the Plan or any trust holding the Plan's assets, or the investment of the Plan's assets;

10. minutes of any meetings of the committees, or similar governing entity of the Plan (and all committees and subcommittees thereof) including all exhibits, attachments, and documents referenced in the minutes;

11. all documents which identify the fiduciaries of the Plan, including those identifying members of any committees charged with administration of the Plan or whose members have discretionary authority or control with respect to the disposition of the Plan's assets;

12. documents evidencing any delegation of fiduciary responsibilities regarding the Plan during the Class Period;

13. any investment policy statements of the Plan;

14. any insurance policies that do or may cover any fiduciary of the Plan for breaches of ERISA mandated duties and any notice of claim or potential claim under such policy in effect or created at any time during the Class Period;

15. prospectuses, including any prospectuses issued under the Securities Act of 1933, provided to Plan participants; and

16. any fidelity bonds covering any Plan fiduciaries and any notice of claim or potential claim under such bond in effect or created at any time during the Class Period.

**Milberg LLP**

Jonathan K. Youngwood, Esq.
July 28, 2008
Page 3


     We request that you provide the foregoing documents to us within thirty (30) days of receiving this request.


Very truly yours,

Arvind Khurana


**Milberg LLP**

# EXHIBIT G

(PART 1 OF 2)

'08 CIV 6626

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

—————————————————————x

MARIA DESOUSA, On Behalf of Herself And
All Others Similarly Situated,

              Plaintiff,

   vs.

LEHMAN BROTHERS HOLDINGS INC.,
RICHARD S. FULD, JR., ERIN M. CALLAN,
WENDY M. UVINO, MICHAEL L. AINSLIE,
JOHN F. AKERS, ROGER S. BERLIND,
THOMAS H. CRUIKSHANK, MARSHA J.
EVANS, SIR CHRISTOPHER
GENT, JERRY A. GRUNDHOFER,
ROLAND A. HERNANDEZ, HENRY
KAUFMAN, JOHN D. MACOMBER, THE
EMPLOYEE BENEFIT PLAN COMMITTEE,
THE COMPENSATION AND BENEFITS
COMMITTEE, JOHN DOES 1-20,

              Defendants.

—————————————————————x



Case No.

CLASS ACTION

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE
## RETIREMENT INCOME SECURITY ACT OF 1974

       Plaintiff, a participant in the Lehman Brothers Holdings, Inc. 401(k) Savings Plan

("Plan") during the proposed Class Period, on behalf of the Plan, herself, and all others similarly

situated, alleges as follows:

### I.    NATURE OF THE ACTION

     1.    Plaintiff brings this suit as a civil enforcement action under the Employee

Retirement Income Security Act of 1974 ("ERISA") §§ 409, 502(a)(2), and (3), 29 U.S.C. §§

1109 and 1132(a)(2), (3), for relief on behalf of the Plan. The Plan is a retirement plan operated

and established by Lehman Brothers Holdings, Inc. ("Lehman Brothers" or the "Company") as a

benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Lehman Brothers common stock is one of the investments offered in the Plan. According to the Company's Form 11-K filed with the U.S. Securities and Exchange Commission ("SEC") on December 31, 2006 (the "2006 11-K"), in excess of $230 million or more of the Plan's assets were invested in Lehman Brothers Stock. Indeed, the Plan was heavily invested in Lehman Brothers Stock at all times relevant to this action, as discussed herein.

2.    Plaintiff Maria DeSousa is a participant in the Plan. During the class period of September 13, 2006 through the present (the "Class Period"), her retirement portfolio included Lehman Brothers Stock.

3.    Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to her and to other participants and beneficiaries of the Plan during the Class Period in violation of ERISA, particularly with regard to the Plan's holdings of Lehman Brothers Stock.

4.    Lehman Brothers is the sponsor of the Plan.

5.    Since the Plan's holdings in Lehman Brothers Stock comprised a significant percentage of the overall value of the assets held by the Plan, the long-term retirement savings of the Plan's participants were dependent to a substantial degree both on the performance of Lehman Brothers Stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a large, ongoing investment of assets of the Plan. This action alleges that the fiduciaries of the Plan breached their fiduciary duties to the Plan and its participants under ERISA, by, *inter alia*, selecting and maintaining Lehman Brothers Stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a suitable or prudent investment option for the Plan.

- 2 -

6.     The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plan's investment in Lehman Brothers Stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their holdings invested in Lehman Brothers Stock.

7.     The basic prudence allegations arise from the fact that Defendants knew, or should have known, that Lehman Brothers was engaging in risky and unsound business practices in connection with its investments in collateralized debt obligations, including its exposure to the subprime credit market, which have rendered Lehman Brothers Stock an imprudent, inappropriate and extraordinarily risky investment for the retirement savings of the Plan's participants.

8.     As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plan's participants.     Indeed, the Plan's participants have seen their retirement savings accounts devastated as Lehman Brothers Stock plummeted from a high of approximately $70 per share near the beginning of the Class Period to approximately $18 per share as of the date of this complaint. Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from these fiduciary breaches.

9.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for Plan-wide relief for breach of fiduciary duty, Plaintiff brings this case as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period. Plaintiff also brings this action as a participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

- 3 -

10.    Because much of the information and documents on which Plaintiff's claims are based are solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff may, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the claims below.

## II.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District.  The Court also has personal jurisdiction over Defendants because the Company maintains executive offices in this District, and the Plan is administered within this District.    Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.    Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants administer the Plan in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

## III.    THE PARTIES

**Plaintiff**

14.    Plaintiff Maria DeSousa is a resident of the State of New Jersey.  She is a participant in the Plan within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and

§1132(a).  During the Class Period, Plaintiff DeSousa held Lehman Brothers Stock in her individual Plan account.

**Corporate Defendants**

15.  Defendant Lehman Brothers Holdings, Inc. is a Delaware corporation with its principal place of business located at 745 Seventh Avenue, New York, NY 10019.  Through its Capital Markets, Investment Banking and Investment Management business segments, Lehman Brothers provides financial services to corporations, governments and individuals worldwide. *See* the Company's Form 10-K filed with the SEC on January 29, 2008 (the "2007 10-K"), at 3.

16.  Upon information and belief, Lehman Brothers at all times acted through its officers, directors and employees, including the Chief Executive Officer ("CEO").  Lehman Brothers had, at all times relevant herein, effective control over the activities of its officers and employees, including their Plan-related activities.  Lehman Brothers exercises ultimate discretionary decisional authority with respect to all aspects of the administration of the Plan, management and disposition of the Plan's assets, and appointment and removal of fiduciaries through its management employees, Lehman Brothers' Board of Directors (the "Board"), Compensation and Benefits Committee and/or Employee Benefit Plan Committee (terms defined herein).

17.  Upon information and belief, under the terms of the Plan, Lehman Brothers was given direct control and management over any aspect of the operation, or administration of the Plan that was not specifically delegated to the named fiduciaries under the Plan and upon information and belief, exercised this control.  Upon information and belief, the Plan names Lehman Brothers as the administrator, as that term is defined in Section 3(16) of ERISA 29 U.S.C. § 1002(16).  Under ERISA, a plan administrator is inherently a fiduciary.

18.    As a matter of corporate law, Lehman Brothers is imputed with the knowledge that its Board and management employees had of the misconduct alleged herein, even if not communicated to Lehman Brothers.

19.    Upon information and belief, Lehman Brothers, together with its Board, exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA. In this regard Lehman Brothers, together with the Board, drafted and disseminated various documents and materials related to the Plan, including but not limited to, a Summary Plan Description ("SPD") and the documents incorporated into the SPD. Based on the allegations contained herein, Lehman Brothers is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the Plan's assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

20.    *The Board.*    Upon information and belief, the business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plan. One of the many roles or functions of the Board is the power to appoint the members of the Compensation and Benefits Committee and Employee Benefit Plan Committee (as defined below). Upon information and belief, the Board likewise exercised management or control over the Compensation and Benefits Committee and Employee Benefit Plan Committee. Based on the above, the Board is a fiduciary with respect to the Plan because it exercised discretionary authority or discretionary responsibility in the administration of the Plan, exercised discretionary authority or control with respect to the management of the

Plan's assets, and exercised discretionary authority and control with respect to the appointment of other Plan's fiduciaries.

21.    ***The Compensation and Benefits Committee.*** One purpose of the Compensation and Benefit Committee (the "Compensation Committee") is to "[d]ischarge the responsibilities of the Board of Directors with respect to the Corporations' compensation and benefits programs." See Compensation Committee Charter. The Compensation committee consists of Mr. John Akers, the chair of the Compensation Committee, Ms. Marsha Evans, Sir Christopher Gent, and Mr. John Macomber, each of whom sits on the Board of Directors. Upon information and belief, the Compensation Committee had overall responsibility for the Plan.

22.    ***The Employee Benefit Plan Committee.*** The Plan assigned fiduciary responsibilities to an Employee Benefit Committee (the "Benefit Plan Committee"). Upon information and belief, the Benefit Plan Committee is a "Named Fiduciary" under the Plan and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). The Benefit Plan Committee consists of the persons that administer the Plan, and has overall responsibility for its management and operation. According to the 2007 Form 11-K, the Benefit Plan Committee is the Plan Administrator. Upon information and belief, members of the Benefit Plan Committee are appointed by the Compensation Committee.

**Individual Defendants**

23.    Defendant Richard S. Fuld, Jr. ("Fuld") served as Lehman Brothers' Chief Executive Officer and Chairman of the Board during the Class Period. Fuld was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plan.

24.    Defendant Erin M. Callan ("Callan") served as the Chief Financial Officer, Controller and Executive Vice President of the Company during the Class Period.

- 7 -

25.    Defendant Wendy M. Uvino ("Uvino") served as the Chairperson of the Benefit Plan Committee during the Class Period. Uvino signed the Form 11-K filed with the SEC for the year ended December 31, 2006 for the Plan and the Forms 5500 for the Plan filed with the Department of the Treasury and Internal Revenue Service for the 2006 tax year.

26.    Defendant Michael L. Ainslie ("Ainslie") served as member of the Board during the Class Period. During the Class Period, Ainslie served on the Board's Audit Committee.

27.    Defendant John F. Akers ("Akers") served as member of the Board during the Class Period. During the Class Period, Akers served as the Chairman of the Compensation Committee, and as a member of the Board's Finance and Risk Committee.

28.    Defendant Roger S. Berlind ("Berlind") served as member of the Board during the Class Period. During the Class Period, Berlind served on the Audit Committee and the Finance and Risk Committee.

29.    Defendant Thomas H. Cruickshank ("Cruickshank") served as member of the Board during the Class Period. During the Class Period, Cruickshank served as a Chairman of the Board's Audit Committee and as a member of the Nominating and Corporate Governance Committee.

30.    Defendant Marsha J. Evans ("Evans") served as a member of the Board during the Class Period. During the Class Period, Evans served as a member of the Compensation Committee and the Finance and Risk Committee.

31.    Defendant Sir Christopher Gent ("Gent") served as a member of the Board during the Class Period. During the Class Period, Gent served on the Audit Committee and the Compensation Committee.

32.    Defendant Jerry A. Grundhofer ("Grundhofer") served as a member of the Board during the Class Period.

33.    Defendant Roland A. Hernandez ("Hernandez") served as a member of the Board during the Class Period. During the Class Period, Hernandez served as a member of Finance and Risk Committee.

34.    Defendant Henry Kaufman ("Kaufman") served as a member of the Board during the Class Period. During the Class Period, Kaufman served as the Chairman of the Finance and Risk Committee.

35.    Defendant John D. Macomber ("Macomber") served as a member of the Board during the Class Period. During the Class Period, Macomber served as a member of the Compensation Committee, the Executive Committee, and the Nominating and Corporate Governance Committee.

36.    The defendants identified in ¶¶ 23 through 35 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants are fiduciaries of the Plan within the meaning of ERISA.

37.    *The Board Defendants.* Lehman Brothers, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Lehman Brothers relied and continues to rely directly on each of the Board Defendants to carry out its fiduciary responsibilities under the Plan and ERISA as specified in ¶ 20 of this Complaint and therefore each member of the Board is a fiduciary for the reasons stated in ¶ 20.

38.    In addition, each member of the Board carried out the Board's role as a fiduciary with respect to the Plan as set forth in ¶ 20, engaged in the conduct and had the powers and duties alleged in ¶ 20, and was, therefore, a fiduciary for the reasons set forth in ¶ 20.

- 9 -

39.    The individuals who served on the Board and acted as fiduciaries with respect to the Plan during the Class Period are as follows:  Defendants Fuld, Callahan Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Grundhofer, Hernandez, Kaufman, and Macomber (collectively, the "Board Defendants").

40.    ***The Compensation Committee Defendants***.  During the Class Period, each member of the Investment Committee carried out the Investment Committee's role as a fiduciary with respect to the Plan as set forth in ¶ 21, engaged in the conduct and had the powers and duties alleged in ¶ 21 and was therefore a fiduciary for the reasons set forth in ¶ 21.

41.    The individuals who served on the Compensation Committee and acted as fiduciaries with respect to the Plan during the Class Period are as follows:  Defendant Akers, Evans, Gent and Macomber (collectively, the "Compensation Committee Defendants").

42.    Plaintiff does not currently know the identity of all the Compensation Committee Defendants during the Class Period.  Therefore, the members of the Compensation Committee Defendants are named fictitiously, as Defendants Does 1 to 10.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

43.    ***The Benefit Plan Committee Defendants***.  During the Class Period, each member of the Benefit Plan Committee carried out the Benefit Plan Committee's role as a fiduciary with respect to the Plan as set forth in ¶ 22, engaged in the conduct and had the power and duties alleged in ¶ 22, and was therefore a fiduciary for the reasons set forth in ¶ 22.

44.    Defendant Uvino served on the Benefit Plan Committee and acted as a fiduciary with respect to the Plan during the Class Period.

45.    Plaintiff does not currently know the identity of all the members of the Benefit Plan Committee during the Class Period.  Therefore, the members of the Benefit Plan Committee

Defendants are named fictitiously, as Defendants Does 11 to 20. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

46. The Compensation Committee Defendants and the Benefit Plan Committee Defendants are collectively referred to herein as the "Committee Defendants." The Compensation Committee and the Benefit Plan Committee are collectively referred to herein as the "Committee."

## IV. NATURE OF THE PLAN

47. The Plan is a defined contribution 401(k) plan that became effective on January 1, 1984, and covers eligible employees of Lehman Brothers and its subsidiaries. The purpose of the Plan is to encourage employees to save for retirement. An eligible employee who is employed by the Company may elect to make salary deferral 401(k) plan contributions upon commencement of his or her employment.

48. Each participant in the Plan may elect to make contributions to the Plan on a pre-tax basis through payroll deductions between 1% and 50% of such participant's eligible compensation (as defined in the Plan document) for each pay period up to an annual maximum of $15,000 for 2006. In addition, participants who are age 50 or older and have made the maximum contribution to the Plan, can make an additional catch-up contribution to the Plan through payroll deductions between 1% and 25% of eligible compensation to an annual maximum of $5,000. A participant can elect to change the rate at which his/her contribution is determined at any time during the year.

49. In 2006, the Company provided a discretionary matching contribution in either Lehman Brothers Stock or cash to those eligible participants who have a twelve month period of service. The discretionary contribution is allocated as follows: (1) Participants with annual compensation below $50,000, and who are not in any position designated to be excluded from

- 11 -

the Company contribution, will receive a Company contribution of $500 plus 100% of the first $3500 of their pre-tax contributions; (2) Participants with annual compensation between $50,000 and $200,000 will receive a Company contribution of up to 100% of the first $4000 of their pre-tax contributions, only if there are funds remaining after contributions are made for the participants making less than $50,000 per year; (3) Company contributions are not made for participants with annual compensation in excess of $200,000.

50.    For the 2007 Plan year, Company contributions were made in cash and were invested in accordance with the participant's elections for the employee contribution. However for the 2006 Plan year, Company contributions were made in cash, which was then immediately invested in the Lehman Brothers Common Stock Fund. *See* 2007 Form 11-K.

51.    Individual notional accounts are maintained for each Plan participant. Each participant's notional account is credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses.

52.    According to the 2006 11-K, "[p]articipants are immediately 100% vested in their pre-tax and catch-up contributions for all Plan years and in any Company contributions that were made for any Plan year prior to 2005. Participants shall be 100% vested in their Company contributions made for 2005 and later Plan years once they have attained three years of vesting service, as defined by the Plan document."

53.    The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the Plan is not a

party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

54.    An employee benefit plan, such as the Plan, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). ERISA requires that every participant in an employee benefit plan be given a SPD.

55.    The assets of an employee benefit 401(k) plan must be held "in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Plan were held in trust by Fidelity Management Trust Company and its affiliates.

56.    ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury. The Plan filed a Form 5500 in October 2006 that was signed by Defendant Uvino.

57.    As of December 31, 2007, the Plan held Lehman Brothers Stock with a fair market value of approximately $228 million. As of December 31, 2006, the Plan held shares of Lehman Brothers Stock with a fair market value of $233 million.

## V.    CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all participants (and beneficiaries thereof) of the Plan, whose individual accounts included investments in Lehman Brothers Stock during the Class Period of September 13, 2006 through the present. Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

59.    This action is properly maintainable as a class action because:

- 13 -

60.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown by Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, thousands of members of the Class.

61.    Plaintiff's claims are typical of those of the Class because Plaintiff, members of the Class and the Plan suffered similar harm and damages as a result of Defendants' systematic unlawful conduct described herein. Absent a class action, the Plan and/or members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

62.    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class they seek to represent.

63.    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class, which would then establish incompatible standards of conduct for Defendants. As the damages suffered by the individual Class members, direct or indirect through their participation in the Plan may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them and/or the Plan. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner, making declaratory and injunctive relief to the Class as a whole appropriate.

64.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact that are common to Plaintiff and the Class include, among others:

- Whether ERISA applies to the claims at issue;

- Whether Defendants owe and owed fiduciary duties to the members of the Class;

- The nature of the fiduciary duties Defendants owe or owed to members of the Class;

- Whether Defendants breached their fiduciary duties; and

- The extent of losses sustained by the Plan, and thereby members of the Class, and the appropriate measure of relief.

65.    Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

## VI.    DEFENDANTS' FIDUCIARY STATUS

66.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or management or disposition of the Plan's assets.

67.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

68.    **Named Fiduciaries.** ERISA requires every plan to provide for one or more named fiduciaries of the Plan pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2). Upon information and belief, the Committee Defendants are Named Fiduciaries under the Plan. In addition, the Lehman Brothers Defendants are Named Fiduciaries since they were appointed the Plan's Administrator.

69.    **De Facto Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries,

- 15 -

i.e., perform fiduciary functions (including a juridical person such as Lehman Brothers). ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, the conduct alleged in herein.

## VII.    DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

70.    ERISA is a comprehensive statute covering virtually all aspects of an employee benefit plan, including retirement savings plans, such as the Plan. The goal of ERISA is to protect the interests of the Plan's participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit Plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit Plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

71.    Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants. Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits. 29 U.S.C. § 1002(21)(A). ERISA requires strict fidelity and loyalty in the execution of the plan's management.

72.    ERISA imposes on Defendants, who are responsible for the Plan, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man [or woman] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

73.    ERISA also imposes on Defendants responsible for the Plan a duty of loyalty, requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

74.    Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plan or disposition of Plan's assets, include but are not limited to:

    (a)    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plan's assets;

    (b)    The duty to evaluate all investment decisions with "an eye single" to the interests of Plan's participants and beneficiaries;

    (c)    The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to    participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)    To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named, which includes, among other things: 1) the duty to ensure that the appointed fiduciary possesses the needed credentials to fulfill his or her duties; 2) the duty to make sure that the appointed fiduciary has adequate knowledge to fulfill his or her duties; 3) the duty to insure that the appointed fiduciary has access to and retains impartial advisers when needed; 4) the duty to require that the appointed fiduciary report regularly to the monitoring fiduciary; and 5) the duty to remove a fiduciary if that fiduciary has breached his or her fiduciary duty or is not performing his or her fiduciary functions in accordance with ERISA;

(e)    The duty to disclose and inform the Plan's Participants of any material adverse information about the Plan that duty entails, among other things: (1) a duty not to make materially false statements or misinform the Plan's participants concerning any aspect of the Plan including its investments; (2) an affirmative duty to inform the Plan's participants about material adverse factors that were affecting the Plan or its investments at any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (3) when a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information that the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment;

(f)    A duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations

and in most instances at a price that renders it improbable that the investments will bring

a fair return commensurate with the prevailing rates;

      (g)    A duty to diversify the Plan's investments to minimize the risk of large

losses to the Plan and its participants; and

      (h)    The duty to not blindly follow plan documents if doing so leads to an

imprudent result. A fiduciary may not avoid fiduciary responsibility by relying solely on

the language of plan documents.

    75.    ERISA permits the fiduciary function to be shared among various individuals and

entities. Given ERISA's functional concept of a fiduciary, absent formal discovery it is

impossible to know the full extent of which fiduciaries exercised which fiduciary functions.

    76.    Insofar as the Plan was not properly diversified funds and therefore more risky to

the Plan's participants, the Defendants had heightened fiduciary duties to the Plan's participants

with respect to the Plan's investment in Lehman Brothers Stock, including heightened duties to

disclose all material information relevant to investments in Lehman Brothers Stock.

    77.    A fiduciary is liable not only for the fiduciary's own breach, but is also liable as a

co-fiduciary if:

      (a)    the fiduciary participates knowingly in, or knowingly undertakes to

conceal, an act or omission of another fiduciary, knowing such act or omission is a

breach; or

      (b)    if, by the fiduciary's failure to comply with ERISA § 404(a)(1), 29 U.S.C.

§ 1104 (a)(1) in the administration of his specific responsibilities that gives rise to

fiduciary status, the fiduciary enables another fiduciary to commit a breach; or

(c)    the fiduciary knew or should have known of a breach by such other

fiduciary and does not make reasonable efforts under the circumstances to remedy the

breach.

## VIII.    LEHMAN BROTHERS STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLAN

### A.    Background of the Subprime Industry

78.    Subprime lending is the practice of making mortgage loans to persons who are

generally unable to access credit from traditional financial institutions.  This is because they do

not satisfy credit, documentations or other underwriting standards mandated by these traditional

mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

79.    Because subprime borrowers are seen as "higher risk," their loans carry interest

rates that are at least two percentage points higher than those offered to borrowers with better

credit.  So, for example, while a credit-worthy borrower could get a mortgage at 5% interest, the

same mortgage would cost a subprime customer 7% interest or more.

80.    The subprime market has grown rapidly in recent years.  In 1994, fewer than

5% of mortgage originations in the United States were subprime, but by 2005 about 20% of

mortgage originations were subprime.  The greater access to subprime mortgages has helped

homeownership grow.

81.    Subprime mortgages totaled $600 billion in 2007, accounting for about one-fifth

of the U.S. home loan market.  An estimate of $1.3 trillion in subprime mortgages are currently

outstanding.

82.    The rapid growth of the subprime lending industry has been attributed to a

number of factors that occurred in 2004 and 2005.  These factors include rising home prices,

declining affordability, historically low interest rates, intense lender competition, innovations in

the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

83.    The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking yield through higher risk securitizations that allow financial institutions to access the capital markets to fund mortgage operations, while simultaneously transferring credit risk away from the institutions and to securitization investors. The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and nontraditional mortgages.

84.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation. As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

85.    Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs. Because of the affordability aspect already noted, borrowers increasingly turned to products such as payment option and interest-only (IO) loan structures in 2004 and 2005. These "nontraditional" mortgages are specifically designed to minimize initial mortgage payments by eliminating or relaxing the requirement to repay principal during the early years of the loan. Payment option and interest-only loans appear to have made up as much as 40 to 50% of all subprime and Alt-A loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from

10% in 2003. The majority of subprime originations over the past several years were "2/28 and 3/27" hybrid loan structures. These hybrid loans provide an initial fixed-rate period of two or three years, after which the loan converts to an adjustable-rate mortgage and the interest rate adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan. The 2/28 and 3/27 loan products accounted for almost three-quarters of subprime securitized mortgages in 2004 and 2005.

86.    Subprime lenders also eased lending standards to take advantage of these borrowers, including limited or no verification of borrower income and high loan-to-value transactions.

87.    In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular the eased lending standards. To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending. The Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting procedures, portfolio risk management, and consumer protection practices that institutions should follow to prudently originate and manage nontraditional mortgage loans. A major aspect of this guidance is the recommendation that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. The guidance also reminds institutions that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

88.    In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined and the rate of home price appreciation decelerated and in some cases home prices fell, leaving the most recent subprime borrowers vulnerable to payment difficulties. Subprime

borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in earlier years. Even borrowers with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

89.     Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders may have lowered their underwriting standards in the face of reduced borrower demand for credit.

90.     Instead of holding mortgage loans generally, lenders sold subprime mortgages that were bundled into pools of securities and offered them to individual and institutional investors.

91.     These pools of securities are called collateralized debt obligations ("CDOs"). A CDO is an investment-grade security backed by a pool of bonds, loans and other assets, such as mortgages

92.     In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency and during the first half of 2007, dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed.

93.     At all times relevant to this action, Lehman Brothers heavily underwrote risky pools of securities tied to subprime mortgages, using complex vehicles such as CDOs.

94.    Having invested hundreds of millions of dollars in securities backed by subprime mortgages which had become nearly worthless, Lehman Brothers was ultimately forced to announce substantial mortgage-related charges.

95.    Plaintiff allege that Defendants knew or should have known that the Plan's heavy investment in Lehman Brothers Stock was imprudent since Lehman Brothers was encountering enormous and very serious problems as a result of its significant investments in CDOs and other similar vehicles, as well as internal control and risk management failures.  As a consequence of those company-specific problems, which were not adequately or completely disclosed to the market or the participants in the Plan, investment in Lehman Brothers Stock was exceedingly risky and the Company's stock was artificially inflated.

**B.    Lehman Brothers' Involvement in the Subprime Industry**

96.    Over the past decade, Lehman Brothers became a major player in the mortgage market and in underwriting securities backed by subprime mortgages.  The Company was heavily invested in CDOs and purchased several mortgage originators to fuel its securitization of mortgage-backed CDOs.  In 2004, Lehman Brothers purchased BNC Mortgage LLC, which was lending more than $1 billion per month as of the first quarter of 2006.  Yalman Onaran, *Lehman Brothers Fault-Finding Points to the Last Man Fuld as Shares Languish*, *Bloomberg News*, July 22, 2008 ("Lehman Fault Finding").  By 2006, Lehman Brothers was the top underwriter for subprime mortgage-backed securities, with a roughly 11 percent market share.  Jenny Anderson and Vikas Bajaj, *Lehman Brothers Closes Subprime Unit and Lays Off 1,200*, New York Times, Aug. 23, 2007.  Lehman Brothers also bought mortgage lender Aurora Loan Services, LLC, which provides "Alt-A Loans" (loans that are not considered subprime, but are made without full documentation of assets).  Aurora originated more than $3 billion per month in loans in the first half of 2007.  Yalman Onaran, Lehman Fault-Finding, *Bloomberg News,* July 22, 2008.

97.    Lehman Brothers' appetite for accumulating subprime debt continued throughout the market collapse of 2007 and 2008, during which it continued to aggressively underwrite mortgage-backed securities, accumulating an $85 billion portfolio. *Id.*

98.    Despite the fact that Defendants knew, or should have known, about the Company's deteriorating mortgage portfolio and serious financial problems, Defendants failed to disclose materially adverse facts to the market and Plan participants throughout the Class Period. The Complaint alleges that throughout the Class Period, Defendants negligently failed to disclose the following materially adverse facts which seriously impacted the overall health of the Company: (1) the full extent of the Company's exposure to losses incurred from trading in subprime mortgage backed derivatives; (2) the extent of the Company's exposure to losses incurred from mortgage-backed securities, including its failure to timely write-down its positions in these securities; (3) the nature and extent of its exposure to losses incurred from mortgage-backed security originations, including its failure to timely write-down its positions in these securities; (4) that the Company had materially overvalued its positions in commercial and subprime mortgages, and in securities tied to these mortgages; (5) that the Company had inadequate reserves for its mortgage and credit related exposure; (6) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and (7) that the Company lacked adequate internal and financial controls.

**C.    Defendants Touted Lehman Brothers Financial Health to the Plan Participants**

> *1.    Fall 2006 – Warning Signs of Trouble in The Subprime Market And Lehman Brothers Fails to Adequately Take Actions to Protect Plan Participants.*

99.    Despite that Defendants knew or should have known about Lehman Brothers' risky business practices and artificially inflated stock during the Class Period, the Company fostered a positive attitude toward Lehman Brothers Stock as a Plan investment. Management

- 25 -

touted strong Company performance and stock benefits. Employees were continually told positive news by Company executives about Lehman Brothers' growth, and were led to believe that Lehman Brothers Stock was a good investment.

100. Moreover, Lehman Brothers publicly and repeatedly highlighted favorable operating results, favorable revenue growth trends, and other positive financial indicators, which were later found to be misleading.

101. For example, on September 13, 2006, the beginning of the Class Period, Defendants issued a press release "Lehman Reports Third Quarter Results; Reports Net Income of $916 Million and Net Reserves of $4.2 Billion." The release stated:

> Lehman Holdings Inc. (ticker symbol: LEH) today reported net income of $916 million for the third quarter ended August 31, 2006, or $1.57 per common share (diluted), representing increases of 4% and 7% respectively, from net income of $879 million, or $1.47 per common share (diluted), reported for the third quarter of fiscal 2005. Second quarter fiscal 2006 net income was $1.0 billion, or $1.69 per common share (diluted).

Lehman Brothers' continued its rosy outlook telling the market, and in turn Plan participants:

> *Fixed Income Capital Markets net revenues increased 6% to $2.0 billion in the third quarter of fiscal 2006 from $1.9 billion in the third quarter of 2005, reflecting record results in real estate and strong results in foreign exchange products, partially offset by lower performances within mortgages, high yield and interest rate products. Id.* [Emphasis added].

102. Yet, while Lehman Brothers was discussing the strength of its subprime business, it was well aware of the growing warning signs that the Company's mortgage business was in serious trouble. For example, on July 22, 2008 *Bloomberg News* reported:

> Toward the end of 2006, people familiar with Lehman's risk management operations say, executives at the firm started seeing trouble in the mortgage market. The securitization division raised rates on its bonds to reflect higher risk, which meant higher interest on loans Lehman's mortgage units made to home owners. When that didn't slow borrowing, lending standards were tightened, a

- 26 -

decision that was met with resistance by BNC and Aurora executives whose fees depended on volume, the people say.

Yalman Onaran, Lehman Fault-Finding, *Bloomberg News,* July 22, 2008.

103.    Put another way, as far back as 2006, executives at Lehman Brothers were sending the Company internal signals regarding debt exposure problems stemming from its mortgage portfolio. Yet, despite these warning signs, Defendants took no measures to properly advise Plan Participants of the looming danger associated with their investment in Lehman Brothers Stock, thereby breaching their fiduciary duties to the Plan participants.

104.    Lehman Brothers breaches of fiduciary duty continued throughout late 2006. Specifically, on December 14, 2006, Defendants issued a press release titled "Lehman Reports Record Net Revenues, Net Income and Earnings Per Share for Fiscal 2006; Reports Record Quarterly Net Revenues for the Fourth Quarter of 2006.". The release stated, in relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $1.0 billion, or $1.72 per common share (diluted), for the fourth quarter ended November 30, 2006, representing increases of 22% and 25%, respectively, from net income of $823 million, or $1.38 per common share (diluted), reported for the fourth quarter of fiscal 2005. Third quarter fiscal 2006 net income was $916 million, or $1.57 per common share (diluted).
>
> * * *
>
> Capital Markets net revenues increased 28% to $3.0 billion in the fourth quarter of fiscal 2006 from $2.4 billion in the prior year's fourth quarter on strong performances from both Fixed Income and Equities Capital Markets. *Fixed Income Capital Markets reported its second highest revenue quarter, an increase of 31% from the fourth quarter of fiscal 2005, reflecting strong levels of client activity, as well as improved results in credit products.* (Emphasis Added).

Based on this news, Lehman Brothers' Chairman and Chief Executive Officer, Richard S. Fuld, Jr. ("Fuld") told Plan Participants:

> Once again, we have achieved outstanding results across all our business segments and geographic regions this year. Our record

- 27 -

performance is the result of our client-focused strategy and our continued investment in strategic areas that enable us to deliver the best capabilities, intellectual capital and solutions to our clients. As always, our success is a tribute to how well our people continue to work together across the Firm to deliver superior value to our clients and shareholders.

105.    Unbeknownst to Plan participants, however, in the face of this glowing report Lehman Brothers implemented tactics specifically designed to offset its exposure to bad subprime debt that it knew, or should have knows, was on the horizon. Specifically, in late 2006, on information and belief, Lehman Brothers implemented a strategy to allow certain traders to short impending mortgage losses. As *Bloomberg News* reported, "By the end of 2006, Lehman started hedging against its mortgage exposure. Some traders were allowed to bet against the prices of home loans by shorting indexes tied to mortgage securities." Lehman Fault-Finding, *Bloomberg News*, July 22, 2008.

106.    Thus, by the end of 2006, Lehman Brothers had clear warning signs that an inevitable subprime collapse loomed on the horizon. Armed with this knowledge, Defendants did not take adequate actions to protect the Plan participants.

2.    *2007 – The Warning Signs of 2006 Become the Storm Clouds of 2007.*

107.    As the subprime market teetered on collapse, Lehman Brothers continued to tell the market and Plan that the Company's financial health was robust. For example, on March 14, 2007, the Company issued a press release titled "Lehman Brothers Reports First Quarter Results; Reports Record Net Revenues, Net Income, and Earnings Per Share." The release stated, in relevant part:

Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.15 billion, or $1.96 per common share (diluted), for the first quarter ended February 28, 2007, representing increases of 6% and 7%, respectively, from net income of $1.09 billion, or $1.83 per common share (diluted), reported for the first quarter of fiscal 2006. Fourth quarter fiscal

2006 net income was $1.00 billion, or $1.72 per common share (diluted). The 2006 first quarter results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.

\* \* \*

Capital Markets reported record net revenues of $3.5 billion in the first quarter of fiscal 2007, an increase of 15% from $3.0 billion in the first quarter of fiscal 2006, *driven by strong performances in both Fixed Income and Equities Capital Markets. Fixed Income Capital Markets reported net revenues of $2.2 billion, its second highest revenue quarter and an increase of 3% from $2.1 billion in the first quarter of fiscal 2006,* reflecting record results in credit products as well as a strong performance in real estate, partially offset by declines in securitized products due to weakness in the U.S. residential mortgage sector and in interest rate products. [Emphasis added].

In response to this news Fuld publicly downplayed the "decline" in the U.S. mortgage market and continued to tout the Company's financial status, "[O]ur results clearly demonstrate that we are better positioned than ever to create value for our clients and our shareholders."

108.    Behind the scenes, however, senior level executives at Lehman Brothers were becoming more vocal regarding mounting concerns with Lehman Brothers' mortgage portfolio. For example, on information and belief, Michael Gelband a senior executive in charge of fixed income (i.e. subprime debt) cautioned the Company from taking more risk in the subprime field. In response to this advice, the Company fired him. As *Bloomberg News* reported: "[a]t least two executive who urged caution were pushed aside . . . [M]ichael Gelband, 49, who ran fixed income . . . was pushed out altogether in May 2007 after he balked at taking more risk . . ." Lehman Fault-Finding, *Bloomberg News*, July 22, 2008.

109.    Put another way, while Fuld publicly proclaimed that Lehman Brothers was "better positioned than ever," it was terminating senior executives who expressed concern

regarding its exposure associated with its subprime portfolio. Despite these clear warning signs, Lehman Brothers negligently failed to take proper action to alter Plan investment strategies.

110.    On June 12, 2007, the Company issued a press release entitled "Lehman Brothers Reports Record Quarterly Results; Reports 25% Increase in Net Revenues, 27% Increase in Net Income and 31% Increase in Earnings Per Share from the Second Quarter of 2006." The Company stated, in relevant part:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.3 billion, or $2.21 per common share (diluted), for the second quarter ended May 31, 2007, representing increases of 27% and 31%, respectively, from net income of $1.0 billion, or $1.69 per common share (diluted), reported for the second quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 increased 11% and 13%, respectively, from net income of $1.1 billion, or $1.96 per common share (diluted), reported for the first quarter of fiscal 2007.
>
> * * *
>
> Capital Markets reported record net revenues of $3.6 billion in the second quarter of fiscal 2007, an increase of 17% from $3.1 billion in the second quarter of fiscal 2006, driven by a record performance in Equities Capital Markets. *Fixed Income Capital Markets reported net revenues of $1.9 billion, a decrease of 14% from $2.2 billion in the second quarter of fiscal 2006, as strong client demand across most products and increased real estate and credit product revenues were more than offset by continued weakness in the U.S. residential mortgage business and decreased revenues in the Firm's municipal and interest rate products businesses.* [Emphasis added].

Commenting on this news Fuld said, in relevant part, "For the first six months of fiscal 2007, the Firm reported *record net revenues* of $10.6 billion, an increase of 19% from $8.9 billion for the first half of fiscal 2006." [Emphasis added].

111.    Thus, despite acknowledging "continued weakness in the U.S. residential mortgage business" Defendants failed to take appropriate actions to protect the Plan's

# EXHIBIT G

(PART 2 OF 2)

participants or alert Plan Participants of the seriousness of the Company's exposure related to its subprime holdings.

112.   On July 10, 2007, Lehman Brothers' subprime portfolio began to unravel. Specifically, the Company filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q revealed that the Company had "unrealized" losses of $459 million in that quarter from mortgages and mortgage-backed assets in its inventory.

113.   That same day *Bloomberg News* published an article entitled "Lehman Brothers Leads Brokerage Stocks Lower After S&P Subprime Warning." The article, in relevant part, stated:

> Lehman Brothers Holdings Inc. led declines in shares of U.S. securities firms after Standard & Poor's said it may cut ratings on $12 billion of bonds backed by subprime mortgages, a move that could shave trading profits.
>
> * * *
>
> Some insurers and pension funds are required to sell bonds when they're downgraded, potentially depressing prices of $800 billion in subprime mortgage bonds and $1 trillion of collateralized debt obligations, which repackage mortgage bonds into new securities. Lehman and other Wall Street firms have seen their revenue from fixed-income trading and sales drop in the second quarter, mostly due to weakness in mortgages.
>
> "Downgrades further hurt the mortgage bond business of the securities firms," said David Hendler, an analyst at CreditSights Inc. "Although they've fallen a lot already and the rating agencies usually are behind the curve, their downgrades bring down prices more."
>
> S&P said today that it's preparing to lower the ratings on 2.1 percent of the $565.3 billion of subprime bonds issued in late 2005 through 2006 because of a worse-than-anticipated U.S. housing slump. The company said it's also reviewing the "global universe" of collateralized debt obligations, or CDOs, that contain subprime mortgages, which are loans to the least creditworthy borrowers.

114.    In response to this news, as opposed to clearly and unambiguously informing the Plan participants of the level of its exposure to shaky subprime investments, Lehman Brothers took the exact opposite approach; namely, it obfuscated the totality of its exposure. Specifically, on July 18, 2007, *Bloomberg* published an article entitled "Lehman Brothers Says Subprime Speculation 'Unfounded.'" The article, in relevant part, stated:

> *Lehman Brothers Holdings Inc., the largest underwriter of U.S. mortgage bonds, denied speculation that it may face greater potential losses from subprime mortgages than previously disclosed.*
>
> Speculation about a planned announcement from Lehman Brothers related to its subprime holdings spurred investors to demand higher premiums to insure against the risk of owning Wall Street firms' bonds and helped prompt gains in Treasuries, according to traders including Thomas Tucci, head of U.S. government bond trading at RBC Capital Markets in New York.
>
> *"The rumors related to subprime exposure are unfounded,"* Lehman spokeswoman Kerrie Cohen said today.    [Emphasis added].

115.    In other words, at the very time Defendants should have been informing the Plan participants of the scope of its subprime investments, the Company took the exact opposite approach describing the looming crisis as "unfounded." At best Defendants' tactics were a breach of fiduciary duty under ERISA.

116.    On July 31, 2007, *Bloomberg* published an article entitled "Bear, Lehman Brothers, Merrill, Goldman Traded as Junk, Derivatives Show." The article, in relevant part, stated:

> On Wall Street, Bear Stearns Cos., Lehman Brothers Holdings Inc., Merrill Lynch & Co. and Goldman Sachs Group Inc., are as good as junk.
>
> *Bonds of U.S. investment banks lost about $1.5 billion of their face value this month as the risk of owning the securities increased* the most since at least October 2004, according to Merrill indexes. *Prices of credit-default swaps based on the debt imply that their*

> *credit ratings are below investment grade, data compiled by*
> *Moody's Investors Service show.*
>
> *The highest level of defaults in 10 years on subprime mortgages*
> *and a $33 billion pileup of unsold bonds and loans for funding*
> *acquisitions are driving investors away from debt of the New York-*
> *based securities firms.*   Concerns about credit quality may get
> worse because banks promised to provide $300 billion in debt for
> leveraged buyouts announced this year.
>
> * * *
>
> *Prices of credit-default swaps for Goldman, the biggest investment*
> *bank by market value, Merrill, the third largest, and Lehman*
> *Brothers, the No. 1 mortgage bond underwriter, also equate to a*
> *Ba1 rating, data from Moody's credit strategy group show. Bonds*
> *of New York-based Goldman and Merrill are rated Aa3, seven*
> *levels higher than swaps suggest. Lehman Brothers is rated A1, the*
> *same as Bear Stearns.* [Emphasis added].

117.    On information and belief, ignoring its fiduciary obligations, Lehman Brothers

played the equivalent of a shell game in an effort to further obfuscate the extent of its total risk.

For example, On August 2, 2007, *The Wall Street Journal* published an article entitled

"Subprime Detectives Search in Dark for Next Victim – Wall Street Can Bury Mistakes in Fine

Print." The article, in relevant part, stated:

> The mystery of "where are the losses?" has confounded hedge
> funds searching for opportunities to bet against banks whose day of
> reckoning has yet to come.
>
> *"We've been looking for financials that show losses from these*
> *securities on their books, and they've been very difficult to find,"*
> says Keith Long, president of Otter Creek Management, a hedge
> fund in Palm Beach, Fla., with $150 million in assets. "It's very
> opaque."
>
> Investors have long complained about the lack of transparency
> when it comes to huge financial firms, *whose balance sheets are so*
> *big that they can easily mask multimillion-dollar gains or losses.*
> Analysts and investors currently cite several potential factors that
> could help hide subprime wounds.. [Emphasis added].

On information and belief, Lehman Brothers was engaged in similar efforts to "mask" the extent

of its subprime exposure. For example, *Bloomberg News* later reported that, "Lehman's hedges

helped offset losses in the second half of 2007 and the first quarter of 2008. While the firm wrote down the value of mortgage-related assets *by more than $10 billion,* the net reduction to profit was only $3.3 billion." Lehman Fault Finding, *Bloomberg News,* July 22, 2008. In short, Defendants used a "gain" from one area to offset the totality of a "loss" in another, all the while continuing to assure the Plan's participants that Lehman Brothers Stock was a prudent investment.

118. On August 10, 2007, Business Week published an article entitled "Subprime Woes Wallop Wall Street Firms." The article, in relevant part, stated:

> As more news about the looming credit crunch slapped major stock indexes lower on Thursday, the U.S.'s big investment banks got hit even harder. . . . *(LEH) dropped more than 7%.* Market anxiety had already caused financial stocks to drop more than 5% in the last month.
>
> * * *
>
> *One problem for big investment banks and hedge funds is they reveal very little to the public or investors about their internal holdings. "We don't know how many hidden skeletons there are in anybody's closet,"* Larkin says. [Emphasis added].

119. On September 18, 2007, the Company issued a press release entitled "Lehman Brothers Reports Third Quarter Results; Reports Net Income of $887 Million and Net Revenues of $4.3 Billion." The press release, in relevant part, stated:

> Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $887 million, or $1.54 per common share (diluted), for the third quarter ended August 31, 2007, representing decreases of 3% and 2%, respectively, from net income of $916 million, or $1.57 per common share (diluted), reported for the third quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 were $1.3 billion and $2.21, respectively.
>
> ***
>
> Capital Markets reported net revenues of $2.4 billion for the third quarter of fiscal 2007, a decrease of 14% from $2.8 billion in the third quarter of fiscal 2006. *Fixed Income Capital Markets*

- 34 -

> reported net revenues of $1.1 billion, a decrease of 47% from $2.0
> billion in the third quarter of fiscal 2006, primarily due to lower
> performances within Credit and Securitized Products. Within
> Fixed Income Capital Markets, the Firm recorded very substantial
> valuation reductions, most significantly on leveraged loan
> commitments and residential mortgage-related positions. These
> losses were partially offset by large valuation gains on economic
> hedges and other liabilities. The result of these valuation items
> was a net reduction in revenues of approximately $700 million.
> [Emphasis added].

120.    During this same time period, unbeknownst to the Plan's participants, Lehman

Brothers' executives were cautioning against continued hedging against the Company's

mortgage positions. Specifically, Madelyn Antoncic, the former head of risk at Lehman

Brothers, "[w]as moved to a government relations job in September 2007" after warning

Company officials "[t]hat hedging mortgage positions had curtailed Lehman's profit . . ."

Lehman Fault Finding, *Bloomberg News*, July 22, 2008. In short, Lehman Brothers squeezed out

or reassigned critics of the Company's tactics related to its subprime investments. Worse, during

the entire time period, Defendants failed to take appropriate actions to protect the Plan

participants, and instead continued to tout the purchase of Company stock as a prudent

investment.

121.    On December 13, 2007, the Company issued a press release entitled "Lehman

Brothers Reports Record Net Revenues, Net Income and Earnings Per Share for Fiscal 2007;

Reports Net Income of $886 Million and Net Revenues of $4.4 Billion for the Fourth Quarter of

Fiscal 2007." The press release, in relevant part, stated:

> Lehman Brothers Holdings Inc. (NYSE: LEH) today reported net
> income of $886 million, or $1.54 per common share (diluted), for
> the fourth quarter ended November 30, 2007, representing
> decreases of 12% and 10%, respectively, from net income of $1.0
> billion, or $1.72 per common share (diluted), reported for the
> fourth quarter of fiscal 2006. For the third quarter of fiscal 2007,
> net income was $887 million, or $1.54 per common share
> (diluted).

* * *

Net revenues (total revenues less interest expense) for the fourth quarter of fiscal 2007 were $4.4 billion, a decrease of 3% from $4.5 billion reported in the fourth quarter of fiscal 2006 and an increase of 2% from $4.3 billion reported in the third quarter of fiscal 2007. Capital Markets net revenues decreased 10% to $2.7 billion in the fourth quarter of fiscal 2007 from $3.0 billion in the fourth quarter of fiscal 2006. Fixed Income Capital Markets reported net revenues of $860 million, a decrease of 60% from $2.1 billion in the fourth quarter of fiscal 2006, due to the very challenging markets experienced during the period, although strong results from client activity were reported in the Foreign Exchange and Commodities businesses. Fixed Income Capital Markets recorded negative valuation adjustments on trading assets, principally in the Firm's Securitized Products and Real Estate businesses. These valuation adjustments were offset, in part, by valuation gains on economic hedges and liabilities, as well as realized gains from the sale of certain leveraged loan positions, resulting in a net revenue reduction in Fixed Income Capital Markets of approximately $830 million.

122. Thus, in the wake of an uproar of concerns regarding the collapse of the subprime markets, Lehman Brothers continued to assure the market and Plan participants of the continued viability of Lehman Brothers Stock and of the fact that the Company would remain virtually unscathed by the subprime crisis, despite the Plan's material investment in Lehman Brothers Stock.

**D.     Lehman Brothers' Failure to Disclose the Full Extent of its Losses Caused Investors to Lose Confidence in the Value of its Stock**

123. Throughout the Class Period, Lehman Brothers was aware of the risk associated with its subprime and mortgage investment portfolio. Despite that risk, Lehman Brothers failed to adequately inform the Plan participants (or for that matter the market) that the Company's subprime investments were in grave danger. Ultimately, Lehman Brothers' belated and partial disclosures rocked investor confidence. By the end of the Class Period, Lehman Brothers Stock was trading at an all-time low, at approximately $18 per share, down from a high of over $70 per share at the beginning of the Class Period. Defendants breached their fiduciary obligations they

- 36 -

owed to the Plan and Plan participants by failing (or refusing) to inform Plan participants of the full scope of the volatility of its subprime investments; knowledge Defendants possessed or should have possessed, as far back as 2006.

124.    On a March 13, 2008 First Quarter Earnings Conference Call with analysts, CFO Erin Callahan informed investors of the following related to the Company's Level 3 Assets (Level 3 Assets are assets that have no reliable market price):

> In terms of level 3 assets, we expect a slight increase for the quarter to 39 billion. This represents 5% of total assets. So that's a rather detailed summary of our exposure. I wanted to give you that color, and wanted to give you some sense of why current dislocations in the market did significantly impact us, as we play in all of these asset classes. So our mark-to-market volatility is significant, we believe a significant portion of this is related to the liquidity.

Yet, even after acknowledging this problem, Defendants, as Plan fiduciaries, failed to properly take actions to protect the Plan and Plan participants.

125.    Instead, on information and belief, in an effort to buoy investor confidence, Lehman Brothers engaged in strategy to artificially lower its Level 3 assets by diverting them to hedge fund investments. Specifically, on the Company's First Quarter Form 10-Q filed with the SEC on May 13, 2008, Lehman Brothers listed Level 3 assets at $37.911 billion-- $1.1 billion less than asserted in the Earnings Call.

126.    On information and belief, the missing $1.1 billion was diverted to a new hedge fund in which Lehman Brothers owned a minority interest. Specifically, on July 3, 2008 *Bloomberg News* reported on the Company's investment in R3 Capital Partners stating:

> You don't need to know much more about Lehman's transactions with the fund, R3 Capital Partners, to see the problem.
>
> There's no way for outsiders to ascertain whether Lehman's dealings with R3 were at arm's length, as Lehman and R3 say they were. And the last thing Lehman needs is for skeptical investors to

be worrying about whether it is engaging in any opaque related-party transactions.

Lehman isn't providing much information about its dealings with R3, and hasn't mentioned the fund in its Securities and Exchange Commission filings.

\*\*\*

As of June 12, one fund managed by R3 had raised $1.08 billion [the precise amount of the Company missing Level 3 assets] from a single unidentified investor and was seeking to raise $4 billion more from others, according to a Form D disclosure that R3 filed with the SEC.

Lehman has invested about $1 billion in R3, said Thor Valdmanis, a spokesman at R3's public relations firm, FD. (After he told me this, Valdmanis asked me not to use the information, saying he wasn't authorized to divulge it.)

Jonathan Weil, Lehman's Hedge-Fund Deals Leave Public in Dark, Bloomberg.com, July 3, 2008.

127.    Throughout the Class Period Defendants continued to peddle Lehman Brothers Stock as a strong investment for the Plan irrespective of the reality of the situation. This sentiment was reflected by the Company's CFO in its Fourth Quarter Earnings call for 2007 when she stated:

In general, as we have indicated, we have come through the current downturn very well positioned on a competitive basis. We believe we can capitalize on this opportunity for 2008.

Lehman Brothers' Earnings Call Q4 2007 at pg 8. Throughout the "downturn," the Company's stock fell from a high of over $70.00 per share to its current value of approximately $18.00 per share.

## IX.    CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

128.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. The Defendants breached their duties to prudently and loyally manage the Plan's assets because, during the Class Period, Defendants knew or should

- 38 -

have known that Lehman Brothers Stock was not a prudent investment for the Plan and knew or should have known that the value of Lehman Brothers Stock was exposed to an unacceptable risk of loss.

129.    Defendants' knowledge that the Lehman Brothers Stock was an imprudent investment is based on the fact that Defendants knew or should have known of the unsound business practices and risky lending activities and other misrepresentations alleged herein. Defendants failed to take adequate steps to prevent the Plan, and indirectly the participants, from suffering losses as a result of the Plan's investments in Lehman Brothers Stock.

130.    Upon information and belief, not one of the Defendants conducted an appropriate investigation into whether Lehman Brothers Stock was a prudent investment for the Plan in light of the Company's unsound business practices, risky lending activities and other related serious corporate misconduct, and given the fact that the Plan held enormous investments in Lehman Brothers Stock.  Moreover, not one of the Defendants provided the Plan's participants with information regarding the true nature of these business practices and the extraordinary risks that they presented to Lehman Brothers, such that the Plan's participants could make informed decisions regarding the Lehman Brothers Stock in the Plan.  Indeed, not one of the Defendants took any meaningful action to protect the Plan against the risk of enormous losses as a result of the Company's very risky and inappropriate corporate misconduct.

131.    On a Class-wide and Plan-wide basis the risk of an undiversified investment in Lehman Brothers Stock imposes a greater risk than that of other undiversified investments.

132.    The risk associated with the investment in Lehman Brothers Stock during this time of unsound business practices was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock.  This abnormal investment risk

could not have been known by the Plan's participants, and the Defendants knew or should have known that it was not known by them because the Defendant fiduciaries never disclosed it. This extraordinary risk made any investment in Company stock inappropriate and imprudent.

133.    Participants, even before placing any retirement savings in Lehman Brothers Stock, relied on the stability and financial viability of Lehman Brothers as the basis for their standard of living. The participants' salaries, healthcare and other benefits, as well as the participants' pension (if any) and retirement health insurance depended upon Lehman Brothers continued solvency and viability.

134.    Thus, one of the risks that could impair the participant's investment in Lehman Brothers Stock – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-Plan related retirement benefits. The risks are correlated and, if realized, would financially devastate most employees and participants in the Plan. Therefore, the Defendants had a heightened duty with regard to both the decision to continue investing in Lehman Brothers Stock as well as the duty to inform participants concerning the imprudence of investing in Lehman Brothers Stock.

135.    Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Lehman Brothers Stock was a prudent investment for the Plan; failed to develop appropriate investment guidelines for Lehman Brothers Stock; failed to divest the Plan of Lehman Brothers Stock; failed to discontinue further contributions of Lehman Brothers Stock to the Plan; failed to remove Lehman Brothers Stock as an investment option for the Plan; failed to either consult or appoint independent fiduciaries regarding the appropriateness of an investment in Lehman Brothers Stock; and failed to resign as fiduciaries of the Plan, if as a result of their employment by Lehman Brothers, they could not loyally serve the Plan and their

participants. In addition, these Defendants breached their fiduciary duties when they failed to prohibit any participant from making an "investment switch" into Lehman Brothers Stock. In fact, the Defendants continued to invest and to allow investment of the Plan's assets in Lehman Brothers Stock even though they knew or should have known that Lehman Brothers would be taking billions of dollars in losses to earnings to remedy its risky investment practices, resulting in a decrease in the value of Lehman Brothers Stock. No other Defendant fiduciary took any action to remedy the breaches set forth in this paragraph.

136.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plan's participants, made in their fiduciary capacity, which contained statements concerning Lehman Brothers Stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Lehman Brothers lending practices, Lehman Brothers earnings, and Lehman Brothers' profitability as detailed in this Complaint, that were contained in the following documents that, upon information and belief, were specifically incorporated into the SPD: SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports, Lehman Brothers' Annual Report, and the Plan's annual reports on SEC Form 11-K. In addition, the foregoing documents omitted, and continue to omit, material information concerning Lehman Brothers' financial performance, including Lehman Brothers' exposure to subprime mortgage-based securities. No Defendant took any action to remedy the breaches set forth in this paragraph.

137.    Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plan participants, well-recognized in the 401(k) and ESOP industry and trade press:

(a)    Out of loyalty, employees tend to invest in company stock;

(b)    Employees tend not to change their investment option allocations in the plan once made;

(c)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d)    Many employees do not recognize their exposure to massive loss from failing to diversify their investment.

138.    As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plan participants regarding the Plan's investment in Lehman Brothers Stock did not effectively inform the Plan participants of the past, immediate, and future dangers of investing in Lehman Brothers Stock.

139.    Based on their actual or constructive knowledge as set forth herein, Defendants knew about Lehman Brothers' risky exposure to the subprime credit market. Defendants knew or should have known of the affirmative misrepresentations made to Participants in the SEC documents and annual reports incorporated into the SPD. Defendants knew that the Plan participants lacked the knowledge that Defendants had or should have had concerning the unsound business practices and knew or should have known that the Plan participants would be harmed by this lack of knowledge. Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the Plan participants the true nature, extent, and risks of these problems. Rather, Defendants failed to timely communicate accurate information to the Plan participants concerning Lehman Brothers true financial condition, including its risky exposure to the subprime credit market in prior periods, when they knew or should have known that the Plan

- 42 -

participants needed this information. Defendants and/or their individual fiduciary delegates, on a

Class-wide and Plan-wide basis, failed to provide the Plan participants with complete and

accurate information regarding Lehman Brothers Stock, such that the participants could

appreciate the true risks presented by investments in Lehman Brothers Stock and could make

informed decisions, thereby avoiding the unreasonable and entirely predictable losses incurred as

a result of the Plan's investment in Lehman Brothers Stock. No Defendant took any action to

remedy the breaches set forth in this paragraph.

140.    The Lehman Brothers Defendants and Board Defendants failed in their fiduciary

responsibilities in monitoring the Committee Defendants. The Lehman Brothers Defendants and

Board Defendants breached their fiduciary duties because they did not have procedures in place

so that they could review and evaluate on an ongoing basis whether the Committee Defendants

were performing their duties adequately and in accordance with ERISA's fiduciary provisions.

The Lehman Brothers Defendants and Board Defendants breached their fiduciary duty to remove

the Committee Defendants when they knew the Committee Defendants had breached their

fiduciary duties. The Lehman Brothers Defendants and Board Defendants failed to adequately

review the performance of the Committee Defendants to: ensure that they were fulfilling their

fiduciary duties under the Plan and ERISA; ensure that they had adequate information to do their

job of overseeing the Plan's investments; ensure that they had adequate access to and use of

impartial advisors when needed; and ensure that they reported regularly to the Board.

## X.    CAUSATION

141.    The Plan suffered massive losses because a substantial amount of the Plan's assets

were imprudently invested in Lehman Brothers Stock during the Class Period, and in breach of

Defendants' fiduciary duties.

- 43 -

142.   Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning Lehman Brothers Stock and divesting the Plan from Lehman Brothers Stock offered by the Plan when such investment became imprudent, the Plan would have avoided losses suffered in Lehman Brothers Stock.

143.   As a result of Defendants' actions, Plaintiff and the Class, which invested in Lehman Brothers Stock through the Plan, were wrongfully damaged, as the Plan suffered substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein. Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they would have taken steps to eliminate or reduce the amount of Lehman Brothers Stock held by the Plan, eliminated the option for participants to place funds in Lehman Brothers Stock, or fully disclosed the material adverse facts concerning Lehman Brothers Stock described herein. Plaintiff and the Class are entitled to the best alternative investment available to them under the circumstances, and the Plan would have achieved gains and avoided losses but for Defendants' breach of fiduciary duty as described herein.

## SECTION 404(c) DEFENSE IS INAPPLICABLE

144.   The Plan and the Plan's fiduciaries do not qualify for any affirmative defense based on ERISA Section 404(c) as the Plan did not satisfy the numerous stringent requirements of Section 404(c) and the Department of Labor Regulations promulgated there under, as set forth in 29 C.F.R. § 2550.404c-1. This is because Defendants, among other ERISA § 404(c) disclosure failures, failed to ensure effective participant control by providing complete and accurate material information to participants regarding Lehman Brothers Stock. See 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Lehman Brothers Stock as a result of

their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

145.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants.    Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plan suffer a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan and are not entitled to any protection under ERISA § 404(c).

146.    The losses suffered by the Plan and the Plan participants and beneficiaries, including Plaintiff and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein.    Plaintiff and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of Lehman Brothers risky and unsound business practices, as well as Defendants' continuing breaches of fiduciary duty in failing to disclose such material facts.

## XI.    REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

147.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the Plan's assets should not have been so heavily invested in Lehman Brothers Stock.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

148.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires

"any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

149.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

150.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan in the amount of the losses to the Plan resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and § 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

### COUNT I
### Failure to Prudently Manage the Plan's Assets;
### Breach of Fiduciary Duties in Violation of ERISA § 404
### (Against All Defendants )

151.    Plaintiff incorporates the foregoing paragraphs herein by reference.

152.    The Plan are governed by the provisions of ERISA, 29 U.S.C. § 1001, *et. seq.*, and Plaintiff and the Class are participants and/or beneficiaries in the Plan. Defendants are all fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They were thereby bound by the duties of loyalty, exclusive purpose, and prudence.

153.    Defendants named in this Count were each responsible, in different ways and degrees, for the Plan's investments in Lehman Brothers Stock.

154.    Under ERISA, fiduciaries who exercise discretionary authority or control over the management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to plan participants are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

155.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

156.    Defendants named in this Count were responsible for ensuring that investment in Lehman Brothers Stock was prudent and consistent with the purpose of the Plan. Defendants are liable for any and all losses incurred as a result of such investments being imprudent.

157.    During the Class Period, the Defendants named in this Count knew or should have known that Lehman Brothers Stock was not a suitable, prudent or appropriate investment for the Plan as described herein, irrespective of any duty of diversification that may exist. Notwithstanding this knowledge, these Defendants offered and continued to offer Lehman

Brothers Stock as investment options for the Plan and/or offered and continued to offer to direct and approve the investment in Lehman Brothers Stock.

158.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants named in this Count failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's participants and beneficiaries, from suffering losses as a result of the Plan's investments in Lehman Brothers Stock. The Defendants named in this Count knew or should have known that a prudent fiduciary acting under similar circumstances would have made different investment decisions with respect to the Lehman Brothers Stock and that continued investment in Lehman Brothers Stock was not in keeping with the Plan's settlors' expectation on how a prudent fiduciary would operate.

159.    The Defendants named in this Count had actual or constructive knowledge of the Company's serious mismanagement, risky exposure to the subprime credit market and other misrepresentations that impacted Lehman Brothers Stock as alleged in this Complaint. Despite this knowledge, they participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing the Plan participants that Lehman Brothers Stock was not a prudent investment.

160.    In addition to other breaches of fiduciary duty alleged in this Count, the Defendants committed the following fiduciary breaches: (a) failed to conduct an appropriate investigation into whether Lehman Brothers Stock was a prudent investment for the Plan; (b) failed to develop appropriate investment guidelines for Lehman Brothers Stock; (c) failed to divest the Plan of Lehman Brothers Stock; (d) failed to discontinue further Plan contributions to Lehman Brothers Stock; (e) failed to remove Lehman Brothers Stock as investment options of the Plan; (f) failed to either consult or appoint independent fiduciaries regarding the

- 48 -

appropriateness of an investment in Lehman Brothers Stock; (g) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Lehman Brothers Stock an unsuitable and imprudent investment for the Plan; and (h) failed to resign as fiduciaries of the Plan if, as a result of their employment by Lehman Brothers or its affiliates, they could not loyally serve the Plan and their participants. In addition, these Defendants breached their fiduciary duty when they failed to prohibit any participant in the Plan from making an "investment switch" into Lehman Brothers Stock.

161. As a result of the breach of fiduciary duties of the Defendants named in this Count, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

162. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA §409, 29 U.S.C. § 1109(a), Defendants named in this Count are personally liable to restore the losses to the Plan caused by their breach of fiduciary duty as alleged in this Count.

## COUNT II
### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against All Defendants)

163. Plaintiff incorporates the foregoing paragraphs herein by reference.

164. At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

165. During the Class Period, Defendants knew or should have known that Lehman Brothers Stock was not a suitable, prudent or appropriate investment for the Plan.

166. As alleged herein, the scope of the Defendants' fiduciary duties and responsibilities included drafting and disseminating Plan documents, SPDs and information to participants regarding the assets of the Plan.

- 49 -

167.    All Defendants had a duty to provide participants with information they possessed that they knew or should have known would have a material impact on the Plan.

168.    The duty of loyalty under ERISA requires the Defendants to speak truthfully to the Plan participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. The Defendants' duty of loyalty included not only the negative duty not to misinform, but also an affirmative duty to inform when the Defendants' knew or should have known that silence might be harmful. If a fiduciary knows that a material misrepresentation has been made to a Participant, that fiduciary, without regard to the functions that make that person a fiduciary, has an affirmative duty to correct that misrepresentation. Moreover, Defendants are required to provide each participant with sufficient information to make informed decisions with regard to investment alternatives available under the Plan, including Lehman Brothers Stock.

169.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan sponsor.

170.    This duty to inform participants included the Defendants' obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that participants can make informed decisions with regard to investment options available under the Plan. This duty applies to all of the Plan's investment options, including the Lehman Brothers Stock.

171.  Because a substantial percentage of the Plan's assets were invested in Lehman Brothers Stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Lehman Brothers Stock.

172.  Because of the disparity in knowledge between Defendants and the Plan participants, the participants relied on Defendants to provide them with accurate and complete information about Lehman Brothers, which was material to the suitability of Lehman Brothers Stock as a prudent investment option.

173.  The fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

174.  The Defendants breached their fiduciary duties by direct and indirect communications with the Plan participants, made in their fiduciary capacity, which contained statements concerning Lehman Brothers Stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Lehman Brothers' unsound business practices and Lehman Brothers' risky exposure to the subprime credit market as detailed in this Complaint.

175.  The Defendants breached their fiduciary duties not only with regard to the affirmative misrepresentations, but also because those documents omitted, and continue to omit, material information concerning Lehman Brothers' serious mismanagement, including Lehman

- 51 -

Brothers' risky exposure to the subprime credit market. In addition, the Defendants breached their fiduciary duties by conveying inaccurate information regarding the soundness or security of Lehman Brothers Stock and the prudence of investing retirement contributions in Lehman Brothers Stock.

176. All Defendants breached their fiduciary duty when they failed to provide Plan participants, on a Class-wide and Plan-wide basis, information regarding the imprudence of investing in Lehman Brothers Stock. All Defendants knew or should have known that the Plan participants lacked the knowledge that Defendants possessed concerning the imprudence of investing in Lehman Brothers Stock; knew or should have known that the Plan participants would be harmed by this lack of knowledge; and knew or should have known that material misrepresentations regarding Lehman Brothers Stock were made to the Plan participants. All Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the Plan's participants the true nature, extent, and risks of investing in Lehman Brothers Stock when they knew or should have know that investment in Lehman Brothers Stock was imprudent. Rather, all Defendants failed to timely communicate accurate information to the Plan participants concerning Lehman Brothers' risky exposure to the subprime credit market during the Class Period when they knew or should have known that the Plan participants needed this information.

177. As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses. If the Defendants had discharged their disclosure obligations prudently and in the sole interests of the Plan participants and beneficiaries, then losses suffered by the Plan would have been avoided or greatly minimized. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly

Plaintiff and the other Class members, lost hundreds of millions, if not billions of dollars of retirement savings.

178.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA §409, 29 U.S.C. § 1109(a), the Defendants are personally liable to the Plan for these losses incurred as a result of Defendants' misrepresentations to the Plan participants as well as their breach of the fiduciary duty to disclose and inform.

**COUNT III**
**Failure in Appointing and Monitoring Plan Fiduciaries;**
**Breaches of Fiduciary Duties in Violation of ERISA § 404**
**(Against the Board Defendants)**

179.    Plaintiff incorporates the foregoing paragraphs herein by reference.

180.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

181.    At all relevant times herein, the fiduciary duties of the Board Defendants included the power and responsibility to appoint, and the duty to oversee and thereby monitor the performance of the Committees.

182.    At all relevant times herein, the scope of the fiduciary duties of the Board Defendants included the oversight and the power and responsibility to appoint, and thereby monitor the performance of the Committees.

183.    During the Class Period, Defendants knew or should have known that Lehman Brothers Stock was not a suitable, prudent or appropriate investment for the Plan, as described herein.

184.    Under ERISA, a fiduciary with appointment powers must ensure that the appointed fiduciaries are performing their fiduciary obligations, including those obligations with respect to handling, holding and investing plan assets; and must take prompt and effective action

to protect the Plan and participants when the appointed fiduciaries are not meeting their fiduciary obligations.

185.   The appointing fiduciary must have procedures in place so that they may review and evaluate on an ongoing basis whether the appointed fiduciaries are doing an adequate job (including, for example, by requiring periodic reports on their work and the Plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need).   In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for (1) promptly and prudently concluding that their appointees were faithfully and effectively performing their obligations to the Plan participants; or (2) deciding whether to retain or remove their appointees.

186.   An appointing fiduciary must provide the appointed fiduciaries with all the information that they have or reasonably should have in order to prudently manage the Plan and the Plan's assets or that may have a material impact on the Plan and the fiduciaries' investment decisions regarding the Plan.

187.   The Board Defendants breached their fiduciary appointing and monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plan and manage their assets; (2) failing to adequately monitor their appointees, evaluate their performance, or have an adequate system in place for doing so, (and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent action); (4) failing to ensure that the appointed fiduciaries (although possessing actual knowledge of   unsound business practices and risky lending activities and other misrepresentations concerning Lehman Brothers Stock as alleged herein) understood the true extent of Lehman Brothers' risky exposure to the subprime credit market and its impact on the

value of Lehman Brothers Stock and the Plan's concomitant investment in Lehman Brothers Stock.

188.    The Board Defendants breached their fiduciary duty by failing to remove the appointed fiduciaries, as named herein, whose performance was inadequate.    The Board Defendants, knew that the appointed fiduciaries: (a) failed to conduct an appropriate investigation into whether Lehman Brothers Stock was a prudent investment for the Plan; (b) failed to develop appropriate investment guidelines for Lehman Brothers Stock; (c) failed to divest the Plan of Lehman Brothers Stock; (d) failed to discontinue further Plan contributions to Lehman Brothers Stock; (e) failed to remove Lehman Brothers Stock as investment options for the Plan; (f) failed to consult with or appoint independent fiduciaries regarding the appropriateness of an investment in Lehman Brothers Stock; (g) failed to prohibit any participant from making an "investment switch" into Lehman Brothers Stock; (h) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Lehman Brothers Stock an unsuitable or imprudent investment for the Plan; and (i) failed to inform the Plan participants that investment in Lehman Brothers Stock would not be prudent.

189.    As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.    Had Defendants named in this Count discharged their fiduciary duties as described above, the losses suffered by the Plan would have been averted or, at a minimum, lessened.    Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost hundreds of millions, if not billions of dollars of retirement savings.

190.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

191.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA §409, 29 U.S.C. § 1109(a), the Board Defendants are personally liable to restore the losses to the Plan caused by their failure to monitor and remove fiduciaries as alleged in this Count.

## COUNT IV
### Co-Fiduciary Liability;
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against all Defendants)

192.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

193.    At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

194.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he participates in, or undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) he fails to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities that give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he knew or should have known of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

195.    During the Class Period, Defendants knew that Lehman Brothers Stock was not a suitable, prudent or appropriate investment for the Plan as described herein.

**Failure to Remedy**

196.    ERISA § 405(a)(3), 29 U.S.C. § 1105(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

197.    The Board Defendants were aware that the Committee Defendants breached their fiduciary duties as alleged in Count I of the Complaint.  Despite this knowledge, the Board Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Lehman Brothers Stock, as well as other fiduciary breaches alleged in Count I.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3).  The actions that the Board Defendants could have taken, included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Lehman Brothers Stock to the Plan's participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (4) preparing to obtain an injunction from a Federal District Court.

198.    To the extent that it is determined that any Board Defendant and/or Committee Defendant did not breach his fiduciary duty as alleged in Count I of the Complaint, that Defendant was still aware that the remaining Defendants in Count I did, in fact, breach their fiduciary duties.  Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duties by failing to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Lehman Brothers Stock and other fiduciary breaches alleged in Count I.  Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that

- 57 -

the Defendant(s) could have taken included but are not limited to: objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board or Committee; disclosing the imprudence of the investment in Lehman Brothers Stock to Plan Participants; notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or preparing to obtain an injunction from a Federal District Court.

199.    To the extent that it is determined that any Defendant did not commit any of the fiduciary breaches as alleged in Count II of the Complaint, any such Defendant was still aware that the remaining Defendants named in Count II breached their fiduciary duties. Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duty by failing to undertake any effort to remedy the fiduciary breaches alleged in Count II, including the duty to remedy their co-fiduciaries' misrepresentations and their co-fiduciaries' breach of the affirmative duty to inform the Plan participants regarding the imprudence of investing in Lehman Brothers Stock. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Lehman Brothers Stock to the Plan Participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or (4) preparing to obtain an injunction from a Federal District Court.

**Enabling a Breach**

200.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2) also imposes co-fiduciary liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the

- 58 -

administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

201.    To the extent that it is determined that any Board Defendant or Committee Defendant lacked knowledge of the circumstances rendering the Plan's investment in Lehman Brothers Stock imprudent, then all other Defendants enabled the imprudent asset management decisions of that Defendant by failing to provide that Defendant with complete and accurate information regarding the Company's risky exposure to the subprime credit market and other misrepresentations concerning Lehman Brothers Stock. In failing to inform their co-fiduciaries, who lacked knowledge, if any, these Defendants breached ERISA § 405(a)(2).

202.    Through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint, the Board Defendants enabled the Committee Defendants imprudent management of Lehman Brothers Stock in the Plan.

203.    Further, through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged above, the Board Defendants and Committee Defendants enabled the remaining Defendants' imprudent management of Lehman Brothers Stock in the Plan.

204.    The Board Defendants' failure to monitor the Committee Defendants enabled the Committee Defendants to breach their duties.

205.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

206.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plan caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class; Declaring that Defendants, and each of them, are not entitled to protection under ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

B.    Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

C.    Compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made had Defendants fulfilled their fiduciary obligations;

D.    Awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.    Enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    Requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Lehman Brothers Stock;

G.    Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions set forth herein, pursuant to Fed. R. Civ. P. 64 and 65;

H.    Awarding the Plan and/or Plaintiff and members of the Class, restitution, disgorgement, and/or other remedial relief;

I.    Awarding the Plan and/or Plaintiff and members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

J.      Awarding such other relief as this Court may deem just and proper.

DATED:   July 25, 2008

Respectfully submitted,

MILBERG LLP

By:

Lori G. Feldman  LF 3478
Arvind B. Khurana  AK 3643
Sara Fuks  SF 6034
Jennifer Sosa  JS 0324
One Pennsylvania Plaza
New York, NY  10119-0165
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229
lfeldman@milberg.com
akhurana@milberg.com
sfuks@milberg.com
jsosa@milberg.com

*Attorneys for Plaintiff*

**ZIMMERMAN REED**
Timothy J. Becker
Kirsten D. Hedgberg
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400 (telephone)
(612) 341-0844 (facsimile)
TJB@zimmreed.com
KDH@zimmreed.com

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Gregg M. Fishbein
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401-2197
(612) 339-6900 (telephone)
(612) 339-0981 (facsimile)
gmfishbein@locklaw.com

**HARWOOD FEFFER LLP**
Robert I. Harwood
488 Madison Avenue, 8th Floor
New York, New York 10022
(212) 935-7400 (telephone)
(212) 753-3630 (facsimile)
rharwood@hfesq.com

*Of Counsel*

# EXHIBIT H

# MILBERG LLP

NEW YORK
LOS ANGELES
TAMPA

Bob Khurana
Direct Dial: 212.631-8615
akhurana@milberg.com

July 28, 2008

<u>VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

The Honorable Elaine L. Chao
Secretary of the U.S. Department of Labor
U.S. Department of Labor
200 Constitution Ave., NW
Washington, DC 20210

      Re:   *DeSousa v. Lehman Brothers Holdings, Inc., et. al.*
            <u>Notice of Filing of ERISA Class Action</u>

Dear Secretary Chao:

    Pursuant to 29 U.S.C. § 1132(h), we enclose a copy of an ERISA class action complaint filed in the Southern District of New York on behalf of our client.

                       Sincerely,

                       Arvind Khurana

Enc.

# EXHIBIT I

# MILBERG LLP

NEW YORK
LOS ANGELES
TAMPA

Bob Khurana
Direct Dial: 212.631-9615
akhurana@milberg.com

July 28, 2008

<u>VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED</u>

The Honorable Henry M. Paulson, Jr.
Secretary of the U.S. Department of Treasury
U.S. Department of Treasury
1500 Pennsylvania Ave., NW
Washington, DC 20220

      Re:    *DeSousa v. Lehman Brothers Holdings, Inc., et al.*
              Notice of Filing of ERISA Class Action

Dear Secretary Paulson:

    Pursuant to 29 U.S.C. § 1132(h), we enclose a copy of an ERISA class action complaint filed in the Southern District of New York on behalf of our client.

                  Sincerely,

                  Arvind Khurana

Enc.

## Milberg LLP

One Pennsylvania Plaza · New York, NY 10119-0165 · (212) 594-5300 · Fax: (212) 868-1229 · www.milberg.com